# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | } | |
| | } | |
| v. | } | Case No.: 2:07-cr-00243-RDP-JEO |
| | } | |
| WILLIAM MERRIWEATHER, JR., | } | |
| | } | |
| Defendant. | } | |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

Before the court is Defendant's Motion to Declare the Defendant Currently Incompetent to Stand Trial. (Doc. #65). After thoroughly considering the exhibits and testimony admitted into evidence during the hearing on Defendant's motion conducted from July 25, 2011 through August 3, 2011, the court file, and each party's written submissions, the court makes the following findings of fact and conclusions of law regarding Defendant William Merriweather, Jr.'s ("Merriweather") competency to proceed to trial.[1]

## I. FINDINGS OF FACT

### A.    Background (The Government's Allegations in the Indictment)

1.    On May 14, 2007, the Government alleges that Merriweather robbed the Bessemer, Alabama branch of Wachovia Bank. During the commission of that offense, Merriweather shot four

---

[1] The court is well aware that considerable time has passed since October 4, 2011, the date the parties completed their respective post-hearing briefing. At least in part, the delay has been occasioned by the difficult process of working through the evidence, evaluating the substance and import of expert opinion testimony, and resolving the direct and irreconcilable conflicts that have been produced by six medical professionals, three for each party. There is much at stake here. Among the most fundamental rights possessed by the accused is the right not to be tried for a serious crime unless one is competent to stand trial. As to this issue, the two sides are in utter disagreement about Defendant's mental state, and the court has no medical or psychiatric training. There are no easy answers. Therefore, as will be seen, the court has fallen back on the time-honored (and tested) methodologies utilized for evaluating the divergent testimony of those who appeared at the hearing including, but not limited to: the experts' opportunity to carefully and closely observe Defendant; the presence (or absence) of corroborative evidence; the expertise (and potential bias) of the witnesses; and the expert witnesses's demeanor during his/her testimony.

women, killing two of them and wounding the other two.  (Doc. #1 at 1-4).  Merriweather then grabbed approximately $11,255 in cash and exited the bank with a hostage, whom he used as a human shield.  (Doc. #4 (sealed) at 2).  While attempting to flee, Merriweather was shot by police officers, immediately apprehended, and given emergency medical care.  (Doc. # 4 (sealed) at 2).  Merriweather has remained in custody since that time.

**B.      Background Regarding Defendant Merriweather**

1.      William Merriweather was born the youngest of three children on May 20, 1976, in Birmingham, Alabama to William Merriweather, Sr. and On Sun Merriweather.  (Tr. Vol. II, 295; Doc. #24 at 5; Def. Ex. #7 at 1).  His mother was diagnosed with a brain tumor and died when Merriweather was three years old.  (Tr. Vol. II, 296).  Reportedly, prior to her death, Merriweather's mother suffered from depression and once attempted suicide.  (Tr. Vol. II, 296).  Shortly after On Sun's death, Merriweather's father married her younger sister, Kum Cha, and together they raised Merriweather and his siblings, along with two sons born to Kum Cha and Merriweather, Sr.  (Doc. #24 at 7; Def. Ex. #7 at 2).

2.      Despite the death of Merriweather's biological mother, it appears that Merriweather, Sr. and Kum Cha provided Merriweather and his siblings a stable home and childhood.  Merriweather, Sr. indicated that Merriweather "was very close to his stepmother."  (Doc. #24 at 6).  When asked to describe his childhood, Merriweather commented that "[e]verything was okay" and that he and his siblings "stayed out in the streets a lot, just playing."  (Doc. #24 at 5).  Merriweather believed that the household was financially "okay" and described his parents as supportive, though not emotionally supportive.  (Doc. #24 at 5).  He reported that his parents were strict in their

discipline, but denied any form of childhood physical abuse.  There were no signs of psychosis or any mental illness throughout Merriweather's childhood and adolescence.  (Tr. Vol. II, 335).

3.      Merriweather graduated from Jackson Olin High School in 1994, where he participated in football and ROTC.  (Tr. Vol. II, 296; Doc. #24 at 5).  After high school, he moved in with his sister, Euknesha Kim Patton ("Patton"), to study at Alabama State University in Montgomery, Alabama. (Tr. Vol. II, 296).  While living in Montgomery, Merriweather began dating Latisha Simpson in 1995. (Tr. Vol. III, 552).  Merriweather did not complete his education at Alabama State and instead moved back to Birmingham in 1996.  (Tr. Vol. II, 297).  In 2001, Merriweather enrolled in ITT Technical College in Birmingham, Alabama, where he took courses in electrical work.  (Tr. Vol. II, 298; Doc. #24 at 5).

4.      The record evidence demonstrates that Merriweather has used drugs and alcohol consistently since his adolescence.  Much of what is known about Merriweather's drug use is self-reported; but there have been enough corroborating sources that the court is convinced that Merriweather has participated in substantial drug use.  (Tr. Vol. I, 43; Doc. #24 at 6).

5.      According to Merriweather's testimony during his first mental capacity evaluation with Dr. Pietz, he began consuming alcohol at age 14 and using marijuana at age 17.  (Tr. Vol. I, 43). Merriweather reported that his illicit use of marijuana developed into a prolonged and extensive history of substance abuse and addiction, which involved the daily use of marijuana, and the frequent use of cocaine, crystal methamphetamine, alcohol, and ecstacy.  (Tr. Vol. I, 43). Merriweather began using cocaine at age 22, and he characterized that controlled substance as his drug of choice.  (Tr. Vol. I, 43).  Later, at around age 28, he began to use crystal methamphetamine frequently.  (Tr. Vol. I, 43). He also acknowledged using "various pills," "ecstacy," and shooting heroin intravenously.

3

(Tr. Vol. I, 43; Doc. #24 at 6).  Merriweather would use cocaine up to three times each day when it was available to him.  (Doc. #24 at 6).

6.      Merriweather's father described an incident where Merriweather confided in him that he was hearing voices.  Suspecting drug use, Merriweather's father asked Merriweather if he had been taking illicit drugs.  (Doc. #24 at 7).  Merriweather responded in the affirmative, which prompted Merriweather, Sr. to inform him that the voices should cease if Merriweather would stop taking drugs.[2]  (Doc. #24 at 7).  Merriweather's sister, Euknesha Kim Patton, recalled a similar experience that prompted her to ask Merriweather if he had been using drugs, and Merriweather admitted to her that he was.  (Tr. Vol. II, 301).

7.      Substances such as marijuana, cocaine, crystal methamphetamine, alcohol, and ecstacy can cause psychotic symptoms to develop and persist for years after drug use has ended.  (Tr. Vol. I, 40, 43, 121-22, 159, 163; Tr. Vol. IV, 604).

8.      While being treated at UAB Hospital for the gunshot wound following his arrest, Merriweather tested positive for opiates.  (Tr. Vol. I, 103-04; Def. Ex. #15 at 18).

9.      The earliest account of strange behavior exhibited by Merriweather comes from Latisha Simpson, who started dating Merriweather in 1995 when he moved to Montgomery to study at Alabama State University.  (Tr. Vol. III, 552).  Simpson testified at the hearing that Merriweather started to act oddly around 1996.  (Tr. Vol. III, 553).  For example, Simpson noted that Merriweather would laugh "at times when things weren't funny."  (Tr. Vol. III, 554).  She also recalled that Merriweather experienced "visions" and "hallucinati[ons]."  (Tr. Vol. III, 554).  Further questioning

---

[2] William Merriweather, Sr. stated this more succinctly: "I asked him are you taking something and he said yes and I said you stop taking what you taking and you stop hearing voices." (Doc. #24 at 7).

revealed, however, that to Simpson's understanding these "visions" and "hallucinati[ons]" meant bad dreams. (Tr. Vol. III, 554). She stated that Merriweather experienced those "all the time." (*Id.*). These bad dreams, Simpson testified, would cause Merriweather to wake up screaming on "several occasions." (*Id.* at 555, 566). Yet, in her affidavit (Def. Ex. #75 at 1), Simpson stated that Merriweather woke up screaming "on one occasion," a fact that she did not dispute at the hearing, but insisted that she meant to say "several occasions." These and other inconsistencies[3] lead the court to find Simpson's testimony to be of limited value.

        10.      Merriweather's family reportedly began observing unusual behavior by Merriweather a few years after he returned to Birmingham in 1996. Between late 2001 and early 2002, Euknesha Kim Patton, Merriweather's sister, received calls from family members informing her that Merriweather was acting strangely. (Tr. Vol. II, 299). This prompted Patton, who by her testimony had traveled to Birmingham to visit her family sometime in late 2001 or early 2002, to meet with Merriweather. (*Id.*). Patton testified that, during the meeting, Merriweather informed her that he was hallucinating, and seeing demons in everyone, including family members. (*Id.* at 299-300). According to Patton, Merriweather further confided in her that he felt that there was a conspiracy against his life, that he would see signs along the neighborhood and on television directed at him, that he was preoccupied with the letter "C," that he believed that the government planted a chip in

---

[3] For example, Simpson's recollection of her contact with Merriweather is incongruent with other record evidence, including her own prior statements. She maintained that she communicated with Merriweather five to six times a year between 1999 and 2011 (Tr. Vol. III, 565); but Simpson also affirmed that her last conversation with Merriweather occurred in April 2007 (*id.* at 564) and stated that she lost contact with him sometime before 2004, when Merriweather met her at her salon (*id.* at 559), which was the last time she saw him. (*Id.* at 564). Neither her last conversation nor her last meeting is mentioned in her sworn affidavit. (Tr. Vol. III, 565; Def. Ex. #75 at 1). Even if Simpson's conversations with Merriweather were as frequent as she previously reported, they apparently did little to inform Simpson about Merriweather's life subsequent to the end of their relationship in 1999 (or 2001, her testimony is unclear). (*Compare* Tr. Vol. III, 553 *with id.* at 559)); Simpson was unaware as to whether Merriweather was married and expecting children (Tr. Vol. III, 561) and also unclear as to where Merriweather worked (*id.* at 558).

his shoulder, and that he could hear his father's thoughts without his father speaking.  (Tr. Vol. II, 300).  At the end of their conversation, Patton asked Merriweather if he had been using substances, to which Merriweather responded that he had; however, according to Patton, Merriweather did not associate his experiences with a lack of rest, stress, or drug use.  (Tr. Vol. II, 301).

11.     Merriweather's family did not pursue medical treatment for Merriweather's behavior or his reported experiences.  (Tr. Vol. I, 27-28; Vol. II, 299-300, 335, 349-50; Doc. #24).

12.     Patton and her husband decided that it would be in Merriweather's best interest to invite Merriweather to return with them to Montgomery.  (Tr. Vol. II, 302).  Merriweather packed a bag and left with them that night.  (*Id*. at 303).  Merriweather left his car in Birmingham.  (*Id*. at 304).

13.     For approximately nine months, Merriweather stayed with his sister in Montgomery, sharing a bunk bed with Patton's two young children.  (Tr. Vol. II, 303).  During the first six months, Patton and her husband took precautions to restrict Merriweather's exposure to drugs and alcohol.  (*Id*.).

14.     According to Patton, Merriweather's paranoia persisted during his stay in her home.  Patton testified that Merriweather told her that he thought her 6 and 4-year-old sons were plotting to kill him because they were allegedly speaking in code.  (Tr. Vol. II, 305).  Merriweather similarly accused Patton and her husband of speaking in code with each other.  (*Id*. at 306).  Such incidents, however, did not seem to diminish Merriweather's ability to trust Patton with his life or Patton's ability to trust Merriweather with her young children.  Patton recounted that Merriweather would come into her bedroom to sleep at the foot of her bed, complaining that "he was seeing demons and

6

. . . hearing voices." (Tr. Vol. II, 306). Patton and her husband "would tap him on the shoulder and ask him to go back to the boys' room." (*Id*.).[4]

15.     At the same time, Patton also testified that Merriweather's condition appeared to improve somewhat over the course of his stay with her. His conversations became more rational and he experienced fewer "acrimonious" situations after four months. (Tr. Vol. II, 310). Patton attributed this to Merriweather's church participation. (*Id*.).

16.     Merriweather eventually moved out of Patton's home to live with Alecia Smith, a former girlfriend (Tr. Vol. II, 307, 314). Merriweather took a position working with the Department of Corrections in Montgomery. (*Id*. at 312). The job lasted approximately sixty days. (*Id*.). Merriweather and Smith broke up after several months and Merriweather moved into a separate apartment, but he was evicted from that residence after six months. (*Id*. at 313-14).

17.     Patton and her husband took Merriweather back into their home in 2003. (Tr. Vol. II, 315). Merriweather stayed in his sister's home for another three to four months. (*Id*.).

18.     This final stay in his sister's home proved more fractious than Merriweather's prior tenancy. Patton attested that she laid down several house rules Merriweather was expected to abide by during his stay: (1) he would not bring home visitors, (2) he would not smoke cigarettes in the house, (3) he would not bring alcoholic beverages into the house, and (4) he would clean up after himself. (Tr. Vol. II, 315). Merriweather broke all of these rules. (*Id*.). This prompted Patton and her husband to ask Merriweather to leave, which he did promptly.[5] (*Id*. at 316).

---

[4] The court has serious doubts about this testimony because the court questions whether Patton would have directed her brother back into her children's bedroom at night after he complained about "seeing demons" and "hearing voices."

[5] Patton could not recall the precise year when this happened. (Tr. Vol. II, 316).

19.     Patton testified that she continued to maintain contact with Merriweather and saw him the day before he robbed the Bessemer bank.  (Tr. Vol. II, 317).  She noted that Merriweather's appearance disturbed her.  (*Id.*).  He wore dirty clothes and his manner of dress was different.  (*Id.*).  He had shaved his eyebrows and his head except for a patch of hair at the top of his head.  (Tr. Vol. II, 317-18).  Patton also described finding Merriweather practicing martial arts, chanting "Shaolin Monk, Shaolin Monk."  (*Id.* at 319).

20.     On May 15, 2007, the day after the robbery, Merriweather was interviewed by detectives at the Jefferson County Jail.  (Def. Ex. #16 at 1).  During this interview, Merriweather's speech remained rational, coherent, and composed, which was surprising given that he had been shot the day before.  (Def. Ex. #16 at 3, 128).  His responses, however, were noticeably evasive.  On several occasions, Merriweather would try to delay answering a question.[6]  Merriweather professed to be ignorant of his mother's ethnicity.  (Def. Ex. #16 at 55).  At one point, Merriweather simply told the investigators that he intended not to cooperate.  (Def. Ex. #16 at 22) ("I'm going to look over here the whole time you're talking to me today.").

21.     During that post-arrest interview in the Jefferson County Jail, Merriweather repeatedly indicated to law enforcement that there was an accomplice, despite insistence by the detectives that video surveillance of the robbery revealed no other party to the robbery.  (Def. Ex. #16 at 19, 23, 27, 29).  Merriweather avoided naming the alleged accomplice, and provided an evasive reply when questioned directly.  (Def. Ex. #16 at 18) ("[Y]ou know, you can have all types of names.").  Merriweather never named the alleged accomplice at the interview.  Deeply skeptical

---

[6] Def. Ex. #16 at 12 ("I would have to tell you now?"); Def. Ex. #16 at 18 ("You want to do this now?"); Def. Ex. #16 at 25 ("Like I say, I don't want to talk about this now.").

about the existence of such an accomplice, one of the interviewers, Agent Paul Watson, informed Merriweather that the charade was a waste of time because if he were to "go back and tell [investigators], well, Charles,[7] was in the bank with [Merriweather]. . . then they're actually going to be wasting their time [looking] for somebody that may not exist."  (Def. Ex. #16 at 88).

**C.     Procedural History and Preliminary Proceedings**

1.     On June 27, 2007, Merriweather was indicted by the Grand Jury in the United States District Court for the Northern District of Alabama.  (Doc. #1).  The charges include allegations that Merriweather engaged in Armed Bank Robbery by Force or Violence Resulting in Death, as well as Armed Robbery with Forced Accompaniment in violation of 18 U.S.C. §§ 2113(a), (d) and (e); the Use or Carrying of a Firearm During a Crime of Violence (gun discharged) in violation of 18 U.S.C. § 924(c)(1)(A); and the Use or Carrying and Discharge of a Firearm in Relation to a Crime of Violence Resulting in Death in violation of 18 U.S.C. §§ 924(c) and (j).  (Doc. #1).  Merriweather has also been indicted by the State of Alabama on charges of Capital Murder, Attempted Murder, and Kidnapping in the First Degree.  (Doc. #4 at 3).

2.     During preliminary hearings for the state charges, the Defense notified the court that it intended to retain the services of a mental health professional.  (Doc #4 at 3; Doc #22 at 1). Anticipating that the Defense would raise mental health defenses, the United States interviewed Merriweather's family and friends.  (Doc # 4 at 3).  Based on this investigation, the United States filed a motion on July 13, 2007, requesting that the court order Merriweather to submit to a mental evaluation to determine his mental competency to stand trial and his mental state at the time of the offenses. (Doc. #4 (Under Seal) at 3-4; *see also* Docs. #22 at 2, #152 at 2).

---

[7] Agent Watson used the name "Charles" in his hypothetical to illustrate a point, and was not identifying an actual person.

3.      By that time, the Defense had already retained Dr. Kimberly Svec Ackerson, a local forensic psychologist, to evaluate Merriweather. (Doc. #22 at 2). Magistrate Judge John E. Ott was aware of this arrangement and deferred ruling on the Government's motion until after it received Dr. Ackerson's evaluation report. (*Id*.). Dr. Ackerson's evaluation report, which was completed following her last interview with Merriweather on September 24, 2007, was inconclusive. The report noted that Merriweather exhibited strong indicators of mental illness, but commented that Merriweather's self-admitted history of drug use "serves to complicate the clinical picture." (Def. Ex. #34 at 2). Moreover, Dr. Ackerson indicated that she was at an impasse with Merriweather, who refused to participate. (*Id*.). Dr. Ackerson strongly recommended that further evaluation be conducted at a facility that would be able to provide 24-hour observation with properly-trained mental health professionals available. (Def. Ex. #34 at 2).

4.      In light of Dr. Ackerson's recommendations, Judge Ott, in his October 12, 2007 order, referred Merriweather to the Bureau of Prisons for in-patient evaluation and treatment "to discern competency issues and to afford Defendant appropriate mental health treatment." (Doc. #22 at 3).

5.      From November 2, 2007 through January 14, 2008, Merriweather was housed at the United States Medical Center for Federal Prisoners in Springfield, Missouri ("MCFP Springfield") where he was evaluated by Dr. Christina Pietz. (Doc. #24). At the conclusion of Merriweather's stay at MCFP Springfield, Dr. Pietz issued two formal reports: (1) a report regarding Merriweather's competency to proceed to trial (Doc. #24 at 1-17), and (2) a report regarding Merriweather's mental state at the time of the crime. (*Id*. at 18-27). In Dr. Pietz's report regarding Merriweather's competency to stand trial, she acknowledged testimony from Merriweather's family describing

psychotic behavior, but concluded that such symptoms were best explained by Merriweather's illicit drug use. (*Id*. at 11-12). The report concluded that Merriweather "does not currently suffer from a mental illness" (*Id*. at 13) and that Merriweather "is currently competent to stand trial and make other decisions regarding his case." (*Id*. at 15).

6. After his mental evaluations were conducted at MCFP Springfield, Merriweather was returned to the Jefferson County Jail. (Doc. #7 at 4).

7. On June 3, 2008, the United States filed its formal Notice of Intent to Seek the Death Penalty. (Doc. #29). Pursuant to 18 U.S.C. § 3005, Judge Ott appointed Richard S. Jaffe and J. Derek Drennan to represent Merriweather. (Doc. #33; Doc. #36).

8. On November 10, 2008, almost a year after Merriweather's evaluation at MCFP Springfield was completed, Jaffe first expressed his concern to the Government that, based on information discovered by the Defense mitigation team, Merriweather was "decompensating"[8] and would not be competent to assist in his defense. (Doc. #70 at 5). Jaffe repeated his concerns on May 14, 2009, when he again informed the Government that Merriweather was decompensating and having "conversations in his head." (Doc. #70 at 5).

9. On December 9, 2008, Judge Ott granted the Defense's request for a mitigation investigator and a victim liaison. (Doc. #47).

10. On January 26, 2009, Dr. Richard G. Dudley, a psychiatrist retained by the Defense, interviewed Merriweather (Def. Ex. #9 at 2) and later produced an affidavit declaring his belief that

---

[8] "Decompensation" has been defined as a breakdown in the psychological defense mechanisms that help individuals maintain good mental functioning. Decompensation may occur under stress or in mental disorders such as anxiety, depression, or psychoses with hallucinations or delusions. ADA P. KAHN & JAN FAWCETT, THE ENCYCLOPEDIA OF MENTAL HEALTH 127 (1993).

Merriweather "is unable to understand the charges against him and is unable to assist his lawyers or [Dudley] with [Merriweather's] case." (Def. Ex. #66 at 1). On April 30, 2009, Dr. James Merikangas, another psychiatrist retained by the Defense, interviewed Merriweather for approximately one and a half hours (Tr. Vol. VII, 1128) and concluded in a two-sentence letter addressed to the Defense that Merriweather was incompetent to stand trial. (Doc. #66). The Defense did not notify the Government of either of those evaluations. (Doc. #70 at 6-7).

11.     Dr. Robert Hunter, a psychiatrist at the Jefferson County Jail, testified that he was called on two occasions to examine Merriweather in 2009. On April 16, 2009, Dr. Hunter was called to examine Merriweather after he fasted enough to slip through the food door, and was able to slide under the gate. (Tr. Vol. V, 886; Def. Ex. #36 at 1). After escaping his cell, Merriweather assaulted another prisoner. (*Id.*). Dr. Hunter testified that Merriweather was calm and cooperative during the interview and did not show any outward signs of psychosis. (Def. Ex. #36 at 1). During his second examination on July 31, 2009, however, Dr. Hunter testified that Merriweather's behavior was markedly different. (Def. Ex. #36 at 1). Merriweather was "paranoid and preoccupied with the idea that he was housed 'around homosexuals'" and his speech and thought processes "were rambling and at times disjointed." (*Id.*). Dr. Hunter described Merriweather as irritable and noted that he became increasingly hostile as the interview progressed, which forced Dr. Hunter to terminate the interview. (*Id*.).

12.     On August 5, 2009, the Defense moved to have Merriweather declared incompetent to stand trial and requested that he be remanded to the custody of the Attorney General to be placed in a federal mental health facility until competency was restored. (Doc. #65). In support of its motion, the Defense filed Dr. Merikangas's letter as a sealed ex parte pleading, effectively depriving

the Government of notice concerning both the existence of the evaluations and their use.  (Doc. #70 at 6-7).[9]

13.     Judge Ott conducted a telephone conference with the parties on August 10, 2009 to ascertain their positions regarding the motion.  (Doc. #70 at 7).  Apprehensive about the impartiality of the previously undisclosed psychiatrists hired by the Defense, the United States requested that Merriweather undergo another mental evaluation by the Bureau of Prisons to obtain a more current, less biased determination as to whether Merriweather had actually decompensated since his evaluation at MCFP Springfield.  (Doc. #70 at 7-8).

14.     The Defense responded with a request that the court appoint a private independent psychiatrist(s) — rather than the Bureau of Prisons — to evaluate Merriweather's competency due to allegations that Dr. Pietz was biased in favor of the Government. (Doc. #72).  The Defense also moved the court to exclude Dr. Pietz from participating in any future evaluations should the court nonetheless remand Merriweather to the Bureau of Prisons for reevaluation.  (Doc. #72).

15.     A hearing was convened on August 20, 2009 and the parties submitted post-hearing briefs. (Doc. #79 at 1-2).  After considering the respective arguments and applicable law, Judge Ott issued an order on November 16, 2009, directing that Merriweather undergo a new evaluation at the Federal Medical Center at Butner, North Carolina ("FMC Butner").  (Doc. #79).  At the insistence of Defense counsel, Judge Ott further ordered that all interviews with Merriweather be videotaped, and that the final report include input by a neuropsychiatrist and/or neurologist.  (Doc. #79 at 14).

---

[9] While the court cannot approve of these tactics, these facts do not affect the court's determination of the issue at stake here: whether Merriweather is competent to stand trial.

16.     From December 9, 2009, until April 18, 2011, Merriweather underwent an extended in-patient competency evaluation at FMC Butner.  (Tr. Vol. IV, 583).  During his 496-day stay at FMC Butner, Merriweather was kept under constant surveillance by staff members who checked on his condition every 15 minutes.  (Tr. Vol. IV, 584).

17.     Merriweather's behavior during his time at FMC Butner appears to have been stable. According to Eugene Singleton, a federal corrections officer who saw Merriweather on a regular basis, Merriweather had the calm demeanor of an ordinary inmate doing his time.  (Tr. Vol. VIII, 1265-66).  Singleton never observed Merriweather reacting to hallucinations or paranoid delusions. (*Id.*).  Merriweather was never aggressive or rude toward the corrections officers.  (Tr. Vol. VIII, 1267).  Merriweather generally spent his time sleeping, but he would chat from time to time with Singleton when he made his periodic rounds, sometimes requesting peanut butter, or a magazine or novel to read.  (Tr. Vol. VIII, 1268-69).

18.     In compliance with Judge Ott's second requirement, the Bureau of Prisons secured the services of two outside consultants, Alan Mirsky, Ph.D., a neuropsychologist, and Thomas Gualtieri, M.D., a neuropsychiatrist, to evaluate Merriweather in addition to the evaluation performed by FMC Butner staff.  Their reports were reviewed and summarized by Dr. Edward Landis, the Deputy Chief Psychologist at FMC Butner, who passed them to the psychiatrist charged with supervising Merriweather's evaluation at FMC Butner, Staff Psychiatrist Bruce Berger, M.D. (Tr. Vol. VIII, 1288).

19.     Dr. Berger reviewed the reports submitted by Drs. Misky, Gaultieri, and Pietz (Tr. Vol. IV, 585) as well as collateral reports by Drs. Dudley, Hunter, and Merikangas.  (Tr. Vol. IV, 587).  Dr. Berger, who was assisted by Dr. Jill Grant and a team of mental health professionals,

conducted four videotaped formal interviews in addition to seeing Merriweather on a daily basis for 496 days.  (Tr. Vol. IV, 586).  On April 1, 2011, Dr. Berger issued a report in which he concluded that Merriweather "does currently posses the capacity to understand his current charges, understand courtroom functioning, and could, should he so choose, work affirmatively with his attorney in a rational way…[and that] he is competent to proceed."  (Gov't Ex. #10 at 10).

20.    After his evaluation at FMC Butner, Merriweather was returned to the Northern District of Alabama on April 20, 2011 and housed at the Shelby County Jail.  (Tr. Vol. VII, 1015).

21.    Upon his return to the Shelby County Jail, Merriweather initially refused to eat for nine days, but instead requested Ensure from medical staff.  (Tr. Vol. VII, 1215).  On the ninth day (April 29, 2011), Merriweather resumed eating with a renewed appetite; he would ask for extra trays and often consumed two or three trays per meal.  (*Id*.).  According to Officer Tim Laatsch, a corrections officer with the Shelby County Sheriff's Office, Merriweather ate regularly until he was moved from his segregation unit into an intermediate housing unit closer to the general prison inmate population.  (*Id*. at 1215-16).  After being relocated, Merriweather again refused to eat.  (*Id*. at 1216). Officer Laatsch testified that Merriweather had apparently told another inmate that he (Merriweather) would not eat anything wet or shiny.[10]  (*Id*.).  Because he refused to eat, Merriweather lost a significant amount of weight and was consequently re-located to the medical unit of the jail where he could be more closely monitored.  (*Id*.).  Although Merriweather refused the food prepared by the facility, Officer Laatsch was able to procure pre-packaged store items, which Merriweather did consume.  (*Id*. at 1217).

---

[10] That inmate reported Merriweather's statement to another officer, who conveyed the information to Officer Laatsch. (Tr. Vol. VII, 1216).  The inmate's statement to the other officer and the unidentified officer's statement to Officer Laatsch both appear to be examples of hearsay without exception, but neither side objected to the testimony.

22.     After beginning his stay at the Shelby County Jail, Merriweather refused to bathe regularly, showering only every third or fourth day.[11]  (Tr. Vol. VII, 1219).

23.     During three days in June 2011, Dr. Merikangas and Dr. Dudley, the expert witnesses retained by the Defense to evaluate Merriweather two years earlier, attempted to meet with Merriweather at the Shelby County Jail; Merriweather refused to engage with them.  (Tr. Vol. VI, 946; Tr. Vol. VII, 1148).

24.     On June 22, 2011, Dr. Merikangas visited Merriweather in the Shelby County Jail. (Tr. Vol. VII, 1146, 1149).  When Dr. Merikangas attempted to interview Merriweather in a small attorney-client interview room, Merriweather ignored him.  (*Id*. at 1148).  Dr. Merikangas noticed that Merriweather's weight had dropped dramatically.  (*Id.*).  Dr. Merikangas visited Merriweather again on June 23, 2011.  (*Id*. at 1149).  Again, Merriweather was unresponsive.  Dr. Merikangas noted that, when he asked about Merriweather, the correctional officers who accompanied him into the room indicated that Merriweather's behavior towards Dr. Merikangas was not different from his behavior towards the guards and they expressed sympathy for Merriweather.  (*Id*. at 1151).

25.     On June 24, 2011, Dr. Dudley visited Merriweather in his cell at the Shelby County Jail.  (Def. Ex. #9 at 2; Tr. Vol. VI, 945).  The first thing Dr. Dudley noticed was the smell; he had been told by correctional officers that Merriweather had not been showering.  (Tr. Vol. VI, 944-45). Dr. Dudley recounted that correctional officers had told him that Merriweather was not eating food prepared by the jail, but was eating sealed, packaged food.  (*Id*. at 945).  When Dr. Dudley attempted

---

[11] Officer Laatsch testified that Merriweather was offered the opportunity each day to leave his cell and be escorted to a shower.  During most of the days when Officer Laatsch was tasked with escorting Merriweather to shower, Merriweather refused.

to communicate with Merriweather, the only responses he was able to elicit were "the hand signals and the verbal refusal to speak."  (Tr. Vol. VI, 946).

26.    Finally, on June 27, 2011, in the presence of Mr. Jack Earley, a lawyer retained by the Defense as a criminal law expert, Merriweather engaged in an extensive conversation with his Defense counsel.  (Tr. Vol. V, 823).

27.    Also on June 27, 2011, Judge Ott entered an order authorizing personnel at the Shelby County Jail to take any reasonable steps necessary to ensure Merriweather's health was not further compromised, including forcibly feeding and bathing him.  (Doc. #109).

28.    Following the court order, Diana Shirley, Director of Nursing at the Shelby County Sheriff's Office, was scheduled to insert a feeding tube through Merriweather's nose.  (Tr. Vol. VII, 1233).   Director Shirley testified that Merriweather was unhappy about this prospect, and volunteered that he "might try to eat" if she would not insert the feeding tube.  (Tr. Vol. VII, 1234). Shirley responded that the offer to maybe "try to eat" was not a real offer; either Merriweather would eat or the tube would be inserted.  (Tr. Vol. VII, 1234).  Merriweather promptly agreed to eat.  (*Id*.). Shirley further testified that Merriweather resumed eating normally after that confrontation and never again complained about food that was wet or shiny or that he was being poisoned.  (Tr. Vol. VII, 1236).  Shirley further noted that she never observed Merriweather having conversations in his head while at the Shelby County Jail.  (Tr. Vol. III, 1245).

29.    Kelly Hammonds, another nurse at the Shelby County Jail who interacted with Merriweather, testified that Merriweather showered daily following the court order authorizing prison staff to take necessary procedures to ensure that Merriweather bathed and ate.[12] (Tr. Vol. VII,

---

[12] This testimony is consistent with that of Officer Laatsch.  (Tr. Vol. VII, 1219).

1249).  Hammonds further testified that Merriweather spoke clearly and articulately, had no difficulty communicating with prison staff (*id*. at 1244), and never mentioned anything about demons, little green men, or a chip in his arm.  (*Id*. at 1245).  Moreover, after the court order authorized prison staff to force feed him, Merriweather ate three meals a day and was fully cooperative in doing so.  (*Id*. at 1246).

30.     Since being housed at the Shelby County Jail, Merriweather has neither been observed responding to internal stimuli, nor has he given any indication of suffering from delusions or hallucinations.  (*Id*. at 1218, 1236, 1245).

31.     On July 25, 2011, this court convened a hearing, pursuant to 18 U.S.C. §§ 4241(a) and (c), to hear testimony and receive evidence on the issues surrounding Merriweather's competency to stand trial. The court heard from several Government witnesses.  Included in this group were four mental health experts (Drs. Pietz, Berger, Gualtieri, and Landis), two nurses (Diana Shirley and Kelly Hammonds), and two corrections officers (Tim Laatsch and Eugene Singleton). The Defense countered with seven witnesses, including three mental health experts (Drs. Merikangas, Mirsky, and Dudley), a legal "expert" (Jack Early), a jail psychiatrist (Dr. Robert Hunter[13]), Merriweather's sister (Kim Patton), and Merriweather's former girlfriend (Latisha Simpson).  Merriweather did not testify. In addition, the court received a total of 106 exhibits into evidence.

32.     At the request of the court, both parties submitted briefs as well as proposed findings of facts and conclusions of law.  The Government submitted its brief in support of a determination that Merriweather is competent to stand trial (Doc. #152), along with proposed findings of fact and

---

[13] Dr. Hunter did not testify as an expert witness.

conclusions of law. (Doc. #153). The Defense submitted its brief in support of a determination that Merriweather is incompetent to stand trial (Doc. #156), along with proposed findings of fact and conclusions of law. (Doc. #154). The Government, having borne the burden to prove Merriweather competent by a preponderance of the evidence,[14] was permitted to proceed first at the hearing and also had the opportunity to reply to Merriweather's submissions, which it did on October 4, 2011. (Doc. #157). The party submissions have been carefully considered along with the testimony of the expert witnesses.

## D.    Expert Evaluations

Each party called a number of expert witnesses at the hearing, and their testimony is addressed below.

### 1.    Dr. Christina Pietz

1.    Merriweather's first court-ordered evaluation occurred at the United States Medical Center for Federal Prisoners in Springfield, Missouri ("MCFP Springfield") from November 2, 2007 to January 14, 2008. (Tr. Vol. I, 19; Gov't Exs. #2, 3). Merriweather's evaluation was overseen by Dr. Christina Pietz, a psychologist with 21 years of experience at MCFP Springfield. (Tr. Vol. I, 13). Dr. Pietz conducted six formal interviews totaling 12-15 hours, and informal interviews in the course of routine rounds on Merriweather's unit for 75 days. (*Id*. at 19-20, 32). Over the course of Merriweather's evaluation, Dr. Pietz administered five psychological tests: (1) the Validity Indicator Profile; (2) the Shipley Institute of Living Scale; (3) the Minnesota Multiphasic

---

[14] There is a question regarding whether the Government bears the burden of establishing competency, or the defendant bears the burden of establishing that he is incompetent. The language of 18 U.S.C. § 4241 is silent on this point, noting only that the court must find by a preponderance of the evidence that the defendant is incompetent to stand trial. The parties filed briefs on this issue and, thereafter, the Government indicated that it was prepared to undertake the burden of proof on the issue. (Doc. #113 at 6-7). After careful review of relevant case law, the court concluded that the Government should bear the burden of establishing competency. (*See* Doc. #133).

Personality Inventory; (4) the Evaluation of Competency to Stand Trial-Revised (ECST-R);[15] and (5) the Structured Interview of Reported Symptoms. (Doc. #24 at 3). She also consulted daily with the mental health care and correctional staff members who kept Merriweather under constant observation and reviewed collateral information, such as Dr. Ackerson's findings, investigative reports concerning the robbery, and Merriweather's phone conversations after the arrest. (Tr. Vol. I, 24-26).

2.      Dr. Pietz's findings were compiled into two reports, one dealing with Merriweather's competency to stand trial and another concerning Merriweather's mental state at the time of the offense. (Doc. #24).

3.      In Dr. Pietz's report on Merriweather's competency to stand trial, she diagnosed Merriweather with adult antisocial behavior and attributed Merriweather's behavior to polysubstance dependence. (Doc. #24 at 14). She concluded that "Merriweather does not currently suffer from a mental illness, and therefore, by definition does not meet the criteria for being found not competent." (Doc. #24 at 14). Pietz based this conclusion on Merriweather's responses to the psychological tests, his responses during interviews, and a review of relevant literature. (Tr. Vol. I, 63).

4.      Most notably, Dr. Pietz found that Merriweather's scores on the ECST-R suggested no impairment in his ability to consult with his attorney or have a rational understanding of court proceedings. (Doc. #24 at 14). Indeed, Dr. Pietz indicated that Merriweather performed "exceptionally well" on the ECST-R – even better than one of her students. (Tr. Vol. I, 59).

---

[15] The Evaluation of Competency to Stand Trial-Revised ("ECST-R") is a checklist of questions designed to measure a defendant's ability to understand the nature and consequences of the proceedings against him, as well as his ability to assist his lawyers in his own defense. (Tr. Vol. VII, 1186).

5.      There was one exception to Merriweather's otherwise strong performance on the ECST-R: his score suggested moderate impairment in his ability to have a factual understanding of court proceedings.  (Doc. #24 at 14).  Dr. Pietz found this result to be surprising given that Merriweather had clearly demonstrated that he had a factual understanding of court proceedings in other interviews. (*Id*.). When asked about the roles of various actors in legal proceedings, Merriweather was able to correctly identify the roles of the judge, the prosecutor, and the Defense counsel.  (*Id*. at 15).  He understood that a jury of 12-14 jurors would be selected from his community, though he did not know that a guilty verdict required a unanimous decision and stated that "[t]he role of the jury is to find the defendant guilty."  (*Id.*).  When asked about possible pleas, Merriweather had no difficulty articulating his understanding of various pleas available to him. He explained, for example, that "[t]he insanity plea is…instructs that at that moment at the time of what happened, [Merriweather] wasn't [him]self because of illegal drugs that [Merriweather] had taken…from the pills, marijuana and cocaine."  (Doc. #24 at 15).  Merriweather demonstrated that he understood what it means to plead guilty or not guilty and the consequences of entering a plea bargain, commenting that "a defendant should discuss the options of a plea bargain with his attorney."  (*Id.*).  Merriweather further acknowledged that, if found guilty, he may receive "possible life in prison or the death penalty."  (*Id.*).

6.      Conflicts among various statements given by Merriweather are not limited to discrepancies between his performance on the ECST-R and his answers in interviews.  Dr. Pietz's interviews with Merriweather are littered with references to inconsistent statements he made that, when taken together, reveal a pattern of evasive behavior undertaken by Merriweather to conceal the extent of his knowledge and culpability.  For example, when asked about the charges against him,

Merriweather initially claimed that he had no knowledge that he was charged with murder.  (Doc. #24 at 14).  In a subsequent interview, Merriweather acknowledged the murder charge and indicated that his attorney and investigating officers informed him of the charges against him soon after his arrest. (Doc. #24 at 14). When questioned about the events leading up to the arrest, Merriweather initially asserted that he could recall only a few details of the alleged offenses.  (Doc. #24 at 14). During subsequent interviews, however, Merriweather provided clear, detailed, and coherent recollections of the robbery, including a written description of his memory of the events. (Doc. #24 at 15).

       7.     The details of the robbery provided by Merriweather, however, varied with each interview. One jarring inconsistency in Merriweather's recollection of the robbery was his indication in earlier interviews of the presence of an accomplice named "Charlie." (Doc. #24 at 15). During five of the first six interviews, Merriweather provided a different rendition of the robbery with Charlie featured in a new role with each telling.  (Tr. Vol. I, 32-33).  In one version, for example, Charlie took Merriweather to the bank to "cash a check."  (*Id*. at 33).  In another version, Charlie was actually the person who got shot escaping the crime scene.  (*Id*.).  In yet another version, Charlie simply told Merriweather to follow him into the bank, placing Merriweather at the wrong place at the wrong time.  (*Id*.).  From all of these accounts, Dr. Pietz was left with the impression that Merriweather was trying to minimize responsibility by "trying to blame others."  (*Id*. at 35).  Dr. Pietz noted that when she directed Merriweather's attention to a discrepancy between his stories and the investigative record, Merriweather would "try[] to come up with a different response that made more sense." (*Id*.).

8.      Merriweather requested the sixth interview he had with Dr. Pietz, and during that interview gave an account of the robbery in which "Charlie" was absent and Merriweather took responsibility for the robbery.  (Tr. Vol. I, 34).  In that interview, Merriweather stated that he had received a "message" that described the inside of the bank and the identity of the manager.  (*Id.*).

9.      While Merriweather gave different descriptions of his involvement in the bank robbery, Dr. Pietz found that there was never any doubt that Merriweather understood what he was charged with and why he was incarcerated.  (Tr. Vol. I, 32-35).  Dr. Pietz attributed these inconsistencies to evasive behavior rather than mental illness.  (*Id*. at 34-35).

10.      Further supporting her position that Merriweather was more likely manipulative than mentally infirm, Dr. Pietz found Merriweather's speech and behavior to be inconsistent with symptoms typically associated with mental illness.  Dr. Pietz testified that persons suffering from mental illness, Dr. Pietz testified, are disorganized in their thoughts and speech, struggle to provide information, and typically provide inaccurate information tainted by delusional thought.  (Tr. Vol. I, 30).  Concealing disorganized speech (and, therefore, concealing a mental illness) is not easy and will likely reveal itself over time during conversations or meetings involving persons genuinely suffering from a psychotic illness.  (*Id*. at 54).  Throughout Merriweather's 75-day evaluation at MCFP Springfield, his speech was never observed to be disorganized, but was instead described as rational, coherent, and organized.  (*Id*. at 27-30, 41, 44, 46-47, 54-55).  If anything, Dr. Pietz characterized Merriweather's responses to questions relating to the robbery as "cautious."  (Tr. Vol. II, 272, 275).  Merriweather's behavior was similarly inconsistent with symptoms typical of mental illness.  There were no signs of memory deficit.  (Tr. Vol. I, 57).  Merriweather maintained

23

a clean cell and bathed regularly during his stay at MCFP Springfield.  (*Id*. at 45).  Merriweather was never mute, though he did take time to think through his responses.  (*Id*. at 46, 57).

       11.    Dr. Pietz also found no negative signs of schizophrenia.[16]  With regard to positive signs of schizophrenia, there were two incidents that, if genuine, could be construed as evincing positive signs of schizophrenia.  Dr. Pietz, however, found both instances to be suspect. (Tr. Vol. I, 51, 90).

       12.    In the first incident, Merriweather reported seeing gremlins in his cell to Dr. Leanne Preston, the on-call psychologist.  (Tr. Vol. I, 39, 90).   Merriweather told Dr. Preston that he thought he might be suicidal.  (*Id*. at 40).  Dr. Preston placed Merriweather under suicide watch, but wrote in her report that Merriweather's claim that he saw gremlins was suspect.  (*Id*.).  Dr. Pietz found Merriweather's claims to be questionable for at least five reasons.  First, as Dr. Pietz noted, it is very rare for truly psychotic people to experience visual hallucinations.  (*Id*.).  Visual hallucinations are actually more consistent with illicit substance abuse than psychosis.  (*Id*.). Second, even in the rare cases when someone actually experiences visual hallucinations, the hallucinations are usually frightening and not casually mentioned.  (*Id*. at 42).  Third, people who complain about being suicidal are typically not truly suicidal since drawing attention to themselves increases the chances that a suicide attempt would be thwarted.  (*Id*. at 41).  Fourth, when placed under suicide watch, Merriweather was more upset about losing his privacy because of the constant surveillance imposed by the watch than he was due to any perceived gremlins or alleged suicidal

---

[16] Schizophrenic symptoms are categorized into positive and negative signs.  Positive signs include abnormally excessive expressions of mental functioning, such as hallucinations, disorganized speech, delusions, and grossly disorganized or catatonic behavior. Negative signs of schizophrenia include abnormally diminished functioning in speech and behavior, such as a flat affect and alogia. AMERICAN PSYCHIATRIC ASSOCIATION, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 299 (4th ed. 2000).

tendencies.   Indeed, Merriweather actually requested to be taken off suicide watch as soon as possible.  (*Id*.).  Finally, Dr. Pietz testified that generally hallucinations do not completely go away, even for psychotic individuals who are medicated.  (*Id*. at 42).  Merriweather did not mention gremlins when he requested to be taken off the suicide watch or anytime afterwards.  (*Id*. at 41).  Dr. Pietz therefore found Merriweather's alleged hallucination suspect.  (*Id*. at 40).

13.     The second incident involved Merriweather scraping his arms with a spork. (Tr. Vol. I, 42).  He told a nurse that there were bugs in the room, which may have been a visual hallucination.  (*Id*.).  Merriweather, however, did not seem overly concerned about it.  (*Id*.).  Dr. Pietz discounted this incident because visual hallucinations are typically sufficiently frightening to the patient to warrant more than a single, casual mention.  (*Id*.).  In this case, Merriweather mentioned the bugs casually, but did not appear disturbed by them nor did he mention seeing bugs in his room again.  (*Id*.).

14.     Based on her observations of Merriweather during his 75-day evaluation at MCFP Springfield, his responses to psychological tests, and a review of collateral sources, Dr. Pietz concluded that Merriweather was not mentally ill, but instead experienced abnormal stimuli as a result of polysubstance abuse, and exhibited an anti-social disorder.  (Tr. Vol. I, 52-53).  Because Merriweather does not suffer from a mental illness, Dr. Pietz opined that he is competent to stand trial.[17]

---

[17] The ultimate question of whether Merriweather is competent to stand trial is a legal determination that the court must make.

2.      **Dr. Richard G. Dudley, Jr.**

1.      Over one year after Dr. Pietz completed her 75-day evaluation of Merriweather, the Defense hired Dr. Richard G. Dudley Jr., a psychiatrist, to evaluate Merriweather for mental illness.  Dr. Dudley met with Merriweather on three separate occasions.  The first interview, conducted over two days, began on January 26, 2009.  (Def. Ex. #9 at 2).  Dr. Dudley also met with Merriweather on August 17, 2009 (Def. Ex. #66 at 1), and again on June 24, 2011, after Merriweather returned from his second extended evaluation at FMC Butner.[18]  (Def. Ex. #9 at 2). During that final meeting, however, Merriweather refused to communicate with Dr. Dudley.  (Tr. Vol. VI, 946, 962, 1006-07).  Altogether, Dr. Dudley estimates that he spent a total of 16 hours with Merriweather over the course of three sessions.  (*Id*. at 921).

2.      Dr. Dudley is qualified by training and experience as a forensic psychiatrist. (Tr. Vol. VI, 912-17).  He has extensive experience in diagnosing and treating people who are both schizophrenic and substance abusers based upon the time he spent running a community mental health clinic in Harlem, New York City.  (*Id*. at 940).

3.      In addition to interviewing Merriweather, Dr. Dudley reviewed previous evaluations and other collateral sources of information regarding Merriweather's background and history, which he considered vital to his evaluation.  (Tr. Vol. VI, 920-21).  After reviewing the available record and evaluations, Dr. Dudley found four possible diagnoses explaining Merriweather's condition:

---

[18] Dr. Dudley's 2011 consultation with Merriweather lasted only a few minutes, so the vast bulk of his evaluation took place in 2009.  Also, during his cross-examination, he admitted that while sitting in on two days of the hearings (prior to his own testimony), he did not look at or observe Merriweather.

a)    Merriweather suffers from a psychotic disorder, primarily schizophrenia;

b)    Merriweather suffers from substance-induced psychotic disorders;

c)    Merriweather suffers from a combination of drugs and schizophrenia; or

d)    Merriweather is simply malingering.

(*Id.* at 922-23).

4.    Of these possible diagnoses, Dr. Dudley gave his opinion that the most appropriate and accurate diagnosis was that Merriweather is a person who suffers from schizophrenia and who also uses drugs.  (Tr. Vol. VI, 926-27).

5.    Drawing from the DSM,[19] Dr. Dudley defined schizophrenia as "characterized by an episode of illness that lasts for approximately six months."  (Tr. Vol. VI, 927).  That episode of illness, Dr. Dudley testified, has three phases: (1) a prodromal period where the person's ability to function begins to deteriorate; (2) the active phase of the illness (which must span at least one month of that six month period) where the individual is exhibiting the full spectrum of schizophrenia symptoms, both positive and negative; and (3) a period afterwards that is similar to the prodromal period during which the person is pulling himself back together.  (*Id.*).  The course the illness may run is variable; that is, individuals will alternate between periods of illness and stability.  (*Id.*).  Dr. Dudley further attested that "[t]here are people who have some residual symptoms in between episodes of illness and then many people, if untreated, gradually deteriorate over time, and the

---

[19] The Diagnostic and Statistical Manual of Mental Disorders ("DSM") is a manual compiled by the American Psychiatric Association that organizes and defines conditions the American Psychiatric Association classifies as mental disorders. Dr. Dudley's description of schizophrenia is largely consistent with the definition provided in the fourth edition of the DSM. *See* AMERICAN PSYCHIATRIC ASSOCIATION, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 298-99 (4th ed. 2000).

residual symptoms that are there between episodes become more and more severe and so that it begins to look like a pattern of continuous illness with the onset of this whole disorder." (*Id*. at 928).

6.      Dr. Dudley testified that the symptoms his family recounted were exhibited by Merriweather,[20] and the change in Merriweather's condition between Dudley's initial interview in 2009 and what he saw in 2011, were consistent with "classic" schizophrenia.  (Tr. Vol. VI, 928-29, 957).

7.      Dr. Dudley testified that when he saw Merriweather in 2009, Merriweather was verbal, but disorganized and distracted.  Merriweather appeared to be responding to internal stimuli, and his responses were bizarre.  According to Dr. Dudley, Merriweather evinced no understanding of the nature of the case, the charges against him, and the possible outcomes of his case.  Merriweather talked about his imminent release and expressed the view that he had been held longer than he expected.  Dr. Dudley found Merriweather's affect to be flat, and testified that Merriweather would interrupt him with inappropriate laughter.  In a subsequent meeting in 2009, Merriweather expressed to Dr. Dudley that he felt he was at risk of being harmed, perhaps poisoned. (Tr. Vol. VI, 943-44).

8.      An important factor in Dr. Dudley's diagnosis was Merriweather's substantial weight loss.  (Tr. Vol. VI, 923-30, 996).  He did, however, concede that Merriweather's later decision to continue eating, arising from his aversion to the needles and tubes that would have been used to inject nutrition into him, reflected a choice by Merriweather to realize a clear preference. (*Id*. at 1022).

---

[20] Much of Dr. Dudley's understanding of Merriweather's life before the robbery appears to have come from Patton and Simpson. For reasons mentioned earlier, the testimony of Merriweather's sister and former girlfriend regarding his condition before the robbery appear suspect in some important aspects.

9.     Also important to Dr. Dudley's evaluation was Merriweather's refusal to communicate with him during Dr. Dudley's visits to the Shelby County Jail in June 2011. (Tr. Vol. VI, 946). Dr. Dudley interpreted Merriweather's refusal to communicate with him as indicative of the inability to communicate. (*Id*. at 951).[21]

10.     Dr. Dudley dismissed the role of illicit drugs in the context of Merriweather's diagnosis because (1) Merriweather's symptoms seemed to be present when he was not using drugs, and (2) there was a lack of information to identify a drug, or indicate that drugs were used in the quantity or for the duration necessary to cause the symptoms. (Tr. Vol. VI, 925). However, Dr. Dudley did note that, in addition to marijuana use, there is evidence that Merriweather used other illegal drugs. (*Id*. at 958, 978).[22]

11.     Dr. Dudley considered, but ruled out malingering, in part because mimicking the negative symptoms of schizophrenia, even if one were to assume that the patient knows what they are, would be difficult. (Tr. Vol. VI, 937-39). Dudley admitted, however, that he was unfamiliar with the Test of Memory Malingering ("TOMM") and was not an expert in malingering. (*Id*. at 956, 1003).

---

[21] In this regard, Dr. Dudley appears to mistake the different concepts of disinterest and disability. The day after Merriweather failed to speak with Dr. Dudley, Merriweather engaged in an extended conversation with his lawyers and Jack Early. (Tr. Vol. V, 823).

[22] Of course, the record is replete with both anecdotal and empirical evidence of Merriweather's drug use, including (1) Merriweather's self-reports of the use of other drugs and (2) the lab tests conducted at UAB on the day after the bank robbery that indicate his use of opiates. (Tr. Vol. I, 103-04, Def. Ex. #15 at18). Moreover, even if the court were to only consider the anecdotal evidence in isolation, Dr. Dudley has selectively credited certain reports (*e.g.*, reports that Merriweather was obsessed with the letter "C"), but dismissed other reports (*e.g.*, that he was an illicit drug user) in reaching his diagnosis.

12.     Dr. Dudley recommended to counsel that a neurological expert be retained to determine, among other things, whether scans and MRIs of Merriweather's brain were normal. (Tr. Vol. VI, 953).

### 3.     Dr. James Merikangas

1.     On April 30, 2009, while Merriweather was still incarcerated in the Jefferson County Jail, Dr. James Merikangas, a board-certified forensic neuropsychiatrist retained by the Defense, interviewed Merriweather for one and a half to two hours.  (Tr. Vol. VII, 1128).  In connection with this meeting, Dr. Merikangas reviewed extensive collateral material and requested an MRI and a PET scan of Merriweather's brain to detect any physical abnormalities.  (*Id*. at 1129). During the initial meeting, Dr. Merikangas formed an impression that Merriweather was psychotic, suffered from hallucinations, ideas of reference, ideas of influence, and that his grasp on reality was impaired.  Merriweather reported to Dr. Merikangas that televisions were speaking directly to him, he thought that he could control people with his thoughts, and asked if they were in a movie.  Dr. Merikangas observed positive symptoms of schizophrenia, namely, paranoia, hallucinations, and delusions.  (*Id*. at 1129-31).

2.     Two years later, in June 2011, Dr. Merikangas visited Merriweather for a second time.  This occurred after Merriweather had returned from custodial evaluations at FMC Butner.  Dr. Merikangas reported that he attempted to interview Merriweather in a small attorney-client room, this time at the Shelby County Jail, but Merriweather remained mute during the meeting.  (Tr. Vol. VII, 1146).  Dr. Merikangas returned the next day to assess whether Merriweather was competent to stand trial using the ECST.  (*Id*. at 1149).

3.     Dr. Merikangas also reviewed records from Merriweather's stay at FMC Butner, jail records from the Shelby County Jail, and reports and interviews conducted by other medical experts. (Tr. Vol. VII, 1147).

4.     Based on his interviews and a review of these records, Dr. Merikangas concluded that Merriweather suffers from psychosis due to schizophrenia and recommended that Merriweather be given anti-psychotic and mood stabilizing medication. (Tr. Vol. VII, 1142-43).

5.     Dr. Merikangas also found that Merriweather is unable to cooperate with counsel. (Tr. Vol. VII, 1144).  Dr. Merikangas concluded that Merriweather's lack of cooperation with counsel is due to an inability to communicate (rather than a deliberate refusal to communicate), and was not the result of malingering.  Dr. Merikangas reached the conclusion that Merriweather is not malingering based on two observations: (1) it is difficult to maintain a lie for an extended period of time and Merriweather's behavior was consistent during his 16-month stay at FMC Butner, and (2) Merriweather has no incentive to lie.  (*Id*. at 1151, 1163).  With regard to the first observation, Dr. Merikangas stated that "the real determinative thing is to have observations of the patient over a period of time as there are very few people who can totally fake their illnesses in ways that are consistent with their disease under 24-hour observation for weeks and months at a time."  (*Id*. at 1126).[23]  Dr. Merikangas did not observe Merriweather during his 16-month stay in Butner, so his opinions regarding Merriweather's behavior over that time period are given less weight than the findings of those who actually observed Merriweather over that extended period of time.  When

---

[23] The court finds this statement perplexing given Dr. Merikangas's opinion regarding Dr. Berger's evaluation in this case.  Dr. Merikangas, who interviewed Merriweather for no more than two hours (Tr. Vol. VII, 1129), criticized the evaluation by Dr. Berger, who interviewed Merriweather over the course of 16 months, as "negligent" (Tr. Vol. VII, 1145), "deficient," and "incompetent."  (Tr. Vol. VII, 1152).  The court concludes that, even applying Dr. Merikangas' "real determinative" test, Dr. Berger was in a much better position to evaluate Merriweather on a consistent basis.

asked whether he thought Merriweather has an incentive to malinger, Dr. Merikangas initially testified that Merriweather has no incentive to misrepresent his current mental capacity because the result of this competency determination will merely decide whether Merriweather spends the rest of his life in prison or the rest of his life in a hospital setting.  (Tr. Vol. III, 1163).  Of course, Dr. Merikangas's response makes clear that he failed to take into account that the death penalty is being sought in this case.[24]  The court rejects Dr. Merikangas's opinion that Merriweather has no incentive to malinger in this case.  (*Id*. at 1163-64).

      6.    Dr. Merikangas opined that Merriweather is not competent to stand trial because of his psychosis due to schizophrenia and his inability to cooperate with counsel.[25]  (Tr. Vol. III, 1144).

      7.    In reaching his conclusion that Merriweather is afflicted with psychosis due to schizophrenia, Merikangas relied upon MRI and PET scan images.[26]  While testifying about his interpretation of the MRI and PET scan images, Dr. Merikangas directed attention to thinning in the posterior corpus callosum and atrophy in the right parietal lobe.  (Tr. Vol. VII, 1135-36, 1138).  However, Dr. Merikangas acknowledged that the thinning of cerebral tissue like that observed in the images could be symptomatic of a large number of medical conditions, including but not limited to

---

[24] Given Dr. Merikangas's vehement opposition to the death penalty (discussed more fully below), the court concludes he would have to be extremely naive to not have comprehended that the United States seeks imposition of the death penalty in this case.  The court does not believe Dr. Merikangas is so naive.

[25] Again, the ultimate question of whether Merriweather is competent to stand trial is a legal determination that the court must make.

[26] All of the medical experts, including Dr. Merikangas, agree that brain imaging cannot be used to diagnose schizophrenia.  (Tr. Vol. VII, 1137, 1139-40, 1188).  While Dr. Merikangas testified that brain imaging can reveal abnormalities commonly found in people with mental diseases, such as schizophrenia, or any other disease that affects the brain (which is to say that brain imaging can reveal brain abnormalities in people with brain abnormalities), he cautioned that these images should not be used to reach a diagnosis.  (Tr. Vol. VII, 1139-40).  "There is," Dr. Merikangas admitted, "no objective test for schizophrenia."  (Tr. Vol. VII, 1207).

lupus, autoimmune diseases, post-encephalitis, some types of demyelinating disease, traumatic brain injuries, a viral infection that affects the brain (such as measles or HIV), and metabolic disturbances like thyroid diseases or disorders of calcium metabolism.  (Tr. Vol. VII, 1141).

8.      Furthermore, Dr. Merikangas cautioned that he did not conduct the scans himself, and that the images he presented to the court are "for illustrative purposes."  He noted that he "wouldn't presume to look at [the scans] and say [he] c[ould] make a diagnosis from these tiny images." (Tr. Vol. VII, 1139-40).  Dr. Merikangas then proceeded to diagnose "psychosis because of schizophrenia" based on the MRI and PET scan images. (Tr. Vol. VII, 1141-42).  Dr. Merikangas noted that the type of atrophy observed in the images is frequently seen in patients with schizophrenia.  (*Id*. at 1134-39).  He further testified that the brain abnormalities observed cannot be the result of teenage or adult substance abuse because studies have shown that the brain abnormalities caused by illicit substances are of an entirely different nature.  (*Id*. at 1142).

9.      Dr. Merikangas conceded that a schizophrenic can still be found competent to stand trial, citing in particular the case of Ted Kaczynski.[27]  (Tr. Vol. VII, 1156).

10.      Since 1998, Dr. Merikangas has testified in 97 murder proceedings, twice for the prosecution or the court and 95 times for the Defense. (Tr. Vol. VII, 1165).  He acknowledges that he is a staunch opponent of the death penalty, and believes it should be abolished.  (Tr. Vol. VII, 1165-66.  As the Government correctly notes, his lectures and scholarship suggest he has an agenda.

---

[27] Theodore John "Ted" Kaczynski (born May 22, 1942), also known as the "Unabomber," is an American terrorist, mathematician, social critic, anarchist, and Neo-Luddite.  Between 1978 and 1995, Kaczynski engaged in a nation-wide bombing campaign against modern technology, planting or mailing numerous home-made bombs, killing three people and injuring 23 others.  *See generally*, Adam K. Magid, *The Unabomber Revisited: Reexamining the Use of Mental Disorder Diagnoses as Evidence of the Mental Condition of Criminal Defendants*, 84 IND. L.J. SUPPLEMENT 1 (2009) (discussing the implications of a diagnosis of paranoid schizophrenia on the criminal proceedings against Theodore Kaczynski).

(*See* Doc. #152 at 40; *citing* Tr. Vol. VII, 1167-69).  Suffice it to say that of all the mental health experts who testified, Dr. Merikangas was the least objective.

11.     After meeting with Merriweather and reviewing the brain scans, Dr. Merikangas recommended that Merriweather be prescribed a anti-psychotic and mood-stabilizing drugs. (Tr. Vol. VII, 1142).  Based on one and a half to two hours spent with Merriweather, Dr. Merikangas concluded that Merriweather suffers from a mental disease, most likely schizophrenia, should be medicated, and is not competent to stand trial.  (*Id*. at 1143-44).

### 4.     Dr. C. Thomas Gualtieri

1.     In accordance with Judge Ott's order requiring Merriweather's competency evaluation at FMC Butner to include input by a neurologist and/or a neuropsychiatrist (Doc. #79 at 14), Dr. C. Thomas Gaultieri, a board certified psychiatrist with 42 years of medical experience, was asked by FMC Butner's chief psychiatrist, Dr. Jean Zula, to conduct an independent neuropsychiatric evaluation of Merriweather while he was at FMC Butner. (Tr. Vol. III, 381, 385; Gov't Ex. 5 & 6).

2.     Dr.  Gualtieri's evaluation consisted of an approximately two and a half to three hour interview and testing conducted on May 19, 2010.  (Tr. Vol. III, 389-99).  During Dr. Gualtieri's evaluation, Merriweather was calm, polite, attentive, sufficiently groomed, spoke in a level voice, and was able to appropriately sit in his chair and establish good eye contact. (Tr. Vol. III, 401-02, 463, 498, 502; Gov't Ex. 6, 7, and 8).

3.     When engaged in small talk with Dr. Gualtieri, Merriweather behaved appropriately and gave straightforward answers.  (Tr. Vol. III, 401).  When questioned about the robbery or other serious matters, however, Merriweather became evasive, playful, and nonsensical. (Tr. Vol. III, 402; Gov't Ex. 6, 7, and 8).  Similar to his behavior during the videotaped interviews

34

with Dr. Berger, Merriweather's responses to Dr. Gualtieri's questions were often circuitous, circumstantial, and flowed like a stream of consciousness.  (Tr. Vol. III, 402, 452-54; Gov't Ex. 6, 7 and 8).  Dr. Gualtieri detected, however, that Merriweather was "focused very clearly during the entire evaluation on what was in his interests."  (Tr. Vol. III, 403).

4.      Dr. Gualtieri testified that Merriweather's test results suggest that Merriweather was malingering.  (Tr. Vol. III, 417).  Dr. Gualtieri found that Merriweather had performed well on hard tests, but poorly on easy tests, a pattern that he associated with malingering. (Tr. Vol. III, 417).  Merriweather performed worse in subsequent administrations of the Verbal Fluency Test, which suggested malingering to Dr. Gualtieri.  (Tr. Vol. III, 421).  When interpreting tests for malingering, Dr. Gaultieri emphasized that not finding malingering on a malingering test does not necessarily mean that the person is not malingering.  (Tr. Vol. III, 423).

5.      Based on his interview, test results, and a review of relevant literature, Dr. Gualtieri testified that he thought that Merriweather is competent to stand trial.[28]  (Tr. Vol. III, 438-39).

6.      During cross-examination, the Defense drew the court's attention to *Wyatt v. Rogers*, 985 F. Supp. 1356, 1387 n.109 (M.D. Ala. 1997), a case in which a court discredited Dr. Gaultieri's expert testimony.  In that case, the *Wyatt* court discredited Dr. Gaultieri's testimony "because of an attempt to mislead [the court], through charts purporting to give a national average, that was in fact not such an average" and a "failure to correct known error that went to the substance of some very important conclusions."  *Id*.  This court has conducted a thorough review of the

---

[28] At the risk of redundancy, the court again notes that the ultimate question of whether Merriweather is competent to stand trial is a legal determination that the court must make.

transcripts in *Wyatt*, and finds that the reasons given for discrediting Dr. Gualtieri's testimony in *Wyatt* are far wide of the mark; accordingly, the court gives this attempt at impeachment of Dr. Gualtieri no weight whatsoever.[29]

_____

[29] Defendant's challenges to Dr. Gualtieri's credibility is based upon a footnote in an opinion in *Wyatt*.

As a judicial officer in this case, and a practitioner in this state before appointment, the undersigned is simply not in a position to accept at face value the *Wyatt* credibility determination without understanding its context.  For this reason, the court required Defendant to provide the court with the relevant trial transcripts where Dr. Gualtieri testified in *Wyatt*. (Tr. Vol. III, 469).  The court notes that Dr. Gualtieri strongly disagreed with the *Wyatt* court's credibility finding.  (Tr. Vol. III, 461-63).  While expressing great respect for the federal judiciary, Dr. Gualtieri stated his belief that the *Wyatt* court's conduct was both wrongheaded and unprofessional. The court will not weigh in on the latter issue.  As to the former – wrongheadedness – the court has meticulously reviewed the transcripts and simply does not understand the *Wyatt* court's credibility analysis.

In *Wyatt*, by all accounts, the court discredited Dr. Gualtieri's testimony for two reasons: (1) when testifying about the rehospitalization rates of patients in Alabama mental institutions (*Wyatt* Tr. 1097:20) compared to rehospitalization rates nationally (*Wyatt* Tr. 1085:13), Dr. Gaultieri used a chart as demonstrative evidence that included numbers labeled as national averages (*Wyatt* Tr. 895:24-25); and (2) Dr. Gaultieri gave an inaccurate description of a confrontation between two employees at a mental institution. Regarding the first reason, the *Wyatt* court objected to the use of the term "national average," which it seemed to expect to be computed as the simple mean of rehospitalization rates from all 50 states.  (*Wyatt* Tr. 1088:4).  As Dr. Gualtieri testified, however, the figures he used to represent national "averages" actually described rates aggregated from available data from other hospitals as compiled by a research paper (William S. Edell et. al., *Effects of Long-Term Psychiatric Hospitalization for Young, Treatment-Refractory Patients*, 41 HOSP. & COMMUNITY PSYCHIATRY 780 (July 1990)).  Although the *Wyatt* court found this misleading, it is quite clear to this court that Dr. Gualtieri had candidly discussed his methodology on direct examination (*Wyatt* Tr. 1097:6-9) and no one contested the truth of Dr. Gualtieri's facts.  The confusion surrounding the term "average" is unfortunate, but it appears to have been used, not as an attempt to mislead the court, but as a shorthand for Dr. Gualtieri to convey his principal point: that rehospitalization rates in Alabama mental institutions are lower than in most other states.

The second reason the *Wyatt* court disregarded Dr. Gualtieri's testimony was that Dr. Gualtieri recited an inaccurate account of a confrontation between two employees at a mental institution. *Wyatt*, 985 F. Supp. at 1387 n.109 (citing *Wyatt* Tr. 1313-27). Specifically, Dr. Gualtieri wrote in his report that no knife fights occurred in the presence of children because there were no knife fights at the institution. After preparing his report, Dr. Gualtieri discovered (the week before he testified) that he was wrong, and candidly admitted as much at the hearing. (*Wyatt* Tr. 1322:5-6).  The reason for his mistake is simple, and readily apparent from even a cursory review of the hearing transcript.  Dr. Gualtieri called staff at the mental institution, including the center's director, the center's clinical director, and the department director of institutions, to ask about the alleged knife fight. (*Wyatt* Tr. 1314:16-18, 20-21, 23-25).  He was assured "that no such thing happened" and relied upon that statement in preparing his report.  (*Wyatt* Tr. 1321:21-22).  Dr. Gualtieri may have been wrong, but there is nothing in that case's record (and nothing in the record here) to support a finding that he made any attempt to deceive the court.

The court has articulated its findings on this issue in detail not only because it is important in ruling upon the credibility challenge directed at Dr. Gualtieri, but also for another reason.  Oftentimes it is easy for a member of the judiciary to forget the effects such rulings (particularly those not supported by an evidentiary record) can have on third parties' lives, both professional and personal.  The court believes that Dr. Gualtieri is owed at least this: the undersigned has reviewed the relevant portions of the transcripts along with the *Wyatt* court's ruling, and categorically disagrees with the *Wyatt*

5.      **Dr. Allan F. Mirksy**

1.      Dr. Allan F. Mirsky, a neuropsychologist with over 50 years of experience in the field, was, like Dr. Gualtieri, asked to conduct additional psychological testing of Merriweather at FMC Butner pursuant to Judge Ott's order.  (Tr. Vol. VI, 1032, 1043-46).  Dr. Mirsky has devoted much of his 50-year career to the study of schizophrenia.  (*Id*. at 1032-43). During his extensive career, Dr. Mirksy conducted three or four other competency determinations before evaluating Merriweather. (*Id*. at 1085).  To evaluate Merriweather's mental condition, Dr. Mirsky interviewed Merriweather for four to four and a half hours at FMC Butner.  (*Id*. at 1089-90).

2.      During the interview, Dr. Mirsky conducted several tests of Merriweather's mental performance, including tests he developed himself to detect attention deficits.  (Tr. Vol. VI, 1045).  The first test, the Test of Sustained Attention, measures the ability of the patient to respond to the letter X when it appeared among other letters of the alphabet.  (*Id*. at 1049).  The second test, the AX-Test, requires the  patient to respond to the letter X if it follows the letter A. (*Id*.).  The third test, the Auditory Tone Test, requires the patient to distinguish one tone from other tones.  (*Id*.).  Dr. Mirsky also subjected Merriweather to the Wisconsin Card Sorting Test, the TOMM, the Test of Verbal Fluency, and the Reciprocal Motor Programs Test.  (*Id*. at 1048-50).

3.      Merriweather performed poorly on the Test of Sustained Attention, the AX-Test, the Auditory Tone Test, and the Wisconsin Card Sorting Test. (Tr. Vol. VI, 1050).  Dr. Mirsky testified during the hearing that he believed the results of these tests were consistent with a diagnosis

---

court's finding that Dr. Gualtieri intended to mislead that court.

of schizophrenia.  (*Id*. at 1051).  Current research, Dr. Mirsky stated, suggests that schizophrenia is a disease of attention deficits and verbal memory deficits.[30]  (*Id*. at 1043-44).

      4.     On the other hand, Merriweather performed within the normal range on the TOMM, the Test of Verbal Fluency, and the Reciprocal Motor Programs Test.  (Tr. Vol. VI, 1051). Dr. Mirsky interpreted these results to mean that Merriweather was not malingering because "somebody who is faking a disorder just does poorly on everything."  (Tr. Vol. VI, 1051). Furthermore, Dr. Mirsky noted, the TOMM failed to detect malingering.  (Tr. Vol. VI, 1048).  Dr. Mirksy trusted that Merriweather was not malingering because, he noted, it is very difficult for a person, even one who is familiar with the disease's features, to mimic the symptoms of schizophrenia.  (Tr. Vol. VI, 1060).

      5.     The Government asserts that Dr. Mirsky never firmly opined that Merriweather was incompetent, only that certain test results suggest that conclusion.  (Doc. #152 at 38).  In any event, his failure to probe into such things as Merriweather's understanding of (1) the charges against him, (2) the role of his lawyers, the prosecution, and the court, (3) the facts of the case, (4) the nature of the proceedings, and (5) the elements of the crime (as well as defenses available to him) render his opinion testimony less than helpful.

      **6.**     **Dr. Edward E. Landis**

      1.     Dr. Edward E. Landis, Ph.D., the deputy chief psychologist at FMC Butner, reviewed and analyzed all psychological testing performed on Merriweather in preparation for Dr. Berger's evaluation report, including the tests administered by Dr. Mirsky.  (Tr. Vol. VIII, 1282,

---

[30] As will be seen below, this is different from the definition provided by Dr. Dudley.  (*See* Tr. Vol. VI, 927-28).

1286, 1287-88).  Dr. Landis has worked at FMC Butner for approximately 25 years and has testified 137 times in criminal proceedings, primarily on competency issues.

       2.      Dr. Landis criticized Dr. Mirsky's approach to diagnosing Merriweather with schizophrenia.  Rather than observe Merriweather for positive or negative signs of schizophrenia, Dr. Mirsky tested Merriweather's mental performance and found attention deficits.  While there is a theoretical connection between schizophrenia and some lower-level functional processes, such as attention and concentration, attention deficits are not generally accepted as a primary symptom in diagnosing schizophrenia.  (Tr. Vol. VIII, 1292).  Under current standards and accepted diagnosing criteria, Dr. Landis commented, schizophrenia cannot be diagnosed based on deficits in cognitive processing, such as attention.  (*Id*. at 1298-99).  Testing that endeavors to identify deficits in attention, while useful in recovery and rehabilitation, is presently not accepted and will not be accepted in the foreseeable future as part of the differential diagnosis system for diagnosing schizophrenia.  (*Id*. at 1299).

       **7.**      **Dr. Bruce Berger**

       1.      Reports from Drs. Gualtieri, Mirsky, and Landis were ultimately transmitted to the doctor charged with supervising Merriweather's evaluation at FMC Butner, Dr. Bruce Berger, a board-certified forensic psychiatrist with more than 20 years of experience.  Dr. Berger oversaw Merriweather's evaluation during which he, with assistance from Dr. Jill Grant and a team of mental health professionals, observed Merriweather every day for 496 days, conducted four videotaped formal interviews, and reviewed the reports by the other expert examiners and collateral source information.  (Tr. Vol. IV, 586).  Based on this evidence, Dr. Berger concluded that Merriweather's behavior can be best ascribed to drug use, not a psychotic disorder. On April 1, 2011, Dr. Berger

issued a report in which he concluded that Merriweather "does currently posses the capacity to understand his current charges, understand courtroom functioning, and could, should he so choose, work affirmatively with his attorney in a rational way…[and that] he is competent to proceed." (Gov't Ex. #10 at 10).

2.      In reaching his conclusion that Merriweather's behavior results from drug use (as opposed to a psychotic disorder), Dr. Berger considered Merriweather's history of substance use. During his initial interview, Merriweather reported that he had used substances, such as alcohol, marijuana, and cocaine, on a daily basis before the robbery. (Tr. Vol. IV, 604). Such drugs were not available to him during his stay at FMC Butner and Merriweather had never been prescribed psychotropic medication before arriving at FMC Butner, nor was he placed on any medication during his stay at FMC Butner (with the exception of a cream for dry skin, medication for constipation, and a nutritional supplement). (*Id*. at 588).

3.      During Merriweather's 496-day stay at FMC Butner, a time when he was neither treated for mental illness nor under the influence of drugs, Merriweather was generally not observed to exhibit psychotic behavior. Although Dr. Berger acknowledged that there might have been, at most, a nurse's note suggesting that Merriweather may have been responding to internal stimuli, Dr. Berger never observed Merriweather responding to stimuli nor were there any consistent reports of such symptoms from his staff. (Tr. Vol. IV, 598). Eugene Singleton, who interacted directly with Merriweather on a daily basis as one of several staff members who (while working) checked on Merriweather every 15 minutes, observed no significant behavioral problems. (Tr. Vol. VIII, 1266-67). Singleton noted simply that Merriweather's behavior was fairly ordinary for someone waiting his time. (*Id*. at 1266). Consistent with Singleton's observations, Dr. Berger

40

mentioned that Merriweather maintained a clean cell (*Id.* at 1266-67, 1272), maintained acceptable hygiene (Tr. Vol. IV, 593-94), and exhibited no positive or negative signs of schizophrenia.  (*Id.* at 593-94, 597-98, 610-11, 618, 621).  Merriweather's speech pattern was clear and sophisticated (*id.* at 602, 605-06), and he had no difficulty communicating with staff.  (*Id.* at 596-97).

4.      Indeed, many of Merriweather's actions indicate a rational mind at work. Merriweather re-positioned the bed in his cell for greater privacy.  (Tr. Vol. IV, 594, Tr. Vol. VIII, 1272-73).  As an additional assurance of privacy, he posted a "no solicitation" sign on his door.  (Tr. Vol. IV, 598-99).  When he obtained a radio that was non-operational, Merriweather was able to successfully reconfigure it to work with the type of battery available to him.  (*Id.* at 614).  To pass the time, Merriweather also would often request novels  and magazines to read. (Tr. Vol. VIII 1268-69).

5.      However, Merriweather also engaged in curious behavioral patterns that might potentially raise a suspicion of mental illness.  Specifically, Merriweather, while at FMC Butner, as in other facilities, would undergo periods of protracted muteness, abstain from eating, and speak incoherently during taped interviews. (Tr. Vol. IV, 599, 589-93, 601-10).

6.      Nonetheless, although he considered the possibility that Merriweather might be suffering from mental illness, in light of Merriweather's demonstrated capacity for rational behavior, Dr. Berger eventually came to conclude that Merriweather's infirmities were feigned.

7.      With regard to Merriweather's periods of protracted muteness, Dr. Berger explained that there is a difference between actual mutism and selective silence.  Actual mutism refers to a situation where a patient cannot speak, even if the patient desires to communicate.  (Tr. Vol. III, 433; Tr. Vol. IV, 599).  Selective silence, on the other hand, describes a situation where a

patient is able to communicate when he chooses, but chooses not to communicate when it suits him. (*Id*. at 430).  Dr. Berger found Merriweather able to communicate when it served Merriweather's own interests. (Tr. Vol. IV, 596-97, 616).  Therefore, Dr. Berger concluded that Merriweather's silence was not a symptom of a mental disorder, but rather manipulative behavior.  (*Id.*).

   8. Similarly, Dr. Berger considered Merriweather's eating patterns to be less indicative of a mental disorder than of a strong will and a willingness to use nutrition as leverage to attain his goals.  Merriweather consumed both sealed, pre-packaged meals (*e.g.*, Ensure, T.V. dinners) as well as the regular trays provided at FMC Butner, so it did not appear that he was actually concerned about being poisoned.  (Tr. Vol. IV, 591).  He did, however, twice alter his eating habits in order to force the facility to place him under higher surveillance, which in turn meant that he was reassigned to a better cell.  (*Id*. at 591-92, 617, 663).

   9. Dr. Berger noted that Merriweather was calm and collected during the interviews, which was not something he would expect from someone who was decompensating. (Tr. Vol. IV, 605).  After the first two interviews, Merriweather refused further interviews until Judge Ott issued an order compelling Merriweather to participate in the videotaped interviews.  (Tr. Vol. IV, 606).  During the recorded interviews, Merriweather pretended not to know who Dr. Berger was, despite communicating with him without difficulty on a daily basis when not being videotaped.  (*Id*. at 601-04, 608-10; Gov't Ex. #11).  Merriweather was focused when the conversation was about routine matters.  (*Id*. at 593).  These behaviors led Dr. Berger to ultimately conclude that

Merriweather was not mentally ill, and that his unusual behavior represented various attempts to manipulate his environment.[31]  (*Id.* at 601-09).

### 8.   Jack Earley

Mr. Jack Earley, a California-based public defender retained by the Defense, accompanied Defense Counsel – Mr. Jaffe and Mr. Drennan – to see Merriweather on June 27, 2011. (Tr. Vol. V, 819).  Merriweather was initially unresponsive; however, as the three began to leave, a guard stopped them and told them that Merriweather recognized Mr. Jaffe and wished to speak with him. (Tr. Vol. V, 822).  This eventually led to a conversation that lasted hours. (Tr. Vol. V, 823).  Among the issues discussed during the conversation, Mr. Earley recalled that Merriweather was dismissive of the efficacy of retaining additional medical experts, telling his lawyer that "the judge was the one that was going to make the ultimate decisions in the case, and the judge didn't need to hear from defense lawyers or a defense doctor, especially since he already had doctors that he could rely upon." (Tr. Vol. V, 833).  Earley testified that Merriweather's speech during this conversation, while somewhat incoherent to others, seemed organized to Merriweather. (*Id.* at 838).

## II.  The Standard of Review

This case presents a question regarding whether the Government bears the burden of establishing competency, or whether Merriweather bears the burden of establishing that he is incompetent.  The language of Section 4241 is silent on this point, noting only that the court must find by a preponderance of the evidence that a defendant is incompetent to stand trial.  The legislative history is also silent.  "The Senate Report simply states: 'Subsection (d) of section 4241

---

[31] Although the Defense argues that he ignored nursing charts in performing his evaluation, Dr. Berger clarified that he reviewed the nurses' progress notes and spoke directly to the nursing staff about Merriweather.  (Tr. Vol. IV, 645). Moreover, Dr. Berger had prescribed that his staff check on Merriweather every 15 minutes.  (Tr. Vol. VIII, 1266-67).

provides that the court must make a determination with respect to [a] defendant's competency based upon a preponderance of the evidence.'" *United States v. Gigante*, 996 F.Supp. 194, 199 (E.D.N.Y. 1998) ("Legislative history does little to provide additional guidance.").

In *Cooper v. Oklahoma*, 517 U.S. 348 (1996), the Supreme Court briefly addressed this issue, albeit in dicta. The Court held that an Oklahoma statue requiring defendants to prove incompetence to stand trial by clear and convincing evidence violated a defendant's due process rights under the Fourteenth Amendment. *Id.* at 356, 369. In the context of a discussion on the varying burdens of proof required in the fifty states, the Court noted:

> Indeed, a number of States place no burden on the defendant at all, but rather require the prosecutor to prove the defendant's competence to stand trial once a question about competency has been credibly raised. The situation is no different in federal court. *Congress has directed that the accused in a federal prosecution must prove incompetence by a preponderance of the evidence.* 18 U.S.C. § 4241.

*Id*. at 361-62 (emphasis added). As the Eleventh Circuit has also noted, "a petitioner raising a substantive claim of incompetency is entitled to no presumption of incompetency and must demonstrate his or her incompetency by a preponderance of the evidence." *Battle v. United States*, 419 F.3d 1292, 1298 (11th Cir. 2005), *quoting Medina v. Singletary*, 59 F.3d 1095, 1106 (11th Cir. 1995) (internal quotations and citations omitted).

The Government's position is that it should assume the burden of proof (based upon a preponderance of evidence standard) in this case. The court agrees. As indicated in a previous order (Doc. #133), the court recognizes that there is a split of authority on the question, but has carefully reviewed the statute, the relevant case law, and the parties' arguments. After doing so, the court concludes that the decision in *United States v. Talley*, 2010 WL 4791821 (S.D. Fla. 2010) is well-

reasoned and correctly decided.  Thus, this court finds that the burden of proof at a pretrial competency hearing rests squarely on the Government and that *United States v. Makris*, 535 F.2d 906 (5th Cir. 1976), is binding precedent on this court.[32]  Moreover, the holding in *Makris* fits here — not only legally, but also logically.  That is, the *Makris* holding[33] best serves to protect a charged defendant's interests and protects his rights.

### III.  Analysis of Whether Defendant is Competent to Stand Trial

For the reasons explained below, the court finds the Government has met its burden in establishing that Defendant is competent to stand trial.  This court finds that Merriweather is not presently suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable (1) to understand the nature and consequences of the proceedings against him or (2) to assist properly in his defense.

For these reasons, the court finds by a preponderance of the evidence that Defendant Merriweather is competent to stand trial and, accordingly, a trial date will be set by future order.

---

[32] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

[33] In *United States v. Makris*, 535 F.2d 899 (5th Cir. 1976), the former Fifth Circuit reviewed a trial court's determination that a criminal defendant who had undergone brain surgery was competent to stand trial under 18 U.S.C. § 4244, the predecessor statute to 18 U.S.C. § 4241. While reviewing the defendant's contention that the government had to prove his competence beyond all reasonable doubt, the court in *Makris* noted that "[t]here can be no question that in federal criminal cases the government has the burden of proving defendant competent to stand trial at the § 4244 hearing or its *nunc pro tunc* substitute." *Id.* at 906.  The court is aware that Eleventh Circuit cases after *Makris* have since found that placing the burden of proving incompetence on the defendant does not violate his due process rights. *See e.g. United States v. Bradley*, 644 F.3d 1213, 1268 (11th Cir. 2011); *United States v. Izquierdo*, 448 F.3d 1269, 1278 (11th Cir. 2006); *Battle v. United States*, 419 F.3d 1292, 1298 (11th Cir. 2005); *Medina v. Singletary*, 59 F.3d 1095, 1106 (1995).  But, quite obviously, if placing the burden of proof on the defendant does not violate his due process rights, then surely placing the burden of proof on the government offends no constitutional rights of the accused.  Indeed, such a shifting of the burden is even more protective of a defendant's rights.

Therefore, Defendant's Motion (Doc. #65) is due to be denied with respect to his request that the court find Defendant incompetent to stand trial.

The law is well-settled: "a criminal defendant may not be tried unless he is competent." *Godinez v. Moran*, 509 U.S. 389, 396 (1993); *Drope v. Missouri*, 420 U.S. 162, 172-73 (1975); *see also United States v. Sanchez-Ramirez*, 570 F.3d 75, 80 (1st Cir. 2009). "Competence to stand trial is rudimentary, for upon it depends the main part of those rights deemed essential to a fair trial." *Riggins v. Nevada*, 504 U.S. 127, 139 (1992) (Kennedy, J. concurring in judgment) (citing *Drope*, 420 U.S. at 171-72). This fundamental protection is secured by the Fifth Amendment's Due Process Clause. *United States v. Rahim*, 431 F.3d 753, 759 (11th Cir. 2005). In the seminal case in this area, *Dusky v. United States*, 362 U.S. 402 (1960), the Supreme Court held that competency to stand trial depends upon whether a criminal defendant "has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding and whether he has a rational as well as factual understanding of the proceedings against him." *Id.* at 420. In *Dusky* the court announced the two-pronged standard for determining a defendant's competency to be "whether he has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding—and whether he has a rational as well as factual understanding of the proceedings against him." 362 U.S. 402, 402 (1960). *Dusky* remains the law. *See Cooper v. Oklahoma*, 517 U.S. at 354 ("The test for incompetence is also well settled"); *Godinez*, 509 U.S. at 402 (rejecting multiple standards in favor of the "*Dusky* formulation" as the standard for determining competency); 18 U.S.C. § 4241(a) (codifying the *Dusky* standard for determination of mental competency to stand trial[34]); *United States*

---

[34] *See* Insanity Defense Reform Act of 1984, Sen. R. No. 98-225, at 236 (1983), reprinted in 1984 U.S.C.C.A.N. (98 Stat.) 3182, 3418 ("This test of competency, in essence, adopts the standards set forth by the Supreme Court in *Dusky v. United States*."); *see also United States v. Wiggin*, 429 F.3d 31, 37 n. 8 (1st Cir. 2005).

*v. Cruz*, 805 F.2d 1464, 1479 (11th Cir. 1986) (reaffirming the *Dusky* standard in the Eleventh Circuit).

A.      **The Statutory Standard for Competency to Stand Trial**

Title 18 U.S.C. §§ 4241 and 4247 of the United States Code set forth the procedures for determining whether a defendant is competent to stand trial.  The court must first conduct a competency hearing in accordance with 18 U.S.C. § 4247(d).[35]  If the court finds that the defendant is incompetent to proceed to trial, it must then commit the defendant to the custody of the Attorney General for "treatment in a suitable facility," for a "reasonable period of time, not to exceed four months, as is necessary to determine whether there is a substantial probability that in the foreseeable future [the defendant] will attain the capacity to permit the trial to proceed." 18 U.S.C. § 4241(d)(1).

Section 4241(d) outlines a two-prong legal standard for determination of a defendant's mental competency to stand trial:

> If, after the hearing, the court finds by a *preponderance of the evidence* that the defendant is presently suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable
>
> [1] to understand the nature and consequences of the proceedings against him
>
> or
>
> [2] to assist properly in his defense the court shall commit the defendant to the custody of the Attorney General [for hospitalization]....  Determination of Mental Competency to Stand Trial, 18 U.S.C. § 4241(d) (2006) (emphasis added and spacing modified).

---

[35] Section 4247(d) provides that the defendant "shall be represented by counsel" and "shall be afforded an opportunity to testify, to present evidence, to subpoena witnesses on his behalf, and to confront and cross-examine witnesses who appear at the hearing."  *Id.*  Those requirements were satisfied at the hearing on these matters.

Section 4241 legislatively adopted the standard articulated by the Supreme Court in *Dusky*. *See United States v. Wiggin*, 429 F.3d at 37 n. 8.

**B.    Summary of Credibility Findings**

The Government has sought to show that, although Merriweather may have experienced drug-related psychotic symptoms in the past, he is not presently suffering from a mental disease or defect.  (Doc. #152 at 10).  Rather, the Government insists that Merriweather's current symptoms are feigned and his apparent inability to communicate with Defense counsel is deliberate.  On the other hand, the Defense urges that Merriweather is afflicted with schizophrenia as evidenced by his alleged history of hallucinations, odd behavior, and his lack of engagement with counsel.  After thoroughly reviewing the available evidence, including reports and records submitted by the parties, video recordings of Merriweather's interviews at FMC Butner, carefully considering testimony delivered at the hearing, and applying the governing legal standards, the court concludes that the Government has carried its burden of proving by a preponderance of the evidence that Merriweather is not currently suffering from any mental disease or defect, including schizophrenia.

In reaching this determination, the court has analyzed conflicting testimony from multiple expert witnesses.  Because the court has been tasked with resolving conflicts among competing interpretations of fact, it is worth explaining here how much weight the court gave to each of the expert witnesses who testified at the hearing.  The court does so not only to make its reasoning behind this decision more transparent, but also because the Defense has attacked the professional credibility of all of the expert witnesses called by the Government[36] by accusing them of having

---

[36] The Defense has specifically attacked the credibility of Drs. Pietz, Berger, and Gualtieri.  (Doc. #156 at 38-42).

48

performed their duties with "extreme negligence." (Doc. #156 at 42).  Such accusations should not be made lightly; once they are made, they must be evaluated seriously.

The main reason the Defense provides for asserting that Drs. Pietz, Berger, and Gualtieri have acted with "extreme negligence" is that each one of them ultimately found that Merriweather does not have schizophrenia.  (Doc. #156 at 39-41).[37]  The loose bolt in the logic is the assumption that finding some symptoms commonly present in a particular disease or condition should automatically lead to a diagnosis of that disease.  First, common experience (and common sense) teaches that many conditions may share the same symptomatology.  Second, common sense also teaches that many symptoms can be faked.  Doctors, by virtue of their training and experience, may use their extensive medical knowledge to identify a diagnosis that best fits the observed symptoms. Therefore, while it is true that Drs. Pietz, Berger, and Gualtieri have each testified that some of the

---

[37] In essence, the structure of this syllogism follows a peculiar logical pattern:

1.)     Merriweather's symptoms include X, Y & Z;

2.)     Symptoms X & Y could indicate schizophrenia, though other explanations exist; and

3.)     Therefore, it follows that all of these doctors must have acted with extreme negligence when they ultimately concluded that symptoms X & Y are better explained by something other than schizophrenia.

For obvious reasons, this argument fails, at least in part because of its faulty logic.  For example, the Defense could just as well argue that it would be "extremely negligent" to conclude that Merriweather does not have a condition like ovarian cancer because:

1.)     Merriweather's symptoms include significant weight loss and loss of appetite;

2.)     Significant weight loss and loss of appetite could indicate ovarian cancer, though other explanations exist; and

3.)     Therefore, all of these doctors must have acted with extreme negligence when they ultimately concluded that Merriweather's weight loss and loss of appetite are better explained by something other than ovarian cancer.

Clearly, something is amiss.  (Note: the court understands that this analogy leads to an absurd result – but that is the point.).

behaviors arguably exhibited[38] by Merriweather *could* be interpreted to be consistent with a diagnosis of schizophrenia, they all found that those behaviors are better explained by other causes.[39]

Here the court is confronted with competing (and irreconcilable) opinions by two groups of expert witnesses.  In the unique context of this case, the court concludes that a significant factor to consider is the familiarity and exposure each expert witness had with (and to) Merriweather, the thoroughness of the evaluation performed, and the care with which the respective experts reached their conclusions.  Because of the particular set of facts in this case,[40] there was one measurement that effectively encapsulated all of these criteria: the duration of continuous interaction between the expert and Merriweather.  The validity of using the amount of time spent with Merriweather in evaluating an expert witness' credibility is undisputed between the parties.  Indeed, the Defense has suggested that the court should completely discredit the evaluations conducted by Dr. Gualtieri because "[h]is exposure to Merriweather was limited."  (Doc. #156 at 42).  However, what is sauce for the goose is sauce for the gander; if the court were to discredit every expert witness who had limited exposure to Merriweather, it would have to discredit all of the Defense's expert witnesses. The court declines to go so far.  But the court does note that, in this classic battle of the experts, the

---

[38] Actually, each of the experts called by the Government did not conclude that Merriweather exhibits symptoms of schizophrenia. When asked by Defense counsel whether certain symptoms are considered consistent with schizophrenia, they merely affirmed that those symptoms are commonly accepted symptoms of schizophrenia.  (*See* Tr. Vol. I, 111-12; Tr. Vol. IV, 666; Tr. Vol. III, 549).  The experts, however, at other points of their testimony denied that Merriweather exhibited those symptoms.  (*See* Tr. Vol. I, 46-47; Tr. Vol. IV, 663-64; Tr. Vol. III, 436).  So Defendant's claim that "each expert, Defense and Government, testified that Mr. Merriweather showed signs of these positive and negative symptoms [of schizophrenia]" is simply off the mark.

[39] Of course, the acknowledgment by these doctors that they recognize the existence here of certain symptoms of schizophrenia that actually may be rough indicators of that condition only serves to bolster the credibility of their final assessments because they have shown that they considered, but separately and affirmatively rejected, the conclusion that these manifestations point to a diagnosis of schizophrenia.

[40] Namely, the court notes the great disparity between the amount of time Drs. Pietz and Berger invested in evaluating Merriweather, and the time spent by all other expert examiners.

witnesses called by the Government were necessarily able to spend much more time evaluating Merriweather. The maximum estimated time spent cumulatively by all of the Defense's expert witnesses with Merriweather amounts to less than one day.[41]  Dr. Pietz's evaluation lasted 75 days. Dr. Berger's evaluation took place over 496 days.  Because Drs. Pietz and Berger have each individually spent more time evaluating Merriweather than all the other medical experts combined, the court gives substantial credit to their testimonies.  In particular, where conflicts in expert witness testimony arose concerning Merriweather's abilities, the court has given more weight to the testimonies of Drs. Pietz and Berger over those of the other expert witnesses.[42]  After carefully reviewing the evidence, the court makes the following findings.

## C.    Merriweather Does Not Currently Suffer from Schizophrenia

The Defense argues that Merriweather currently suffers from schizophrenia and that his schizophrenia is evidenced by the following symptoms:[43] (1) hallucinations, (2) mutism, (3) poor hygiene, (4) flat affect, and (5) weight loss.  To bolster this argument, the Defense asserts that these symptoms are valid because tests showed that Merriweather was not malingering.  (Doc. #156 at 43). The Defense also argues that brain scans provided objective evidence that Merriweather has schizophrenia.  For the following reasons, the court finds none of these arguments hold water.

_____

[41] The sum total of the time spent by Drs. Merikangas (1.5 hours), Dudley (16 hours), and Mirsky (4.5 hours) amounts to 22 hours.

[42] The court is quick to note that the amount of time spent with Merriweather is but one of the factors the court has considered in crediting the testimony of Drs. Pietz and Berger.  Indeed, the court was impressed with the testimony of Drs. Pietz and Berger, particularly the latter.  Of all the experts called to testify, Dr. Berger appeared to be the most balanced and careful.  He was not an "advocate" in any sense.

[43] While Defendant's brief states that "each [expert] testified that behaviors they witnessed could be a positive or negative symptom of schizophrenia," it never explicitly enumerates which behaviors are believed to evidence schizophrenia.  (Doc. #156 at 37).  Consequently, the court has scoured the record for all relevant behaviors discussed at the hearing.

51

### 1.      Hallucinations

The court has counted five specific instances[44] where Merriweather was alleged to have responded to internal stimuli (hallucinations).  As explained more fully below, four of these alleged incidents are discredited; and the other one coincided with his illicit drug use.

The first incident was described by Merriweather's former girlfriend, Latisha Simpson, who testified that Merriweather experienced "visions and hallucinati[ons]." (Tr. Vol. III, 554).  Further questioning revealed that Simpson's statement about "visions and hallucinati[ons]" actually referred to one bad dream.  (*Id.*).

Another incident that could arguably be described as a hallucination was Merriweather's mention of an alleged accomplice named "Charlie" during his recollection of the robbery in interviews with Dr. Pietz.  (*See* Tr. Vol. I, 32-33; Doc. #24 at 15).  Dr. Pietz dismissed these accounts as an attempt by Merriweather to deflect responsibility for the robbery and noted that Merriweather stopped talking about "Charlie" after she pointed out discrepancies between Merriweather's account and the investigative record.[45]  (Tr. Vol. I, 35).

---

[44] Dr. Dudley and Dr. Merikangas have mentioned *non-specific* accounts of Merriweather responding to internal stimuli, but these accounts are insufficiently detailed for the court to evaluate them.  Dr. Dudley testified during the hearing that Merriweather appeared to be responding to internal stimuli when he visited him in 2009.  (Tr. Vol. VI, 943).  However, no mention of internal stimuli was included in Dr. Dudley's affidavit (Tr. Vol. VI, 965) and further prodding revealed that "internal stimuli" to Dr. Dudley simply referred to "something that was causing [Merriweather] to smile." (Tr. Vol. VI, 965, 1084).  Dr. Merikangas similarly testified that he saw Merriweather "responding to some internal stimulus," but cautioned that he "didn't know what it was." (Tr. Vol. 1149).  Without more information, the court cannot reach any conclusions about these facts without engaging in armchair speculation, which this court declines to do.

[45] One may be led to suspect that Merriweather conceived of "Charlie" following his initial interview at the Jefferson County Jail.  (*See* Def. Ex. #16 at 88).  The name is also shared by a sister-in-law of a family friend.  (*See* Def. Ex. #109 at 1).  In any case, eyewitness accounts make it clear that there was no accomplice.  (Def. Ex. #13).  Moreover, after carefully listening to the tape of the police interrogation where "Charlie" was referenced (Def. Ex. 17), the court concludes that this creation by Merriweather was an attempt at deception, not the result of hallucination.

The third incident also occurred during Merriweather's evaluation at MCFP Springfield. On a single occasion, Merriweather told the on-call psychologist, Dr. Leanne Preston, that he thought he might be suicidal and reported seeing gremlins. (Tr. Vol. I, 39). Dr. Preston wrote in her report that she found Merriweather's claim of seeing gremlins to be suspicious. (Tr. Vol. I, 40). Dr. Pietz was similarly skeptical of Merriweather's claim for at least five reasons: (1) visual hallucinations are more consistent with illicit substance abuse than psychosis; (2) in the rare cases where an individual actually experiences a visual hallucination, the hallucination is usually frightening and not casually mentioned; (3) people who complain about suicide are typically not actually suicidal since drawing attention to their suicidal inclinations increases the risk that their suicide attempts will be intercepted; (4) after being placed under suicide watch, Merriweather became primarily concerned about the loss of privacy and requested to be taken off suicide watch, and (5) where true hallucinations never completely go away, Merriweather never again mentioned gremlins. The court finds Dr. Pietz's reasoning persuasive and concludes that Merriweather's claim of seeing gremlins was most likely pretense.

The fourth incident that could potentially be interpreted as a hallucination was a single occasion when Merriweather was found scraping his arms with a spork and complaining that there were bugs in the room. (Tr. Vol. I, 42). Merriweather mentioned the bugs casually and never complained about bugs in his cell again. (*Id.*). For the same reasons she discounted Merriweather's account of gremlins, Dr. Pietz found this claim similarly suspect.

Finally, the fifth incident was related by Merriweather's sister, Kim Patton, who testified that sometime in either late 2001 or 2002, Merriweather told her that he was hallucinating that there were demons in everybody, including members of his family. (Tr. Vol. II, 299-300). Patton suspected

drug use, which Merriweather confirmed when Patton raised the question.  (Tr. Vol. II, 300).  From a review of the record, the court finds that the best theory to explain the association between Merriweather's hallucinations and his substance abuse is that his substance abuse caused his hallucinations.

It is largely uncontested that Merriweather has used illicit substances.  During interviews with Dr. Pietz, Merriweather described a history of substance abuse that began with alcohol at age 14, grew to include marijuana at age 17, and expanded to included cocaine, crystal methamphetamine, and ecstasy by age 22.  (Tr. Vol. I, 43).  He also acknowledged using "various pills" and injecting heroin intravenously.  (*Id.*).  Following the robbery, Merriweather tested positive for opiates while being treated at UAB Hospital.  (Def. Ex. #15 at 18).

There is also a correlation between Merriweather's history of substance abuse and reports of his odd behavior.  As already noted, Merriweather's complaint to Patton that he was seeing hallucinations was followed by an admission that he had been taking drugs.  (Tr. Vol. II, 300).  Similarly, when Merriweather told his father that he was hearing voices, it was revealed that Merriweather had been taking drugs.  (Doc. #24 at 7).

According to Dr. Pietz, hallucinations are actually quite rare, and, in any event, more consistent with illicit drug use than psychosis.  (Tr. Vol. I, 40).  Substances such as marijuana, cocaine, crystal methamphetamine, alcohol, and ecstacy can cause psychotic symptoms to develop and persist for years after direct drug use has ceased.  (Tr. Vol. I, 40, 43, 121-22, 159, 163; Tr. Vol. IV, 604).  Given that hallucinations are more likely to arise from drug use than from actual psychosis, and that prolonged drug use can cause hallucinations and psychotic-like symptoms long after the consumption of such drugs has ceased, it is reasonable to conclude that someone who has

54

not only had a history of extensive drug use, but a history[46] of hallucinations that coincided with that drug use, most likely suffers from hallucinations (to the extent that he suffers from actual hallucinations rather than dreams) because of substance abuse, not a mental disease. The court finds this is the case here and, therefore, the court adopts the findings of Drs. Berger and Pietz that Merriweather's psychotic-like symptoms are most likely drug-induced, not the product of a mental disease.

### 2.    Mutism

It is not clear whether the Defense has raised Merriweather's refusal to communicate with Drs. Dudley and Merikangas solely for the argument that Merriweather's lack of engagement amounts to mutism, a negative symptom of schizophrenia, or the Defense seeks to show that Merriweather's alleged mutism renders him unable to assist counsel. In any case, both arguments miss the mark.

The great weight of the evidence indicates that Merriweather is not actually mute. As Dr. Berger explained, there is a difference between actual mutism and selective silence. People who are actually mute cannot speak whereas people who are selectively silent can speak, but choose not to when it suits them. (Tr. Vol. III, 430; Tr. Vol. IV, 599). Dr. Berger found that Merriweather was being selectively silent. (Tr. Vol. IV, 596-97; Def. Ex. #51 at 1) (Merriweather was "mute with most of the staff but, ... [was] interested and willing to discuss" what Dr. Berger wrote in his report.). Medical and correctional professionals who observed Merriweather, such as Diana Shirley, Kelly

---

[46] The court notes that while interacting with Dr. Mirsky, Merriweather never self-reported any hallucinations or delusions. (Tr. Vol. VI, 1090-91). Indeed, virtually all the reports of these purported symptoms were historical in nature (and, as the court has already noted, this "history," which was garnered from Merriweather's family members, is less than credible in some instances).

Hammonds, Eugene Singleton, and Timothy Laatsch all communicated freely with Merriweather. (Tr. Vol. VII, 1233-34; Tr. Vol. VII, 1244; Tr. Vol. VIII, 1268; Tr. Vol. VII, 1229). Dr. Mirsky testified that "[t]here was no period of time when [Merriweather] was mute with [him]." (Tr. Vol. VI, 1091).

Even with respect to those incidents to which the Defense points as evidence of Merriweather's mutism,[47] the record evidence reveals Merriweather's ability to speak. Dr. Dudley testified that when Merriweather refused to speak with him, he dismissed him with "hand signals and the verbal refusal to speak." (Tr. Vol. VI, 946). After Merriweather's attorneys and Jack Earley were initially turned away during a visit on June 27, 2011, Merriweather told a guard to call his lawyers back because he recognized Jaffe and wanted to talk. (Tr. Vol. V, 821). When Mr. Earley and Mr. Jaffe returned, Merriweather engaged in a conversation with Mr. Jaffe that, according to Earley, lasted for hours. (Tr. Vol. V, 822-23). Merriweather himself decides when to speak, and when not to. The evidence shows his silence is not connected to any psychosis.[48]

### 3.    Poor Hygiene

The relationship between personal hygiene and schizophrenia was raised at least two times during the hearing. First, the Defense asked Dr. Berger if Merriweather's poor hygiene is a negative symptom of schizophrenia. (Tr. Vol. V, 762). Dr. Berger denied that hygiene was a major issue for

---

[47] Having reviewed the "silent" tapes from the Shelby County Jail (Def. Ex. #121, 131-35), the court cannot tell whether Merriweather was communicating with his attorneys, deliberately not communicating with his attorneys, or a combination of both. The court does, however, note that the testimony provided by Defense witnesses alleging that Merriweather is unable to communicate is belied by other testimony – by both Government and Defense witnesses – indicating that Merriweather engaged in long conversations with his attorneys. (*See e.g.*, Tr. Vol. V, 822-23) (testimony by Jack Earley that Merriweather engaged in conversation with Mr. Jaffe for hours). To be sure, the evidence in the record indicates that Merriweather can be less than communicative when he decides to do so.

[48] This conclusion is buttressed by the testimony of Dr. Mirsky, who indicated that Merriweather was cooperative during his evaluation. (Tr. Vol. VI, 1089).

Merriweather while he was at FMC Butner and further noted that poor hygiene may be used by a prisoner as a tool to get attention.  (*Id.*).  Dr. Dudley suggested that Merriweather's hygiene was indicative of his inability to take care of himself, which was indicative of Merriweather's mental condition.  (Tr. Vol. VI, 929).  While poor hygiene is not a symptom of schizophrenia, Dr. Dudley offered it as a proxy for Merriweather's inability to care for himself (*i.e.*, another sign of disorganized behavior).  (*Id.*).  When pressed on that point, Dr. Dudley admitted that he was unaware of Judge Ott's order, issued subsequent to Dr. Dudley's last visit with Merriweather, that directed staff at the Shelby County Jail to force bathe Merriweather if necessary.  (*Id*. at 999).  As it turns out, forced bathing was unnecessary because Merriweather, when faced with Judge Ott's order, began bathing himself daily without issue.  (Tr. Vol. VII, 1220; Tr. Vol. VII, 1249).  Therefore, the court finds, in any event that Merriweather had the ability (and mental capacity) to care for his personal hygiene, but simply declined to do so until a court order motivated him to act.

### 4.    Flat Affect

It is uncontested that flat affect can be one negative symptom of schizophrenia.  (Tr. Vol. V, 770; Tr. Vol. VI, 933).  However, only Dr. Dudley testified to Merriweather exhibiting flat affect.[49] Dr. Dudley repeatedly commented during the hearing that Merriweather's "affect was largely flat" (Tr. Vol. VI, 944, 952, 999, 1002)  It remains unclear, however, how significant this detail was to Dr. Dudley shortly after his interviews with Merriweather as his reports never mention Merriweather having a flat affect.  (*Id*. at 965-66).  Indeed, Dr. Dudley's most recent report states that Merriweather's "affect was often inappropriate, in th[at] he often smiled and laughed while talking

---

[49] Earley did at one point during the hearing describe Merriweather as "flat," but that was a reference to his energy level.  (*See* Tr. Vol. V, 837).

about content that didn't merit such response." (Def. Ex. #9 at 5). It is difficult to reconcile Dr. Dudley's testimony describing Merriweather as having a "flat" personality with his testimony that Merriweather "often smiled and laughed." Accordingly, Dr. Dudley's testimony as to Merriweather's "flat affect" is given little weight.

     **5.**     **Weight Loss**

The Defense has presented two theories to connect Merriweather's weight loss to schizophrenia: (1) it results from a delusion of persecution, which could be a negative symptom of schizophrenia (Tr. Vol. I, 120), and (2) "a person incapable of making basic decisions about [his] own physical health is in no position to make the sorts of decisions required of a defendant facing the death penalty." (Doc. #156 at 44). Regarding the first argument, when Merriweather refused to eat, the record simply does not suggest that a delusion of persecution was a primary reason why Merriweather fasted. Dr. Berger testified that weight loss is often a way for prisoners to get attention. (Tr. Vol. IV, 617). His observation notes related to his evaluation of Merriweather indicate that Merriweather used his refusal to eat "as a bargaining chip[,] asking for a phone call or other staff request." (Def. Ex. #53 at 1). "There is some apparent manipulation in this," Dr. Berger wrote, "where [Merriweather] will at times key a request with refusal of food if the request is not granted." (Def. Ex. #52 at 1). One example where Merriweather manipulated his weight to accomplish a desired result occurred during his stay in FMC Butner when he used weight loss to force the facility to house him in a better cell. (Tr. Vol. V, 761). On another occasion, Merriweather apparently fasted long enough to slip through a food slot in order to enter the cell of another inmate he disliked and "beat the stew out of [him]." (*Id*. at 899). Merriweather's use of his weight loss as a bargaining chip to manipulate others stopped after Director Shirley confronted him with a feeding

tube.  (Tr. Vol. VII, 1233).  Here, the Defense raises its second theory.  "[I]t is not rational for a person to have to be strapped down and threatened with a tube being snaked down his nose to finally get someone to eat," as "[a] rational person would never let it progress that far."  (Doc. #156 at 44). But that argument is undercut by Merriweather's own volitional conduct; he successfully negotiated with Director Shirley to avoid being force-fed.  (Tr. Vol. VII, 1233-35).  Judge Ott's court order made Merriweather's concerns about poisoned food immediately vanish.  Accordingly, even considering the Defense's own definition of the term, Merriweather is a rational person. Merriweather's ability to successfully negotiate with medical and correctional staff members shows that he is in fact capable of making decisions and engaging with his environment to reach his goals. His dietary habits have more to do with control issues (manipulation) than any alleged psychosis.

### 6.    Malingering

Medical symptoms can be malingered.  In an attempt to bolster the legitimacy of the aforementioned symptoms (and attack the findings of Drs. Berger and Pietz), the Defense has stated that "multiple experts concluded that [Merriweather] was not malingering in any of his tests that were administered to him."  (Doc. #156 at 43).  The Defense then names Drs. Pietz and Misky as experts who testified that Merriweather did not malinger on his tests.  (*Id.*)  In both cases, the Defense's assertion is off target.

First, contrary to the Defense's characterization of her testimony, Dr. Pietz did not "testif[y] that there were no signs of malingering in any of the tests she conducted."  (Doc. #156 at 43) (citing Tr. Vol. I, 67-68).  In the relevant testimony, Dr. Pietz was referring to her use of a validity indicator profile, a test that measures *effort*, not malingering.  (Tr. Vol. I, 50).  In other words, the validity indicator profile shows that Merriweather applied effort when taking Dr. Pietz's tests, but it does not

indicate whether such effort was exerted towards malingering or not. In fact, far from testifying that there were no signs of malingering during the testing process, Dr. Pietz recalled that some of Merriweather's responses led her to suspect malingering. (Tr. Vol. I, 49). When confronted about the suspicious test results, Merriweather admitted that he answered questions about whether or not he experienced hallucinations based on how he experienced the world when under the influence of illicit substances. (*Id.*).

In addition, the Defense makes an even less convincing argument when it asserts that "Dr. Mirsky testified that Merriweather did not malinger on any of the tests." (Doc. #156 at 43) (citing Tr. Vol. VI, 1050, 1060). Dr. Mirsky never testified that Merriweather did not malinger; he testified that he did not find evidence that Merriweather malingered. (Tr. Vol VI, 1050, 1060). To be sure, this is a distinction with a difference. Just as a fisherman should not conclude that the absence of fish in his net means that there is an absence of fish in the sea, the failure to catch Merriweather malingering does not prove that Merriweather did not malinger. This is precisely why Dr. Gualtieri testifed that a malingering test does not indicate with any assurance that a subject is not malingering. That is, a finding of no malingering on a malingering test can be a false negative. (Tr. Vol. III, 422-23). Putting aside the issue of *testing* for malingering, there is record evidence of Merriweather actually malingering in this record. Indeed, the court is more impressed with the testimony of Dr. Berger on this question. In his testimony, Dr. Berger recounted specific observations (made over a substantial period of time) about Merriweather's manipulative tactics.[50] (*See* Tr. 601-609, 658)

---

[50] Dr. Gualtieri also testified about similar conduct exhibited by Merriweather during their interviews. (Tr. Vol. III, 402) (testifying to Merriweather becoming "evasive and playful" during their interviews and refusing to answer questions or answering them in a nonsensical way).

(recounting Merriweather's dilatory interview tactics and attempts to bargain around or manipulate his environment).

Finally, in evaluating the Defense's claim that Merriweather did not malinger, it is worth remembering that the Defense has only cited testimony regarding whether Merriweather malingered on malingering tests, not whether he malingered his symptoms. As established in the preceding section, there is already abundant evidence of the latter.

### 7. Brain Scans

The Defense has also argued that objective evidence of schizophrenia exists in the form of brain scans interpreted by Dr. Merikangas. (Doc. #156 at 37). Dr. Merikangas, the Defense states, "has noted that the type of atrophy . . . that was found in [Merriweather's] brain is frequently seen in patients with schizophrenia." (*Id.*). There are two reasons why this statement is without merit: (1) the methodology appears suspect, but (2) even accepting Dr. Merikangas's methodology as valid, Dr. Merikangas's conclusion is far from conclusive.

First, the enterprise of diagnosing medical conditions using brain imaging techniques, such as MRI or PET, is questionable at best. Dr. Landis testified disapprovingly of Dr. Merikangas's methodology, noting that it is inappropriate to use imaging to diagnose behavior. (Tr. Vol. VIII, 1299). Dr. Gualtieri found the MRI scans to be ambiguous and questioned the legitimacy of attempting to make specific findings based on them. (*Id.* at 395-96). Even Dr. Merikangas himself cautioned that he "wouldn't presume to look at [the MRI scans] and say [he] c[ould] make a diagnosis from these tiny images." (Tr. Vol. VII, 1139-40).

Second, Dr. Merikangas, despite the suggestions otherwise by the Defense, never actually diagnosed Merriweather with schizophrenia. He mentioned that certain observations, such as a thin

corpus callosum and atrophy in the parietal lobe, may be "seen in people with schizophrenia." (Tr. Vol. VII, 1135-37). However, he also testified that the brain scans could also be consistent with other conditions, including conditions such as lupus, auto-immune diseases, post-encephalitis, some types of demyelinating disease, traumatic brain injuries, a viral infection that affects the brain (such as measles or HIV), and metabolic disturbances (like thyroid diseases or disorders of calcium metabolism). (Tr. Vol. VII, 1141). Given this inconclusive finding, and in light of the totality of evidence presented on the subject area, the brain scans simply do not prove much of anything.

Taking all the relevant facts into account, the court agrees with the findings of Drs. Pietz and Berger that Merriweather does not currently suffer from a mental disease or defect.

**D.      Application of the Relevant Standard**

While a finding of incompetency is predicated on the existence of a mental disease or defect,[51] the standard for evaluating a defendant's competency to stand trial is not a medical inquiry, but rather a question of constitutional due process. Our judicial system fundamentally requires that a criminal defendant may not be tried unless he is competent. *Cooper v. Oklahoma*, 517 U.S. 348, 354 (1996); *Godinez v. Moran*, 509 U.S. 389, 396 (1993); *James v. Singletary*, 957 F.2d 1562, 1569-70 (11th Cir. 1992).

The Defense asserts that the *Dusky* standard was "expanded to include a fourth element in *Drope v. Missouri*," specifically requiring that a defendant be able to "assist in preparing his defense." (Doc. #156 at 6, 34). It is not abundantly clear what language Defendant relies upon in

---

[51] *See* 18 U.S.C. § 4241(d) ("If, after the hearing, the court finds by a preponderance of the evidence that the defendant is presently suffering from a mental disease or defect rendering him mentally incompetent . . .").

urging this interpretation of *Drope*[52] as there is no pinpoint citation as to the source and the only place where the quoted text appears is as dictum (contained in an introductory paragraph generally describing the history of the prohibition against placing the mentally incompetent on trial).  *See Drope v. Missouri*, 420 U.S. at 171.  In any case, in the lines following the quoted text, the Supreme Court reaffirmed the two-pronged *Dusky* Standard.  *Drope*,  420 U.S. at 172 ("Accordingly, as to federal cases, we have approved a test of incompetence which seeks to ascertain whether a criminal defendant 'has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding — and whether he has a rational as well as factual understanding of the proceedings against him.'") (citing *Dusky*, 362 U.S. at 402).  Nowhere in *Drope* did the Supreme Court modify or replace the *Dusky* Standard, so *Dusky* remains the standard that this court must follow today.  *See also United States v. Saingerard*, 621 F.3d 1341, 1342 (11th Cir. 2010) (reaffirming the *Dusky* Standard as the test for competency in the Eleventh Circuit).

With that said, while the law is settled as to what the proper standard is, at least one prong of the standard remains poorly defined.  The Supreme Court has not yet fully explained what a "rational understanding" entails, much less whether "rational understanding" has the same meaning in the first prong as it does in the second prong.[53]  The court has not uncovered any Eleventh Circuit

---

[52] Defendant references *United States v. Duhon*, 104 F. Supp. 2d 663 (W.D. La. 2000), a widely-cited case in which the Western District of Louisiana interpreted *Drope* to add a fourth prong (*i.e.*, the Western District of Louisiana treated the second prong of *Dusky* as two separate prongs) to the *Dusky* Standard.  (Doc. #156 at 7).  That decision, however, is not binding precedent on this court and the reasoning behind creating a four-part test is unpersuasive.  In *Duhon*, the Western District of Louisiana espoused a four-part test based upon its reading of the American Bar Association's Mental Health Standard 7.4.1(b).  104 F. Supp. 2d at 670 n.25.  While Mental Health Standard 7.4.1(b) mentions all of the criteria in *Duhon*'s four-factor test, they are not listed as individual factors but rather embedded in two (admittedly lengthy) phrases separated by a single comma and a conjunction.  This suggests to the court that the better reading of Mental Health Standard 7.4.1(b) is that it articulates a two-part test.

[53] *See* Terry A. Maroney, *Emotional Competence, "Rational Understanding," and the Criminal Defendant*, 43 Am. Crim. L. Rev. 1375, 1381-85 (2006) (exploring possible meanings of the term "rational understanding").

precedent that explicitly defines "rational understanding," though some cases address the issue without providing a definition for the term.[54]  Among the few cases that have directly addressed this issue, the most extensive analysis this court has found appears in the Tenth Circuit's decision in *Lafferty v. Cook*, 949 F.2d 1546, 1549-51 (10th Cir. 1991).  In *Lafferty*, the Tenth Circuit deduced that the Supreme Court would consider "a defendant [to lack] the requisite rational understanding if his mental condition precludes him from perceiving accurately, interpreting, and/or responding appropriately to the world around him." *Id.* at 1551.  The Tenth Circuit then announced that it would use "a sufficient contact with reality as the touchstone for ascertaining the existence of a rational understanding." *Id.*

The court hesitates to adopt this interpretation because it is unclear how "sufficient contact with reality" makes a defendant's understanding *rational* as opposed to *factual*.  A defendant who has a sufficient contact with reality may know facts, such as the day of the week or the name of the current President, but the plain language of *Dusky* clearly indicates that competency requires something more.  "[I]t is not enough," the Supreme Court admonished in *Dusky*, "to find that the defendant is oriented to time and place and has some recollection of events."  362 U.S. at 402 (internal quotations omitted).  To give the *Dusky* standard effect, the term "rational understanding" must mean something different from a "factual understanding."

In *Drope*, the Supreme Court expounded upon the common law origins of the competency standard and noted that what matters to the Court is the role the prohibition against subjecting the

---

[54] *See e.g., Bundy v. Dugger*, 850 F.2d 1402, 1409-10 (11th Cir. 1988) (finding a defendant to have a rational understanding of the proceedings against him where the defendant expressed displeasure at one of the trial judge's instructions, evaluated some of the evidence against him, and criticized the state's closing argument for referring to facts not in evidence); *James v. Singletary*, 995 F.2d 187, 188 (11th Cir. 1993) (finding rational understanding where defendant participated in formulating defense strategy with attorneys). However, without a clear definition of what it means for an understanding to be "rational," these cases offer incomplete guidance on this issue.

mentally incompetent to trial plays in an adversarial system of justice.   420 U.S. at 172.   In explaining its understanding of that prohibition, the Supreme Court directed attention to a law review note[55] that argued that the *Dusky* standard can be best understood by viewing the primary purpose of the incompetency rules as not only safeguarding the accuracy of adjudication, but also protecting the fairness of the adversarial system.   (*Id.*).   To that end, the law review article suggested that rationality under the *Dusky* standard requires that a defendant have some ability to confer intelligently, to testify coherently, to follow and evaluate the evidence presented, and have some awareness of the significance of the proceeding and some ability to understand the charges against him, the defenses available to him, and the basic elements of a criminal trial.[56]   The court believes that this understanding best approximates what the Supreme Court had in mind regarding the standard for mental competency and will therefore use these criteria in evaluating Merriweather's rational understanding of the proceedings against him.

In the final analysis, the determination of competency is a legal conclusion.[57]   *United States v. Makris*, 535 F.2d 899, 908 (5th Cir. 1976).[58]   As such, in reaching a competency determination,

---

[55] Note, *Incompetency to Stand Trial*, 81 Harv.L.Rev. 455, 457-459 (1967).

[56] 81 Harv.L.Rev. at 458; *see also* JUDICIAL CONFERENCE OF THE DISTRICT OF COLUMBIA CIRCUIT, REPORT OF THE COMMITTEE ON PROBLEMS CONNECTED WITH MENTAL EXAMINATION OF THE ACCUSED IN CRIMINAL CASES BEFORE TRIAL 132 (1965); Peter R. Silten & Richard Tullis, *Mental Competency in Criminal Proceedings*, 28 Hastings L. J. 1053, 1058 (1976).

[57] The determination of competency as a whole is a mixed question of law and fact.   *Makris* 535 F.2d at 907 ("The question of competency, of course, is a mixed question of law and fact...").   The ultimate determination is a legal conclusion in the sense that competency is a legal concept that must be resolved by the courts and not expert witnesses. *Id.* at 908.   At the same time, the competency ruling is treated as a finding of fact for the purposes of direct review.   *See United States v. Hogan*, 986 F.2d 1364, 1371 (11th Cir. 1993) ("If a state court's conclusion that a defendant is competent to stand trial is a factfinding for habeas review purposes, and the Supreme Court has said it is, then it follows that the identical conclusion by a district court is a factfinding for purposes of direct review").

[58] *See Bonner*, 661 F.2d at 1209.

the court may consider the testimony of medical experts to establish facts; however, it may not abdicate its duty to reach the ultimate determination of a defendant's competency to stand trial. *Id.* at 905, 908. Likewise, the court is not obligated to accept without question the assertions of the lawyers concerning the competence of a defendant. *Drope v. Missouri*, 420 U.S. 162, 178 n.13 (1975). For reasons already articulated, the court concludes the Government has successfully borne its burden of proving by a preponderance of the evidence that Merriweather is competent to stand trial.[59] (*See* Doc. #133) (assigning burden of proof to the United States).

As already noted, the court finds that the Government has shown by a preponderance of the evidence that Merriweather does not currently suffer from a mental disease or defect. However and alternatively, even if Merriweather were found to suffer from an unidentified mental disease or defect, the presence of some mental illness does not necessarily make a defendant incompetent to stand trial. *See Median v. Singletary*, 59 F.3d 1095, 1107 (11th Cir. 1995) ("Not every manifestation of mental illness demonstrates incompetence to stand trial . . . neither low intelligence and mental deficiency, nor bizarre, volatile, and irrational behavior can be equated with mental incompetency to stand trial"); *United States v. Hogan*, 986 F.2d 1364, 1373 (11th Cir. 1993) (cognitive degeneration due to Alzheimer's Disease did not render defendant incapable of assisting attorney); *see also United States v. Vamos*, 797 F.2d 1146, 1150 (2nd Cir. 1986) ("It is well-established that some degree of mental illness cannot be equated with incompetence to stand trial."); *Hall v. United States*, 410 F.2d 653, 658 (4th Cir. 1969) ("[T]he presence of some degree of mental illness is not to be equated with incompetence to be sentenced."). The ultimate question under *Dusky* is whether

---

[59] To be crystal clear, the allocation of the burden of proof in this case has not affected the outcome of the competency determination since the evidence of competency is not in equipoise. *See Medina v. California*, 505 U.S. 437, 441 (1992).

a defendant has sufficient present ability to consult with his lawyers with a reasonable degree of rational understanding, and is able to have a rational and factual understanding of the proceedings against him.

Here, the preponderance of the evidence shows that (1) Merriweather has sufficient present ability to consult with his lawyers with a reasonable degree of rational understanding, and (2) Merriweather has both a rational as well as a factual understanding of the proceedings against him. Thus, Merriweather's functioning has not been impaired to a level below that required by *Dusky*.

### 1. Merriweather has Sufficient Present Ability to Consult with his Lawyers with a Reasonable Degree of Rational Understanding

The first prong of the *Dusky* standard, whether a defendant has "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding," concerns the ability of a defendant to effectively participate in his defense by communicating effectively with his counsel. *See Drope,* 420 U.S. at 171-72; *Cooper*, 517 U.S. at 356-57. It is worth emphasizing that the *Dusky* standard refers to the *ability* of a defendant to communicate with his attorneys, not his *willingness* to communicate with his attorney. Being able but unwilling to communicate with one's attorney does not make a defendant incompetent to stand trial. *See e.g., Ferry v. State*, 453 N.E.2d 207, 212 (Ind. 1983).

Merriweather's attorneys argue that Merriweather ought to be found incompetent under the first prong because "Merriweather is not engaged in meaningful communication with his counsel." (Doc. #156 at 44). In making this argument, the Defense correctly identifies the issue to hinge on whether Merriweather deliberately refused to communicate or was unable to communicate due to a mental disease or defect. (*Id.* at 44-45). However, in making these arguments, the Defense fails

67

to account for this critical distinction, arguing simply that Merriweather's communication with his counsel so far has been "insufficient to protect and exercise his Constitutional rights." (*Id.* at 45).[60]

This argument misses the target. The Defense has not shown that Merriweather *cannot* speak with his attorneys, but only that he *will not* speak with his attorneys (except, of course, when it pleases him). When Merriweather refused to speak with Dr. Merikangas in June 2011, he was not unresponsive to his environment; Dr. Merikangas testified that Merriweather waived food away. (Tr. Vol. VII, 1176). When Dr. Dudley testified to Merriweather's lack of communication, he indicated that the only communication he was able to elicit from Merriweather during his June 2011 visit came in the form of "the hand signals and the verbal refusal to speak with him." (Tr. Vol. VI, 946). While these experts were apparently seeking to express the view that Merriweather was unable to communicate, that assertion is actually undermined by their own testimony. Waiving away a food tray when it was offered shows that Merriweather is aware of his surroundings and able to respond to achieve a desired result (*i.e.*, sending the food away). Similarly, using hand signals and *verbally* expressing the desire not to see someone evinces Merriweather's ability to communicate his desire not to see that person.

Moreover, the conversation that took place the next day among Merriweather, Jack Earley, and Merriweather's attorneys belies the assertion that Merriweather is unable to communicate with his attorneys with a reasonable degree of rational understanding. As Earley, Jaffe, and Drennan were

---

[60] Along the way, Merriweather's attorneys have argued that the question of whether Merriweather's lack of communication was deliberate or involuntary may be resolved entirely by ascertaining that Merriweather has a mental illness. (Doc. #156 at 44-45). The Defense does not focus on this argument much though, noting that "such analysis may be somewhat superfluous" when compared with the later argument that Merriweather's communication with his attorneys has been objectively lacking. However, the problem with this argument is not that it is superfluous, but that it is incorrect; merely because a defendant is afflicted with a mental illness does not necessarily render that defendant incompetent. *See Median*, 59 F.3d at 1107; *Hall* 410 F.2d at 658.

leaving the Shelby County Jail, Merriweather told a guard to call them back because he recognized Jaffe and wanted to talk with him. (Tr. Vol. V, 822). The conversation lasted for hours. (*Id.* at 822-23). Earley testified that Merriweather's speech during this conversation seemed organized (at least to Merriweather). (*Id.* at 838). By the Defense's own testimony, although they contend Merriweather is not able to consult his counsel, he has consulted his lawyers when he desired to speak with them. Merriweather's refusal to speak with members of the Defense team can therefore be best understood to show, not a lack of ability, but a lack of cooperation. As the Eleventh Circuit has noted previously, even if a criminal defendant is "at times uncommunicative with his counsel, periods of uncooperativeness alone are insufficient to support a finding of incompetence." *United States v. Jones*, 200 F. App'x 915, 921 (11th Cir. 2006).[61]

The Defense may protest that, while their own evidence demonstrates that Merriweather is able to consult with his counsel, it does not establish that Merriweather is able to consult with his lawyers with a reasonable degree of rational understanding. Since this requires inquiring into whether Merriweather has rational understanding of the proceedings against him, the court turns now to the second prong of *Dusky*.

### 2.   Merriweather has a Rational as Well as a Factual Understanding of the Proceedings Against Him

*Dusky* requires that a defendant have both a *rational* as well as a *factual* understanding of the proceedings against him. 362 U.S. at 402. Subsequent cases have clarified that the standard does not require that a defendant actually have a present rational and factual understanding of the proceedings against him, but only that he is capable of having a rational and factual understanding

---

[61] Although *Jones* is an unpublished decision, the quoted language is a legal statement which is true beyond question.

of the proceedings against him. *Cooper v. Oklahoma*, 517 U.S. 348, 368 (1996) ("The deep roots and fundamental character of the defendant's right not to stand trial when it is more likely than not that he lacks the capacity to understand the nature of the proceedings against him or to communicate effectively with counsel mandate constitutional protection."); *Godinez v. Moran*, 509 U.S. 389, 401 (1993) ("Requiring that a criminal defendant be competent has a modest aim: It seeks to ensure that he has the capacity to understand the proceedings and to assist counsel."); *Drope v. Missouri*, 420 U.S. 162, 171 (1975) ("A person whose mental condition is such that he lacks the capacity to understand the nature and object of the proceedings against him, to consult with counsel, and to assist in preparing his defense may not be subjected to a trial."). The Government has shown by a preponderance of the evidence that Merriweather is capable of having both a rational and a factual understanding of the proceedings against him.

> **a.** **Merriweather has a Factual Understanding of the Proceedings Against Him**

The evidence leaves little doubt that Merriweather has a factual understanding of the proceedings against him. In his interviews with Dr. Pietz, Merriweather provided clear, detailed, and coherent recollections of the robbery. (Doc. #24 at 16). Merriweather correctly identified the roles of the judge, the prosecutor, and the Defense counsel. (*Id.*). He knew that a jury of 12-14 jurors would be selected from his community. (*Id.*). He was aware of the insanity defense, understood the meaning of a guilty plea, and indicated that "a defendant should discuss the options [sic] of a plea bargain with his attorney." (*Id.*). During his conversation with his lawyers in the presence of Mr. Earley, Merriweather told his lawyers that "the judge was the one that was going to make the ultimate decisions in the case, and the judge didn't need to hear from defense lawyers or a defense doctor, especially since he already had doctors that he could rely upon." (Tr. Vol. V, 833). While

70

Merriweather's understanding of the facts may reflect a cynical outlook, it is nonetheless connected to reality.

### b.      Merriweather Has a Rational Understanding of the Proceedings Against Him

As established earlier, to determine whether Merriweather has a rational understanding of the proceedings against him, the court considers whether Merriweather has some ability to (1) confer intelligently and testify coherently, (2) to follow and evaluate the evidence presented, (3) has some awareness of the significance of the proceeding, and (4) has some ability to understand the charges against him, the defenses available to him, and the basic elements of a criminal trial.

### (1)      Merriweather Has the Ability to Confer Intelligently and Testify Coherently

The evidence has demonstrated that Merriweather has had the ability to communicate intelligently and coherently with psychological examiners and correctional officers over the years, and has that ability at present.  The transcript from Merriweather's initial interview at the Jefferson County Jail shows that Merriweather had no difficulty communicating intelligently and coherently with investigators on the day after the robbery.  (Def. Ex. #16).  During his evaluations at MCFP Springfield, Dr. Pietz found Merriweather articulate and noted that his speech was rational and coherent, and that he would pause to think about what he wanted to say.  (Tr. Vol. I, 27, 54).  Officer Singleton, a corrections officer at FMC Butner, noted that he was able to communicate with Merriweather without difficulty and that their interactions seemed normal.  (Tr. Vol. VIII, 1268). Dr. Berger testified that Merriweather should be able to consult with his attorneys since he could certainly communicate reasonably with himself, nurses, and correctional officers.  (Tr. Vol. IV, 621). Dr. Gualtieri testified that Merriweather maintained appropriate behavior and communicated with an attentive and pleasant demeanor when engaged in small talk, though noted that Merriweather

could become evasive when he wanted to. (Tr. Vol. III, 401-02). Officer Laatsch, a corrections officer at the Shelby County Sheriff's Office, indicated that he had no problems understanding Merriweather. (Tr. Vol. VII, 1229). Merriweather's ability to communicate intelligently and coherently was also clearly evident when he engaged in successful negotiations with Director Shirley to avoid being force fed. (*Id*. at 1233-34). While Merriweather refused to meet with Drs. Merikangas or Dudley, he conferred with Mr. Earley and his attorneys the next day with sufficient intelligence and coherence that Mr. Earley testified that he recognized that Merriweather's speech at least seemed organized to himself.[62] (Tr. Vol. V, 838). The evidence clearly establishes that Merriweather is able to confer intelligently and coherently.

### (2)   Merriweather Has the Ability to Follow and Evaluate the Evidence Presented

The record also shows that Merriweather does have the ability to follow and evaluate the evidence in his trial because his behavior, especially when he attempts to be evasive, reveals a rational, manipulative mind. During his interview with Jefferson County Investigators, Merriweather frequently paused to consider his answers and repeatedly tried to stall the interview. (Def. Ex. #16 at 12, 18, 25). During his interviews with Dr. Pietz, Merriweather would take time to think through his responses (Tr. Vol. I, 46, 57) and recognized when to change them when they were not eliciting the response that he wanted, such as when he changed his recollection of the robbery. (*Id*. at 35). Merriweather also demonstrated that he is able to predict the path of a conversation and react accordingly, which Dr. Gualtieri noticed when Merriweather would become more evasive when the conversation turned to topics relevant to the instant proceedings against him. (Tr. Vol. III, 404-06).

---

[62] The *Dusky* standard, as commentators have noted, does not require that a defendant have a high level of ability or performance. *See* 81 Harv.L.Rev. at 458. After all, a defendant surely does not have to be as intelligent and reasonable as his lawyers to be competent to stand trial.

Further evidence of Merriweather's ability to follow and evaluate facts around him can be found in the activities Merriweather performed in his spare time.   While at FMC Butner, Merriweather would read novels.  (Tr. Vol. VIII, 1269).  Drawing from his electrical engineering background, Merriweather fixed a radio so that he could listen to broadcasts.  (Tr. Vol. V, 614). These are not activities associated with people divorced from reality.

Even more revealing was Merriweather's conversation with his attorneys in the presence of Mr. Earley.  According to Mr. Earley, Merriweather told his lawyers that he believed that "the judge was the one that was going to make the ultimate decisions in the case, and the judge didn't need to hear from defense lawyers or a defense doctor, especially since he already had doctors that he could rely upon."  (Tr. Vol. V, 833).  Merriweather's comment, though untrue (intentionally or not), demonstrates that Merriweather is able to connect facts (he knows about the expert witnesses testifying in the case and can distinguish between doctors and lawyers retained by the Defense from the medical examiners assigned to conduct the competency evaluation) and draw an inference from the evidence.  Taken together, these events reveal that Merriweather is capable of following and evaluating evidence.

### (3)     Merriweather is Aware of the Significance of this Proceeding

Merriweather acknowledged to Dr. Pietz that he is aware that the death penalty may be imposed in his case.  (Doc. #24 at 16).  His awareness of the nature and the implications of these proceedings is similarly evident in the way that he responded to Judge Ott's order authorizing the Shelby County Jail to forcibly feed and bathe him.  His immediate transformation – taking showers and eating regularly without incident after being confronted with Judge Ott's orders – evidences his ability to appreciate his situation.

**(4)     Merriweather Has the Ability to Understand the Charges Against Him, the Defenses Available to Him, and the Basic Elements of a Criminal Trial**

During Dr. Pietz's interview of Merriweather, it became apparent that Merriweather has an unusually comprehensive understanding of the criminal legal process.  Merriweather understood the charges against him and provided a written description of the robbery from memory.  (Doc. #24 at 16).  He understood possible pleas and described the insanity defense.  (*Id.*).  He correctly identified court personnel and proceedings.  (*Id.*).  Dr. Pietz noted that Merriweather had not only done "exceptionally well" on the ECST-R, he had performed better than one of her students.  (Tr. Vol. I, 59-60).  Given his outstanding performance, Merriweather must certainly be able to understand the charges against him, the defenses available to him, and the basic elements of the criminal trial.

## III.  CONCLUSION

After thoroughly reviewing all available evidence, the court concludes that Merriweather is competent to stand trial.  He does not currently suffer from a mental disease or defect that could render him incompetent.  Moreover, even if he did have an undetected mental disease or defect, the evidence clearly establishes that he does not have any impairments that rise to a level that would render him incompetent under *Dusky*.  A separate order consistent with this Memorandum Opinion will be entered.

**DONE** and **ORDERED** this _____5th_____ day of February, 2013.

_____
**R. DAVID PROCTOR**
UNITED STATES DISTRICT JUDGE