FILED
2014 Nov-05 PM 12:11
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# SOUTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, } | |
| } | |
| v. } | Case No.: 2:07-CR-243-RDP-JEO |
| } | |
| WILLIAM MERRIWEATHER, JR., } | |
| } | |
| Defendant. } | |

## *AMENDED* FINDINGS OF FACT AND CONCLUSIONS OF LAW
## REGARDING THE SUPPLEMENTAL COMPETENCY HEARING

Before the court is Defendant William Merriweather's second motion to declare him presently incompetent to proceed to trial. Following a second competency hearing, held pursuant to 18 U.S.C. § 4241(a), the court, having considered all of the evidence and for the reasons set forth below, finds that Defendant is presently competent to stand trial.[1]

## I.      Procedural History

1.      Defendant William Merriweather, Jr. is charged with three capital-eligible offenses: one count of killing during the commission of bank robbery and two counts of use of a firearm during a crime of violence.[2] (Docs. 1; 405 at 1-2). The Government alleges that Merriweather robbed the Bessemer, Alabama branch of Wachovia Bank and during the

---

[1] As the court has reminded the parties, the issue now before the court is not whether Defendant was competent in 2011, 2012, or 2013. The court conducted a full evidentiary hearing on Defendant's competency from July 25, 2011 through August 3, 2011 and ruled that Defendant was competent at that time. The issue now before the court is Defendant's *present* competency.

[2] Merriweather is charged with engaging in Armed Bank Robbery by Force or Violence Resulting in Death, as well as Armed Robbery with Forced Accompaniment in violation of 18 U.S.C. § 2113(a), (d) and (e); the Use or Carrying of a Firearm During a Crime of Violence in violation of 18 U.S.C. § 924(c)(1)(A); and the Use or Carrying and Discharge of a Firearm in Relation to a Crime of Violence Resulting in Death in violation of 18 U.S.C. § 924(c) and (j). (Doc. 1). Merriweather was indicted by the Grand Jury in the United States District Court for the Northern District of Alabama on June 27, 2007. (Doc. 1).

commission of that offense, shot four employees, killing two of them and wounding the other two. (Doc. 1 at 1-4). While attempting to flee, Merriweather attempted to take hostage another bank employee but was shot by police officers, immediately apprehended, and given emergency medical care. (Doc. 4, sealed at 2). He has remained in custody since that time.

2.      The court has previously ruled that Defendant was competent after conducting a competency hearing in 2011. (*See* Docs. 160, Findings of Fact and Conclusions of Law, and 161, Order (on competency) denying Merriweather's initial competency motion). Thereafter, two developments counseled toward the need to conduct a supplemental competency hearing to determine "if there is reasonable cause to believe that [Merriweather] may presently be suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense." 18 U.S.C. § 4241. First, the court learned that the records submitted by the Bureau of Prisons' Federal Medical Center at Butner, North Carolina (FMC Butner), where Merriweather was evaluated pursuant to the initial competency hearing, were incomplete because of the facility's transition from paper to electronic records. Thus, some of the records requested by the Defense from FMC Butner, including a number of nurses' records, were inadvertently omitted from the documents provided to Defense counsel before the 2011 hearing. Those records have now been provided and contain nursing charts called ESH/ADs (Extended Secure Housing/Administrative Services Nurses Flow Sheet)[3] and BEMRs (Butner Electronic Medical Records) (*see* Doc. 554, Second Comp. Hrg. Vol. V at 1130).

---

[3] ESH/ADs are flow sheets made to document nurses' observations of patients' conditions at FMC Butner during each shift in lieu of writing out a longhand note. (Doc. 553, Second Comp. Hrg. Vol. IV at 932, testimony of Carlene A. Beasley).

3.      The second development involved one of the experts who evaluated Defendant at the initial competency hearing. On December 22, 2013, Dr. Christine Pietz contacted the court after Merriweather was housed at the United States Medical Center for Federal Prisoners in Springfield, Missouri ("MCFP Springfield") for a criminal responsibility evaluation. (Doc. 549, Second Comp. Hrg. Vol. I at 96). Dr. Pietz told the court that she needed to evaluate Merriweather further because he was presenting in such a way that raised concerns about his competence at that time.

4.      After these developments, the Defense moved the court for a second competency hearing, arguing that new evidence and the additional records from FMC Butner cast doubts about Defendant's competency. (Doc. 203).

5.      The Supreme Court has not articulated a specific standard for when a second competency hearing is required in a federal case, but the Court has instructed that "[e]ven when a defendant is competent at the commencement of his trial, a trial court must always be alert to circumstances suggesting a change that would render the accused unable to meet the standards of competence." *Drope v. Missouri*, 420 U.S. 162, 180 (1975). While there are "no fixed or immutable signs which invariably indicate the need for further inquiry to determine fitness to proceed," the court will, when warranted, take commensurate measures to ensure that Defendant has a fair trial. *Drope*, 420 U.S. at 180 (1975).[4] In light of the belated disclosure of the nurses' notes, Dr. Pietz's concerns about Merriweather's mental state, and the fact that this is a capital case, the court found that a supplemental hearing was warranted.

_____

[4]  The court is mindful that the "qualitative difference between death and other penalties calls for a greater degree of reliability when the death sentence is imposed." *Lockett v. Ohio*, 438 U.S. 586, 604 (1978).

6.      In 2007, and in connection with the events leading to these federal charges, Merriweather was also indicted by the State of Alabama on charges of Capital Murder, Attempted Murder, and Kidnapping in the First Degree. (Doc. 4 at 3). During preliminary hearings for the state charges, the Defense notified the court that it intended to retain the services of a mental health professional. (Doc 4 at 3; Doc 22 at 1). Anticipating that the Defense would raise mental health defenses, the United States interviewed Merriweather's family and friends. (Doc. 4 at 3). Based on this investigation, the United States filed a motion on July 13, 2007, requesting that the court order Merriweather to submit to a mental evaluation to determine his mental competency to stand trial and his mental state at the time of the offenses. (Doc. 4, sealed at 3-4; *see also* Docs. 22 at 2; 152 at 2).

7.      By that time, the Defense had already retained Dr. Kimberly Svec Ackerson, a local forensic psychologist, to evaluate Merriweather. (Doc. 22 at 2). Magistrate Judge John E. Ott was aware of this arrangement and deferred ruling on the Government's motion until after Dr. Ackerson's evaluation report was received. (*Id.*). Dr. Ackerson's evaluation report, which was completed following her last interview with Merriweather on September 24, 2007, was inconclusive. The report noted that Merriweather exhibited strong indicators of mental illness, but commented that Merriweather's self-admitted history of drug use "serves to complicate the clinical picture." (Def. Ex. 34 at 2). Moreover, Dr. Ackerson indicated that she was at an impasse with Merriweather, who refused to participate. (*Id.*). Dr. Ackerson strongly recommended that further evaluation be conducted at a facility that would be able to provide 24-hour observation with properly-trained mental health professionals available. (Def. Ex. 34 at 2).

8.      In light of Dr. Ackerson's recommendations, Judge Ott, in his October 12, 2007 order, referred Merriweather to the Bureau of Prisons for in-patient evaluation and treatment "to

4

discern competency issues and to afford Defendant appropriate mental health treatment." (Doc. 22 at 3).

9.      From November 2, 2007 through January 14, 2008, Merriweather was housed at the United States Medical Center for Federal Prisoners in Springfield, Missouri ("MCFP Springfield") where he was evaluated by Dr. Christina Pietz. (Doc. 24, sealed). At the conclusion of Merriweather's stay at MCFP Springfield, Dr. Pietz issued two formal reports: (1) a report regarding Merriweather's competency to proceed to trial (Doc. 24, sealed at 1-17), and (2) a report regarding Merriweather's mental state at the time of the crime. (*Id.* at 18-27). In Dr. Pietz's report regarding Merriweather's competency to stand trial, she acknowledged testimony from Merriweather's family describing psychotic behavior, but concluded that such symptoms were best explained by Merriweather's illicit drug use. (*Id.* at 11-12). The report concluded that Merriweather "does not currently suffer from a mental illness" (*id.* at 13) and that Merriweather "is currently competent to stand trial and make other decisions regarding his case." (*Id.* at 15).

10.     After his mental evaluations were conducted at MCFP Springfield, Merriweather was returned to the Jefferson County Jail. (Doc. 7 at 4).

11.     On June 3, 2008, the United States filed its formal Notice of Intent to Seek the Death Penalty. (Doc. 29). Pursuant to 18 U.S.C. § 3005, Judge Ott appointed Richard S. Jaffe and J. Derek Drennan to represent Merriweather. (Docs. 33 and 36).

12.     On November 10, 2008, almost a year after Merriweather's evaluation at MCFP Springfield was completed, Jaffe first expressed his concern to the Government that, based on information discovered by the Defense mitigation team, Merriweather was "decompensating"[5]

_____

[5] "Decompensation" has been defined as a breakdown in the psychological defense mechanisms that help

5

and would not be competent to assist in his defense. (Doc. 70 at 5). Jaffe repeated his concerns on May 14, 2009, when he again informed the Government that Merriweather was decompensating and having "conversations in his head." (Doc. 70 at 5).

13.   On December 9, 2008, Judge Ott granted the Defense's request for a mitigation investigator and a victim liaison. (Doc. 47).

14.   On January 26, 2009, Dr. Richard G. Dudley, a psychiatrist retained by the Defense, interviewed Merriweather (Def. Ex. 9 at 2) and later produced an affidavit declaring his belief that Merriweather "is unable to understand the charges against him and is unable to assist his lawyers or [Dudley] with [Merriweather's] case." (Def. Ex. 66 at 1). On April 30, 2009, Dr. James Merikangas, another psychiatrist retained by the Defense, interviewed Merriweather for approximately one and a half hours (Doc. 148, Tr. Vol. VII, 1128)[6] and concluded in a two-sentence letter addressed to the Defense that Merriweather was incompetent to stand trial. (Doc. 66). The Defense did not notify the Government of either of those evaluations. (Doc. 70 at 6-7).

15.   Dr. Robert Hunter, a psychiatrist at the Jefferson County Jail, testified that he was called upon to examine Merriweather on two occasions -- in April and July 2009. On April 16, 2009, Dr. Hunter was called to examine Merriweather after he fasted enough to slip through the food door, and was able to slide under the gate. (Doc. 146, Tr. Vol. V, 886, Def. Ex. 36 at 1). After escaping his cell, Merriweather assaulted another prisoner. (*Id.*). Dr. Hunter testified that Merriweather was calm and cooperative during the interview and did not show any outward signs

---

individuals maintain good mental functioning. Decompensation may occur under stress or in mental disorders such as anxiety, depression, or psychoses with hallucinations or delusions. ADA P. KAHN & JAN FAWCETT, THE ENCYCLOPEDIA OF MENTAL HEALTH 127 (1993).

[6]  The first competency hearing was held from July 25 to August 3, 2011.

of psychosis. (Def. Ex. 36 at 1). During his second examination on July 31, 2009, however, Dr.
Hunter testified that Merriweather's behavior was markedly different. (Doc. 146, Tr. Vol. V, Def.
Ex. 36 at 1). Merriweather was "paranoid and preoccupied with the idea that he was housed
'around homosexuals,'" and his speech and thought processes "were rambling and at times
disjointed." (*Id.*). Dr. Hunter described Merriweather as irritable and noted that he became
increasingly hostile as the interview progressed, which forced Dr. Hunter to terminate the
interview. (*Id.*).

16.     On August 5, 2009, the Defense moved to have Merriweather declared incompetent
to stand trial and requested that he be remanded to the custody of the Attorney General to be placed
in a federal mental health facility until competency was restored. (Doc. 65). In support of its
motion, the Defense filed Dr. Merikangas's letter as a sealed ex parte pleading. (Doc. 70 at 6-7).

17.     Judge Ott conducted a telephone conference with the parties on August 10, 2009, to
ascertain their positions regarding the motion. (Doc. 70 at 7). Apprehensive about the impartiality
of the previously undisclosed psychiatrists hired by the Defense, the United States requested that
Merriweather undergo another mental evaluation by the Bureau of Prisons to obtain a more current
and impartial determination as to whether Merriweather had actually decompensated since his
evaluation at MCFP Springfield. (Doc. 70 at 7-8).

18.     The Defense responded with a request that the court appoint a private independent
psychiatrist(s) -- rather than the Bureau of Prisons -- to evaluate Merriweather's competency due
to allegations that Dr. Pietz was biased in favor of the Government. (Doc. 72). The Defense also
moved the court to exclude Dr. Pietz from participating in any future evaluations should the court
nonetheless remand Merriweather to the Bureau of Prisons for reevaluation. (Doc. 72).

19.     A hearing was convened on August 20, 2009, and the parties submitted post-hearing briefs. (Doc. 79 at 1-2). After considering the respective arguments and applicable law, on November 16, 2009, Judge Ott ordered that Merriweather undergo a new evaluation at FMC Butner. (Doc. 79). At the insistence of Defense counsel, Judge Ott further ordered that all interviews with Merriweather be videotaped, and that the final report include input by a neuropsychiatrist and/or neurologist. (Doc. 79 at 14).

20.     From December 9, 2009, until April 18, 2011, Merriweather underwent an extended in-patient competency evaluation at FMC Butner. (Doc. 145, Comp. Hrg. Vol. IV at 583). During his 496-day stay at FMC Butner, Merriweather was kept under constant surveillance by medical professionals and staff who checked on him continuously. (Doc. 145, Comp. Hrg. Vol. IV at 584).

21.     As a general matter, Merriweather's behavior during his time at FMC Butner appears to have been stable. According to Eugene Singleton, a federal corrections officer who saw Merriweather on a regular basis, Merriweather had the calm demeanor of an ordinary inmate doing his time. (Doc. 145, Comp. Hrg. Vol. VIII at 1265-66). Singleton never observed Merriweather reacting to hallucinations or paranoid delusions. (*Id.*). Merriweather was never aggressive or rude toward the corrections officers. (Doc. 145, Comp. Hrg. Vol. VIII at 1267). Merriweather generally spent his time sleeping, but he would chat from time to time with Singleton when he made his periodic rounds, sometimes requesting peanut butter, or something to read. (Doc. 145, Comp. Hrg. Vol. VIII at 1268-69).

22.     In compliance with Judge Ott's second requirement, the Bureau of Prisons secured the services of two outside consultants, Alan Mirsky, Ph.D., a neuropsychologist, and Thomas Gualtieri, M.D., a neuropsychiatrist, to evaluate Merriweather in addition to the evaluation

8

performed by FMC Butner staff. Their reports were reviewed and summarized by Dr. Edward Landis, the Deputy Chief Psychologist at FMC Butner, who passed them to the psychiatrist charged with supervising Merriweather's evaluation at FMC Butner, Staff Psychiatrist Bruce Berger, M.D. (Doc. 145, Comp. Hrg. Vol. VIII at 1288).

23.     Dr. Berger reviewed the reports submitted by Drs. Mirsky, Gualtieri, and Pietz (Doc. 145, Comp. Hrg. Vol. IV at 585) as well as collateral reports by Drs. Dudley, Hunter, and Merikangas. (Doc. 145, Comp. Hrg. Vol. IV at 587). Dr. Berger, who was assisted by Dr. Jill Grant and a team of mental health professionals, conducted four videotaped formal interviews in addition to seeing Merriweather on a daily basis for 496 days. (Doc. 145, Comp. Hrg. Vol. IV at 586). On April 1, 2011, Dr. Berger issued a report in which he concluded that Merriweather "does currently possess the capacity to understand his current charges, understand courtroom functioning, and could, should he so choose, work affirmatively with his attorney in a rational way…[and that] he is competent to proceed." (Gov't Ex. 10 at 10).

24.     After his evaluation at FMC Butner, Merriweather was returned to the Northern District of Alabama on April 20, 2011, and housed at the Shelby County Jail. (Doc. 148, Comp. Hrg. Vol. VII at 1015).

25.     Upon his return to the Shelby County Jail, Merriweather initially refused to eat for nine days, but instead requested Ensure from medical staff. (Doc. 148, Comp. Hrg. Vol. VII at 1215). On the ninth day (April 29, 2011), Merriweather resumed eating with a renewed appetite; he would ask for extra trays and often consumed two or three trays per meal. (*Id.*). According to Officer Tim Laatsch, a corrections officer with the Shelby County Sheriff's Office, Merriweather ate regularly until he was moved from his segregation unit into an intermediate housing unit closer to the general prison inmate population. (*Id.* at 1215-16). After being relocated, Merriweather

again refused to eat. (*Id.* at 1216). Officer Laatsch testified that Merriweather had apparently told another inmate that he (Merriweather) would not eat anything wet or shiny.[7] (*Id.*). Because he refused to eat, Merriweather lost a significant amount of weight and was consequently relocated to the medical unit of the jail where he could be more closely monitored. (*Id.*). Although Merriweather refused the food prepared by the facility, Officer Laatsch was able to procure pre-packaged store items, which Merriweather did consume. (*Id.* at 1217).

26.    After beginning his stay at the Shelby County Jail, Merriweather refused to bathe regularly, showering only every third or fourth day.[8] (Doc. 148, Comp. Hrg. Vol. VII at 1219).

27.    During three days in June 2011, Dr. Merikangas and Dr. Dudley, the expert witnesses retained by the Defense to evaluate Merriweather some two years earlier, attempted to meet with Merriweather at the Shelby County Jail; Merriweather refused to engage with them. (Doc. 148, Comp. Hrg. Vol. VI at 946; Doc. 148, Comp. Hrg. Vol. VII at 1148).

28.    On June 22, 2011, Dr. Merikangas visited Merriweather in the Shelby County Jail. (Tr. Vol. VII, 1146, 1149). When Dr. Merikangas attempted to interview Merriweather in a small attorney-client interview room, Merriweather ignored him. (*Id.* at 1148). Dr. Merikangas noticed that Merriweather's weight had dropped dramatically. (*Id.*). Dr. Merikangas visited Merriweather again on June 23, 2011. (*Id.* at 1149). Again, Merriweather was unresponsive. Dr. Merikangas noted that, when he asked about Merriweather, the correctional officers who accompanied him

---

[7] That inmate reported Merriweather's statement to another officer, who conveyed the information to Officer Laatsch. (Doc. 148, Comp. Hrg. Vol. VII at 1216). The inmate's statement to the other officer and the unidentified officer's statement to Officer Laatsch both appear to be examples of hearsay without exception, but neither side objected to the testimony.

[8] Officer Laatsch testified that Merriweather was offered the opportunity each day to leave his cell and be escorted to a shower. During most of the days when Officer Laatsch was tasked with escorting Merriweather to shower, Merriweather refused.

into the room indicated that Merriweather's behavior towards Dr. Merikangas was not different from his behavior towards the guards and they expressed sympathy for Merriweather. (*Id.* at 1151).

29.     On June 24, 2011, Dr. Dudley visited Merriweather in his cell at the Shelby County Jail. (Def. Ex. 9 at 2; Tr. Vol. VI, 945). The first thing Dr. Dudley noticed was the smell; he had been told by correctional officers that Merriweather had not been showering. (Tr. Vol. VI, 944-45). Dr. Dudley recounted that correctional officers had told him that Merriweather was not eating food prepared by the jail, but was eating sealed, packaged food. (*Id.* at 945). When Dr. Dudley attempted to communicate with Merriweather, the only responses he was able to elicit were "the hand signals and the verbal refusal to speak." (*Id*. at 946). On June 27, 2011, in the presence of Mr. Jack Earley, a lawyer retained by the Defense as a criminal law expert, Merriweather engaged in an extensive conversation with Defense counsel. (Tr. Vol. V, 823).

30.     Also on June 27, 2011, Judge Ott entered an order authorizing personnel at the Shelby County Jail to take any reasonable steps necessary to ensure Merriweather's health was not further compromised, including forcibly feeding and bathing him. (Doc. 109).

31.     Following the court order, Diana Shirley, Director of Nursing at the Shelby County Sheriff's Office, was scheduled to insert a feeding tube through Merriweather's nose. (Tr. Vol. VII, 1233). Director Shirley testified that Merriweather was unhappy about this prospect, and volunteered that he "might try to eat" if she would not insert the feeding tube. (*Id*. at 1234). Shirley responded that the offer to maybe "try to eat" was not a real offer; either Merriweather would eat or the tube would be inserted. (*Id*. at 1234). Merriweather promptly agreed to eat. (*Id.*). Shirley further testified that Merriweather resumed eating normally after that confrontation and never again complained about food that was wet or shiny nor expressed concerns that he was being

poisoned. (Tr. Vol. VII, 1236). Shirley further noted that she never observed Merriweather having conversations in his head while at the Shelby County Jail. (Tr. Vol. III, 1245).

32.     Kelly Hammonds, another nurse at the Shelby County Jail who interacted with Merriweather, testified that Merriweather showered daily following the court order authorizing prison staff to take necessary procedures to ensure that Merriweather bathed and ate.[9] (Tr. Vol. VII, 1249). Hammonds further testified that Merriweather spoke clearly and articulately, had no difficulty communicating with prison staff (*Id.* at 1244), and never mentioned anything about demons, little green men, or a chip in his arm. (*Id.* at 1245). Moreover, after the court order authorized prison staff to force feed him, Merriweather ate three meals a day and was fully cooperative in doing so. (*Id.* at 1246).

33.     Since being housed at the Shelby County Jail, Merriweather has neither been observed responding to internal stimuli, nor has he given any indication of suffering from delusions or hallucinations. (*Id.* at 1218, 1236, 1245).

34.     On July 25, 2011, this court convened a hearing, pursuant to 18 U.S.C. § 4241(a) and (c), to hear testimony and receive evidence on the issues surrounding Merriweather's competency to stand trial. The court heard from several Government witnesses, including four mental health experts (Drs. Pietz, Berger, Gualtieri, and Landis), two nurses (Diana Shirley and Kelly Hammonds), and two corrections officers (Laatsch and Eugene Singleton). The Defense presented seven witnesses, including three mental health experts (Drs. Merikangas, Mirsky, and Dudley), an attorney (Jack Earley), Merriweather's sister (Kim Patton), and Merriweather's

---

[9] This testimony is consistent with that of Officer Laatsch. (Doc. 148, Comp. Hrg. Vol. VII at 1219).

former girlfriend (Latisha Simpson).[10] Merriweather did not testify. In addition, the court received a total of 106 exhibits into evidence. At the request of the court, the parties submitted briefs as well as proposed findings of facts and conclusions of law. (*See* Docs. 152 and 153, Gov't Br. and Proposed Order; Docs. 156 and 154, Def.'s Br. and Proposed Order).

35.     On February 5, 2013, the court found that Defendant was competent to stand trial and set this case for trial in January 2014 (Docs. 160 and 161). In advance of that trial setting, Defendant was transported to MCFP Springfield for a criminal responsibility evaluation.

36.     Merriweather again asked for a second competency hearing and requested that the prior finding of competency be overturned. (Doc. 203). This court denied the latter request, but because FMC Butner had produced records that had not been previously disclosed, it took the request for a new hearing under advisement. (Doc. 256).

37.     During this period, this court additionally considered Merriweather's request to exclude the use of any testimony, documents, records, and testing performed during his 2007-08 evaluation at Springfield, on the grounds that this information had been obtained prior to the filing of his Rule 12.2 notice, in violation of his Constitutional rights. (Doc. 186, Def.'s Mtn. to Suppress Pietz Evaluation). This court ordered that the Government could not use statements made to Dr. Pietz during the 2007-08 evaluation in its case-in-chief, but could use relevant evidence from that evaluation in rebuttal if Merriweather put his mental state at issue in his case-in-chief. (*See* Doc. 198 (Order of Magistrate John Ott remanding Merriweather for evaluation at MCPF Springfield)).

---

[10] Additionally, the Defense offered evidence from a jail psychiatrist (Dr. Robert Hunter) who did not testify as an expert witness.

38.     When Defendant arrived at MCFP Springfield for his criminal responsibility evaluation, he was initially seen by Dr. Lea Preston-Baecht, Ph.D ("Dr. Preston") on November 1, 2013. (Doc. 549, Second Comp. Hrg. Vol. I at 21; GX 33 at 3). Dr. Preston was initially concerned about the manner which Defendant presented because Merriweather was exhibiting disorganized thinking, which can be an indication of psychosis. (*See* GX-33 at 3). Unlike the first time that Dr. Preston interviewed Merriweather in 2011, Merriweather was more evasive and less forthcoming during the November 2013 interview. (Doc. 549, Second Comp. Hrg. Vol. I at 23).

39.     A few days later, Dr. Pietz met with Defendant. (Doc. 549, Second Comp. Hrg. Vol. I at 24). Dr. Pietz shared Dr. Preston's initial concerns about Merriweather's presentation, as he exhibited the same disorganized and tangential speech in the interview with Dr. Pietz. (Doc. 549, Second Comp. Hrg. Vol. I at 23; GX-33 at 4). Those concerns continued when Dr. Pietz saw Defendant on November 8, 2013. (Doc. 549, Second Comp. Hrg. Vol. I at 24). Defendant again presented as organized and coherent at times, but disorganized at other times. (*Id.*). Dr. Pietz reported that Merriweather occasionally had word-finding difficulties, but then would also adopt evasive behaviors such as asking Dr. Pietz questions in response to her questions. When Dr. Pietz refused to answer personal questions, Merriweather would respond that he would not answer her questions either. (Doc. 549, Second Comp. Hrg. Vol. I at 25). This was a different presentation than his initial stay when at MCFP Springfield.

40.     Dr. Pietz requested one of her colleagues, psychiatrist Dr. Carlos Tomelleri, to interview Defendant with her on November 13, 2013. (Doc. 549, Second Comp. Hrg. Vol. I at 27). Defendant again presented as very disorganized, tangential, and difficult to follow, leading Dr. Tomelleri to suspect psychosis. (*Id.* at 28). Dr. Tomelleri was also concerned about Defendant's statements that he did not know what his charges were or that he was facing the death penalty. (*Id.*

14

at 28-29). When Dr. Tomelleri asked Merriweather open-ended questions, Merriweather responded with an unrelated (but nevertheless organized) story. (*Id.* at 31).

      41.    Soon after these concerns arose, Dr. Pietz asked a staff member at FPMC Springfield, Correctional Counselor Felicia Williams, about Merriweather. Williams told Dr. Pietz that she believed Merriweather understood his charges and why he was at Springfield. (Doc. 549, Second Comp. Hrg. Vol. I at 27). Williams said that while asking Merriweather about his emergency notification information, Merriweather asked Williams if she was a St. Louis Rams fan. (*Id.* at 32). When she told him she was actually a Kansas City Chiefs fan, he noted that at that time the Chiefs were undefeated (which was accurate). (*Id.*). Williams said that she found Defendant was coherent and rational and that he clearly answered her questions. (*Id.*).

      42.    Dr. Pietz tried to interview Merriweather again on November 18. He said he would not speak about his case without his legal counsel being present. (Doc. 549, Second Comp. Hrg. Vol. I at 36). Merriweather again told unrelated stories when Dr. Pietz asked him questions. (*Id.* at 32). However, Dr. Pietz noted that while Merriweather at times seemed perplexed, he could follow the thread of a conversation. Dr. Pietz suspected that Merriweather was intentionally evading her questions to manipulate the conversation. (*Id.*). Merriweather also refused to take the Minnesota Multiphasic Personality Inventory (MMPI) on three occasions while at Springfield the second time. (Doc. 549, Second Comp. Hrg. Vol. I at 41-42). He had taken the MMPI during his first stay at Springfield.

      43.    Merriweather maintained that he did not know his charges in an interview Dr. Pietz conducted on November 22. (Doc. 549, Second Comp. Hrg. Vol. I at 43). Dr. Pietz called upon Dr. Robert Sarrazin, Chief of Psychiatry at Springfield, to get his impression of Merriweather. After

speaking with Merriweather, Dr. Sarrazin concluded that Merriweather did not have a mental illness. (*Id.* at 45).

44.     Dr. Pietz received Judge Ott's order that all interviews must be videotaped. Thus, Dr. Pietz videotaped her interview with Merriweather on November 27, 2013. (Doc. 549, Second Comp. Hrg. Vol. I at 46; GX-19). Dr. Pietz observed that Merriweather's answers during that interview were coherent and organized. (*Id.*). He did not appear to experience any visual or auditory hallucinations. (*Id.* at 48, 52). The staff at FPMC Springfield denied seeing Merriweather experience any hallucinations. (*Id.* at 53). At times, Merriweather refused to answer or evaded answering questions, but Dr. Pietz concluded that he was doing this intentionally. She believed Merriweather understood the legal process and what roles the judge and his lawyers had in his case. (*Id.* at 49). Merriweather was not taking any antipsychotic medications while at MCFP Springfield. (Doc. 549, Second Comp. Hrg. Vol. I at 23, 80).

45.     Following the November 27th recorded interview, Merriweather stopped speaking with Dr. Pietz. (Doc. 549, Second Comp. Hrg. Vol. I at 54). Instead, he used hand gestures to pantomime answers to Dr. Pietz's questions, which she interpreted as an unwillingness to speak about the offense – as opposed to signs of schizophrenia or psychosis. (*Id.* at 54-55). On December 19th, the last morning that Dr. Pietz asked Merriweather to speak with her, he again pantomimed a response, which she interpreted as a "no." (*Id.* at 58).

46.     In March 2014, Merriweather's counsel moved the court to conduct a second competency hearing. (Doc. 330). The court granted that motion and ruled that all evidence received during the 2011 hearing would be considered "on the issue of whether [Merriweather] suffers from a mental disease or disorder." (Docs. 335; 428 at 3).

47.     From July 21 to July 25, 2014, the court again heard evidence on Merriweather's present competence to stand trial. The court heard from several Government witnesses, including two expert witnesses, Drs. Berger and Pietz, a number of nurses from FMC Butner, and two officers from the Shelby County Jail. The Defense presented two expert witnesses (Drs. Cunningham and Stalcup), and more nurses from FMC Butner,

48.     At the second competency hearing, the Government, having borne the burden to prove Merriweather competent by a preponderance of the evidence, was permitted to proceed first at the hearing and also had the opportunity to brief and to reply to Merriweather's submissions.[11] (Docs. 565 and 568, Gov't Br. and Reply). The Defense submitted briefs in support of its position that Merriweather is incompetent due to schizophrenia. (Docs. 556; 569). The parties' submissions have been carefully considered along with the testimony of the expert witnesses.

## II.     Findings of Fact

49.     The court's initial competency order discussed Merriweather's background, including his family, employment, and activities before his arrest. (Doc. 160 at 2-9). The court summarizes that hearing testimony below.

---

[11] Of course, there is a question regarding whether the Government bears the burden of establishing competency, or a defendant bears the burden of establishing that he is incompetent. The language of 18 U.S.C. § 4241 is silent on this point, noting only that the court must find by a preponderance of the evidence that the defendant is incompetent to stand trial. The parties filed briefs on this issue and, thereafter, the Government indicated that it was prepared to undertake the burden of proof on the issue. (Doc. 113 at 6-7). After careful review of relevant case law, the court permitted the Government to bear the burden of establishing competency. (*See* Section III. Standards and Procedures for Determining Competency to Stand Trial, *supra*, and Doc. 133).

A.      **Testimony Presented at the 2011 Competency Hearing**

1.      **Testimony About Defendant's Background**

50.     William Merriweather was born the youngest of three children on May 20, 1976, in Birmingham, Alabama to William Merriweather, Sr. and On Sun Merriweather. (Doc. 24 at 5, Tr. Vol. II, 295; Def. Ex. 7 at 1). His mother was diagnosed with a brain tumor and died when Merriweather was three years old. (Doc. 143, Comp. Hrg. Vol. II at 296). Reportedly, prior to her death, Merriweather's mother suffered from depression and once attempted suicide. (Doc. 24, Tr. Vol. II, 296). Shortly after On Sun's death, Merriweather's father married her younger sister, Kum Cha, and together they raised Merriweather and his siblings, along with two sons born to Kum Cha and Merriweather, Sr. (Doc. 24 at 7; Def. Ex. 7 at 2). Merriweather reported during a psychological examination that he had an otherwise ordinary childhood and adolescence, (Doc. 24 at 5) and experienced no signs of psychosis or mental illness during that time. (Doc. 143, Comp. Hrg. Vol. II at 335).

51.     After graduating from high school, Merriweather moved in with his sister, Euknesha Kim Patton ("Patton"), to study at Alabama State University in Montgomery, Alabama. (Doc. 143, Comp. Hrg. Vol. II at 296). He did not complete his education at Alabama State and instead moved back to Birmingham in 1996, enrolling in 2001 at ITT Technical College, where he took courses in electrical work. (Doc. 143, Comp. Hrg. Vol. II at 297-98; Doc. 24 at 5).

52.     The record evidence demonstrates that Merriweather has used drugs and alcohol consistently since his adolescence. Much of what is known about Merriweather's drug use is self-reported; but there have been enough corroborating sources that the court is convinced that Merriweather has participated in substantial drug use. (Doc. 142, Comp. Hrg. Vol. I at 43; Doc. 24

18

at 6). Merriweather has reported that he began using alcohol at age 14 and marijuana at 17. (Doc. 142). Merriweather has stated that his marijuana use progressed into substance abuse and addiction, which involved the daily use of marijuana, and the frequent use of cocaine, crystal methamphetamine, alcohol, and ecstasy. (Doc. 142, Comp. Hrg. Vol. I at 43). He began using cocaine at age 22 and at around age 28, he began to use crystal methamphetamine frequently. (Doc. 142, Comp. Hrg. Vol. I at 43). He also acknowledged using "various pills," "ecstasy," and shooting heroin intravenously. (Doc. 142, Comp. Hrg. Vol. I at 43; Doc. 24 at 6). Merriweather would use cocaine up to three times each day when it was available to him. (Doc. 24 at 6). Significantly, while being treated at UAB Hospital for the gunshot wound following his arrest, Merriweather tested positive for opiates. (Doc. 142, Comp. Hrg. Vol. I at 103-04; Def. Ex. 15 at 18).

53.     In the evidence at the first competency hearing, Merriweather's family and friends recounted instances when Merriweather displayed unusual behavior. While Merriweather was a student at Alabama State University in 1995, his then-girlfriend Latisha Simpson testified that he told her that he would at times laugh "when things weren't funny." (Doc. 144, Comp. Hrg. Vol. III at 554). She also recalled that Merriweather frequently experienced "visions" and "hallucinati[ons]," which she explained were bad dreams that would cause him to wake up screaming on "several occasions." (Doc. 144, Comp. Hrg. Vol. III at 554-56).[12]

54.     Merriweather's family reportedly began observing unusual behavior by Merriweather after he returned to Birmingham in 1996. Between late 2001 and early 2002, Euknesha Kim Patton, Merriweather's sister, received calls from family members informing her

---

[12] There is some discrepancy between Simpson's testimony at the first competency hearing and her affidavit, in which Simpson stated that Merriweather woke up screaming "on one occasion." Simpson testified at the hearing that she meant to say "several occasions" in her affidavit.

that Merriweather was acting strangely. (Doc. 143, Comp. Hrg. Vol. II at 299). This prompted Patton, who had traveled to Birmingham to visit her family sometime in late 2001 or early 2002, to meet with Merriweather. (*Id.*). Patton testified that, during the meeting, Merriweather informed her that he was hallucinating, and seeing demons in everyone, including family members. (*Id.* at 299-300). According to Patton, Merriweather further confided in her that he felt that there was a conspiracy against his life, that he would see signs along the neighborhood and on television directed at him, that he was preoccupied with the letter "C," that he believed that the government planted a chip in his shoulder, and that he could hear his father's thoughts without his father speaking. (Doc. 143, Comp. Hrg. Vol. II at 300). At the end of their conversation, Patton asked Merriweather if he had been using substances, to which Merriweather responded that he had; however, according to Patton, Merriweather did not associate his experiences with a lack of rest, stress, or drug use. (*Id.* at 301).

55.      Merriweather's family did not pursue medical treatment for Merriweather's behavior or his reported experiences. (Doc. 142, Comp. Hrg. Vol. I at 27-28; Vol. II at 299-300, 335, 349-50; Doc. 24). Patton and her husband decided that it would be in Merriweather's best interest to invite Merriweather to return with them to Montgomery. (Doc. 143, Comp. Hrg. Vol. II at 302). Merriweather packed a bag and left with them that night. (*Id.* at 303). Merriweather left his car in Birmingham. (*Id.* at 304). Merriweather stayed with the Pattons in Montgomery for nine months, sharing a bunk bed with their two young children. (*Id.* at 303). During the first six months, Patton and her husband took precautions to restrict Merriweather's exposure to drugs and alcohol. (*Id.*).

56.      According to his sister, Merriweather's paranoia persisted during his stay in her home. Patton testified that Merriweather told her that he thought her 6 and 4-year-old sons were

plotting to kill him because they were allegedly speaking in code. (Doc. 143, Comp. Hrg. Vol. II at 305). Merriweather similarly accused Patton and her husband of speaking in code with each other. (*Id.* at 306). Patton recounted that Merriweather would come into her bedroom to sleep at the foot of her bed, complaining that "he was seeing demons and . . . hearing voices." (Tr. Vol. II, 306). Patton and her husband "would tap him on the shoulder and ask him to go back to the boys' room." (*Id.*). These incidents, however, did not seem to diminish Merriweather's ability to trust Patton with his life or Patton's ability to trust Merriweather with her young children, so it is unclear how seriously Patton took these statements about "seeing demons" and "hearing voices."

57.    At the same time, Patton also testified that Merriweather's condition appeared to improve somewhat over the course of his stay with her. His conversations became more rational and he experienced fewer "acrimonious" situations after four months. (Doc. 143, Comp. Hrg. Vol. II at 310). Patton attributed this to Merriweather's church participation. (*Id.*).

58.    Merriweather eventually moved out of the Pattons' home to live with Alecia Smith, a former girlfriend (Doc. 143, Comp. Hrg. Vol. II at 307, 314). Merriweather took a position working with the Department of Corrections in Montgomery. (*Id.* at 312). The job lasted approximately sixty days. (*Id.*). Merriweather and Smith broke up after several months and Merriweather moved into a separate apartment, but he was evicted from that residence after six months. (*Id.* at 313-14).

59.    Patton and her husband took Merriweather back into their home in 2003. (Doc. 143, Comp. Hrg. Vol. II at 315). Merriweather stayed in his sister's home for another three to four months. (*Id.*). This final stay in his sister's home proved more fractious than Merriweather's prior tenancy. Patton attested that she laid down several house rules Merriweather was expected to abide by during his stay: (1) he would not bring home visitors, (2) he would not smoke cigarettes in the

house, (3) he would not bring alcoholic beverages into the house, and (4) he would clean up after himself. (Doc. 143, Comp. Hrg. Vol. II at 315). Merriweather broke all of these rules. (*Id.*). This prompted the Pattons to ask Merriweather to leave, which he did promptly.[13] (*Id.* at 316).

60.    Euknesha Patton testified that she continued to maintain contact with Merriweather and saw him the day before he robbed the Bessemer bank. (Doc. 143, Comp. Hrg. Vol. II at 317). She noted that Merriweather's appearance disturbed her. (*Id.*). He wore dirty clothes and his manner of dress was different. (*Id.*). He had shaved his eyebrows and his head except for a patch of hair at the top of his head. (Doc. 143, Comp. Hrg. Vol. II at 317-18). Patton also described finding Merriweather practicing martial arts, chanting "Shaolin Monk, Shaolin Monk." (*Id.* at 319).

61.    On May 15, 2007, the day after the robbery, Merriweather was interviewed by detectives at the Jefferson County Jail. (Def. Ex. 16 at 1). During this interview, Merriweather's speech remained rational, coherent, and composed, which was surprising given that he had been shot the day before. (Def. Ex. 16 at 3, 128). His responses, however, were noticeably evasive. On several occasions, Merriweather would try to delay answering a question. Merriweather professed to be ignorant of his mother's ethnicity. (Def. Ex. 16 at 55). At one point, Merriweather simply told the investigators that he intended not to cooperate. (Def. Ex. 16 at 22) ("I'm going to look over here the whole time you're talking to me today.").

62.    During that post-arrest interview in the Jefferson County Jail, Merriweather repeatedly indicated to law enforcement that there was an accomplice, despite insistence by the detectives that video surveillance of the robbery revealed no other party to the robbery. (Def. Ex. 16 at 19, 23, 27, 29). Merriweather avoided naming the alleged accomplice, and provided an

---

[13] Patton could not recall the precise year when this happened. (Doc. 143, Comp. Hrg. Vol. II at 316).

evasive reply when questioned directly. (Def. Ex. 16 at 18) ("[Y]ou know, you can have all types of names."). Merriweather never named the alleged accomplice at the interview. Deeply skeptical about the existence of such an accomplice, one of the interviewers, Agent Paul Watson, informed Merriweather that the charade was a waste of time because if he were to "go back and tell [investigators], well, Charles, was in the bank with [Merriweather]. . . then they're actually going to be wasting their time [looking] for somebody that may not exist." (Def. Ex. 16 at 88).

63.     There is evidence that, on one occasion, Merriweather confided in his father about an incident where he was hearing voices. Suspecting drug use, Merriweather's father asked Merriweather if he had been taking illicit drugs. (Doc. 24 at 7). Merriweather responded in the affirmative, which prompted Merriweather, Sr. to inform him that the voices should cease if Merriweather would stop taking drugs. (Doc. 24 at 7). Merriweather's sister, Euknesha Kim Patton, recalled a similar experience that prompted her to ask Merriweather if he had been using drugs, and Merriweather admitted to her that he was.  (Doc. 143, Comp. Hrg. Vol. II at 301).

## 2.     Dr. Christina Pietz

64.     Merriweather's first court-ordered evaluation occurred at the United States Medical Center for Federal Prisoners in Springfield, Missouri ("MCFP Springfield") from November 2, 2007 to January 14, 2008. (Doc. 142, Comp. Hrg. Vol. I at 19; Gov't Exs. 2, 3). Merriweather's evaluation was overseen by Dr. Christina Pietz, a psychologist with 24 years of experience at MCFP Springfield. (Doc. 142, Comp. Hrg. Vol. I at 15). Dr. Pietz was the first witness called by the Government in both competency hearings. In her first evaluation of Merriweather, Dr. Pietz conducted six formal interviews totaling 12-15 hours, and informal

interviews in the course of routine rounds on Merriweather's unit for 75 days. (Doc. 142, Comp. Hrg. Vol. I at 19-20, 32).

65.     Over the course of Dr. Pietz's first evaluation of Merriweather, Dr. Pietz administered five psychological tests: (1) the Validity Indicator Profile; (2) the Shipley Institute of Living Scale; (3) the Minnesota Multiphasic Personality Inventory; (4) the Evaluation of Competency to Stand Trial-Revised (ECST-R);[14] and (5) the Structured Interview of Reported Symptoms. (Doc. 24 at 3). She also consulted daily with the mental health care and correctional staff members who kept Merriweather under constant observation and reviewed collateral information, such as Dr. Ackerson's findings, investigative reports concerning the robbery, and Merriweather's phone conversations after the arrest. (Doc. 142, Comp. Hrg. Vol. I at 24-26).

66.     Dr. Pietz filed two reports with the court, one dealing with Merriweather's competency to stand trial and another concerning Merriweather's mental state at the time of the offense. (Doc. 24). In Dr. Pietz's report on Merriweather's competency to stand trial, she diagnosed Merriweather with adult antisocial behavior and attributed Merriweather's behavior to polysubstance dependence. (Doc. 24 at 14). She concluded, "Merriweather does not currently suffer from a mental illness, and therefore, by definition does not meet the criteria for being found not competent." (Doc. 24 at 14). Pietz based this conclusion on Merriweather's responses to the psychological tests, his responses during interviews, and a review of relevant literature. (Tr. Vol. I, 63). Dr. Pietz ruled out malingering as a possible explanation for Merriweather's behavior, noting

---

[14] The Evaluation of Competency to Stand Trial-Revised ("ECST-R") is a checklist of questions designed to measure a defendant's ability to understand the nature and consequences of the proceedings against him, as well as his ability to assist his lawyers in his own defense. (Doc. 148, Comp. Hrg. Vol. VII at 1186).

that both she and Dr. Mirsky administered tests to detect malingering and neither doctor found evidence of malingering. (Doc. 142, Comp. Hrg. Vol. I at 67; 87.

> 67.     Most notably, Dr. Pietz found that Merriweather's scores on the ECST-R suggested no impairment in his ability to consult with his attorney or have a rational understanding of court proceedings. (Doc. 24 at 14). Indeed, Dr. Pietz indicated that Merriweather performed "exceptionally well" on the ECST-R – even better than one of her students. (Doc. 143, Comp. Hrg. Vol. II at 256; Doc. 142, Comp. Hrg. Vol. I at 59).

> 68.     There was one exception to Merriweather's otherwise strong performance on the ECST-R: his score suggested moderate impairment in his ability to have a factual understanding of court proceedings. (Doc. 24 at 14). Dr. Pietz found this result to be surprising given that Merriweather had clearly demonstrated that he had a factual understanding of court proceedings in other interviews. (*Id.*). When asked about the roles of various actors in legal proceedings, Merriweather was able to correctly identify the roles of the judge, the prosecutor, and the Defense counsel. (*Id.* at 15). He understood that a jury of 12-14 jurors would be selected from his community, though he did not know that a guilty verdict required a unanimous decision and stated that "[t]he role of the jury is to find the defendant guilty." (*Id.*). When asked about possible pleas, Merriweather had no difficulty articulating his understanding of various pleas available to him. He explained, for example, that "[t]he insanity plea is…instructs that at that moment at the time of what happened, [Merriweather] wasn't [him]self because of illegal drugs that [Merriweather] had taken…from the pills, marijuana and cocaine." (Doc. 24 at 15). Merriweather demonstrated that he understood what it means to plead guilty or not guilty and the consequences of entering a plea bargain, commenting that "a defendant should discuss the options of a plea bargain with his

attorney." (*Id.*). Merriweather further acknowledged that, if found guilty, he may receive "possible life in prison or the death penalty." (*Id.*).

69.     Conflicts among various statements given by Merriweather are not limited to discrepancies between his performance on the ECST-R and his answers in interviews. Dr. Pietz's interviews with Merriweather are littered with references to inconsistent statements he made that, when taken together, reveal a pattern of evasive behavior undertaken by Merriweather to conceal the extent of his knowledge and culpability. For example, when asked about the charges against him, Merriweather initially claimed that he had no knowledge that he was charged with murder. (Doc. 24 at 14). In a subsequent interview, Merriweather acknowledged the murder charge and indicated that his attorney and investigating officers informed him of the charges against him soon after his arrest. (Doc. 24 at 14). When questioned about the events leading up to the arrest, Merriweather initially asserted that he could recall only a few details of the alleged offenses. (Doc. 24 at 14). During subsequent interviews, however, Merriweather provided clear, detailed, and coherent recollections of the robbery, including a written description of his memory of the events. (Doc. 24 at 15).

70.     The details of the robbery provided by Merriweather, however, varied with each interview. One jarring inconsistency in Merriweather's recollection of the robbery was his indication in earlier interviews of the presence of an accomplice named "Charlie." (Doc. 24 at 15). During five of the first six interviews, Merriweather provided a different rendition of the robbery with Charlie featured in a new role with each telling. (Doc. 142, Comp. Hrg. Vol. I at 32-33). In one version, for example, Charlie took Merriweather to the bank to "cash a check." (*Id.* at 33). In another version, Charlie was actually the person who got shot escaping the crime scene. (*Id.*). In yet another version, Charlie simply told Merriweather to follow him into the bank, placing

26

Merriweather at the wrong place at the wrong time. (*Id.*). From all of these accounts, Dr. Pietz was left with the impression that Merriweather was trying to minimize responsibility by "trying to blame others." (*Id.* at 35). Dr. Pietz noted that when she directed Merriweather's attention to a discrepancy between his stories and the investigative record, Merriweather would "try[] to come up with a different response that made more sense." (*Id.*).

71.     Merriweather requested the sixth interview he had with Dr. Pietz, and during that interview gave an account of the robbery in which "Charlie" was absent and Merriweather took responsibility for the robbery. (Doc. 142, Comp. Hrg. Vol. I at 34). In that interview, Merriweather stated that he had received a "message" that described the inside of the bank and the identity of the manager. (*Id.*).

72.     While Merriweather gave different descriptions of his involvement in the bank robbery, Dr. Pietz found that there was never any doubt that Merriweather understood what he was charged with and why he was incarcerated. (Doc. 142, Comp. Hrg. Vol. I at 32-35). Dr. Pietz attributed these inconsistencies to evasive behavior rather than mental illness. (*Id.* at 34-35).

73.     Further supporting her position that Merriweather was more likely manipulative than mentally infirm, Dr. Pietz found Merriweather's speech and behavior to be inconsistent with symptoms typically associated with mental illness. Dr. Pietz testified that persons suffering from mental illness are disorganized in their thoughts and speech, struggle to provide information, and typically provide inaccurate information tainted by delusional thought. (Doc. 142, Comp. Hrg. Vol. I at 30). Concealing disorganized speech (and, therefore, concealing a mental illness) is not easy and will likely reveal itself over time during conversations or meetings involving persons genuinely suffering from a psychotic illness. (*Id.* at 54). Throughout Merriweather's 75-day evaluation at MCFP Springfield, his speech was never observed to be disorganized, but was

instead described as rational, coherent, and organized. (*Id.* at 27-30, 41, 44, 46-47, 54-55). If anything, Dr. Pietz characterized Merriweather's responses to questions relating to the robbery as "cautious." (Doc. 143, Comp. Hrg. Vol. II at 272, 275). Merriweather's behavior was similarly inconsistent with symptoms typical of mental illness. There were no signs of memory deficit. (Doc. 142, Comp. Hrg. Vol. I at 57). Merriweather maintained a clean cell and bathed regularly during his stay at MCFP Springfield. (*Id.* at 45). Merriweather was never mute, though he did take time to think through his responses. (*Id.* at 46, 57).

74.     Dr. Pietz also found no negative signs of schizophrenia.[15] With regard to positive signs of schizophrenia, there were two incidents that, if genuine, could be construed as evincing positive signs of schizophrenia. Dr. Pietz, however, found both instances to be suspect. (Doc. 142, Comp. Hrg. Vol. I at 51, 90).

75.     In the first incident, Merriweather reported to Dr. Leanne Preston, the on-call psychologist, that he was seeing gremlins in his cell. (Doc. 142, Comp. Hrg. Vol. I at 39, 90). Merriweather told Dr. Preston that he thought he might be suicidal. (*Id.* at 40). Dr. Preston placed Merriweather under suicide watch, but wrote in her report that Merriweather's claim that he saw gremlins was suspect. (*Id.*). Dr. Pietz, who was the medical professional charged with assessing him, found Merriweather's claims to be questionable for at least five reasons. First, as Dr. Pietz noted, it is very rare for truly psychotic people to experience visual hallucinations. (*Id.*). Visual

---

[15] The Diagnostic and Statistical Manual of Mental Disorders (DSM) is a manual compiled by the American Psychiatric Association that organizes and defines conditions that the American Psychiatric Association classifies as mental disorders. AMERICAN PSYCHIATRIC ASSOCIATION, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS (5th ed. 2014). Schizophrenic symptoms are categorized into positive and negative signs. Positive signs include abnormally excessive expressions of mental functioning, such as hallucinations, disorganized speech, delusions, and grossly disorganized or catatonic behavior. Negative signs of schizophrenia include abnormally diminished functioning in speech and behavior, such as a flat affect and alogia. AMERICAN PSYCHIATRIC ASSOCIATION, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 299 (4th ed. 2000).

hallucinations are actually more consistent with illicit substance abuse than psychosis. (*Id.*).
Second, even in the rare cases when someone actually experiences visual hallucinations, the
hallucinations are usually frightening and not casually mentioned. (*Id.* at 42). Third, people who
complain about being suicidal are typically not truly suicidal since drawing attention to themselves
increases the chances that a suicide attempt would be thwarted. (*Id.* at 41). Fourth, when placed
under suicide watch, Merriweather was more upset about losing his privacy because of the
constant surveillance imposed by the watch than he was due to any perceived gremlins or alleged
suicidal tendencies. Indeed, Merriweather actually requested to be taken off suicide watch as soon
as possible. (*Id.*). Finally, Dr. Pietz testified that generally hallucinations do not completely go
away, even for psychotic individuals who are medicated. (*Id.* at 42). Merriweather did not mention
gremlins when he requested to be taken off the suicide watch or anytime afterwards. (*Id.* at 41). Dr.
Pietz therefore found Merriweather's alleged hallucination suspect. (*Id.* at 40).

76.     The second incident involved Merriweather scraping his arms with a spork. (Doc.
142, Comp. Hrg. Vol. I at 42). He told a nurse that there were bugs in the room, which may have
been a visual hallucination. (*Id.*). Merriweather, however, did not seem overly concerned about it.
(*Id.*). Dr. Pietz discounted this incident because visual hallucinations are typically sufficiently
frightening to the patient to warrant more than a single, casual mention. (*Id.*). In this case,
Merriweather mentioned the bugs casually, but did not appear disturbed by them nor did he
mention seeing bugs in his room again. (*Id.*).

77.     Based on her observations of Merriweather during his first 75-day evaluation at
MCFP Springfield, his responses to psychological tests, and a review of collateral sources, Dr.
Pietz found that Merriweather was not mentally ill. (Doc. 142, Comp. Hrg. Vol. I at 52-53). She
diagnosed Merriweather with two disorders found in the Diagnostic and Statistical Manual of

Mental Disorders: substance-induced psychotic disorder, and adult antisocial behavior. (Doc. 549, Second Comp. Hrg. Vol. I at 18). She concluded that he was competent to stand trial.[16]

### 3.    Dr. Bruce Berger

78.      Reports from Drs. Gualtieri, Mirsky, and Landis were ultimately transmitted to the doctor charged with supervising Merriweather's evaluation at FMC Butner, Dr. Bruce Berger, a board-certified forensic psychiatrist with more than 20 years of experience. Dr. Berger oversaw Merriweather's evaluation during which he, with assistance from Dr. Jill Grant and a team of mental health professionals, observed Merriweather every day for 496 days, conducted four videotaped formal interviews, and reviewed the reports by the other expert examiners and collateral source information. (Doc. 145, Comp. Hrg. Vol. IV at 586). Based on this evidence, Dr. Berger concluded that Merriweather's behavior could be best ascribed to drug use, not a psychotic disorder. On April 1, 2011, Dr. Berger issued a report in which he concluded that Merriweather "does currently possess the capacity to understand his current charges, understand courtroom functioning, and could, should he so choose, work affirmatively with his attorney in a rational way…[and that] he is competent to proceed." (Gov't Ex. 10 at 10).

79.      In reaching his conclusion that Merriweather's behavior results from drug use (as opposed to a psychotic disorder), Dr. Berger considered Merriweather's history of substance use. During his initial interview, Merriweather reported that he had used substances, such as alcohol, marijuana, and cocaine, on a daily basis before the robbery. (Doc. 145, Comp. Hrg. Vol. IV at 604). Such drugs were not available to him during his stay at FMC Butner and Merriweather had

---

[16] The ultimate question of whether Merriweather is competent to stand trial is a legal determination that the court must make.

never been prescribed psychotropic medication before arriving at FMC Butner, nor was he placed on any medication during his stay at FMC Butner (with the exception of a cream for dry skin, medication for constipation, and a nutritional supplement). (*Id.* at 588).

80.     During Merriweather's 496-day stay at FMC Butner, a time when he was neither treated for mental illness nor under the influence of drugs, Merriweather was generally not observed to exhibit psychotic behavior. Although Dr. Berger acknowledged that there are nurses' notes[17] suggesting that Merriweather may have been responding to internal stimuli and presented other behaviors that could be viewed as psychotic symptomology, Dr. Berger never observed Merriweather responding to stimuli nor were there any consistent reports of such symptoms from his staff. (Doc. 145, Comp. Hrg. Vol. IV at 598). Eugene Singleton, who interacted directly with Merriweather on a daily basis as one of several staff members who (while working) checked on Merriweather every 15 minutes, observed no significant behavioral problems. (Doc. 150, Comp. Hrg. Vol. VIII at 1266-67). Singleton noted simply that Merriweather's behavior was fairly ordinary for someone waiting his time. (*Id.* at 1266). Consistent with Singleton's observations, Dr. Berger mentioned that Merriweather maintained a clean cell (*Id.* at 1266-67, 1272), maintained acceptable hygiene (Doc. 145, Comp. Hrg. Vol. IV at 593-94), and exhibited no positive or negative signs of schizophrenia. (*Id.* at 593-94, 597-98, 610-11, 618, 621). Merriweather's speech pattern was clear and sophisticated (*Id.* at 602, 605-06), and he had no difficulty communicating with staff.   (*Id.* at 596-97).

81.     Indeed, many of Merriweather's actions indicate a rational mind at work. Merriweather repositioned the bed in his cell for greater privacy. (Doc. 145, Comp. Hrg. Vol. IV at

---

[17] Nurses' notes were a major point of emphasis during the Second Competency Hearing and will be addressed by the court *infra*.

594; Doc. 150, Comp. Hrg. Vol. VIII at 1272-73). As an additional assurance of privacy, he posted a "no solicitation" sign on his door. (Doc. 145, Comp. Hrg. Vol. IV at 598-99). When he obtained a radio that was nonoperational, Merriweather was able to successfully reconfigure it to work with the type of battery available to him. (*Id.* at 614). To pass the time, Merriweather also would often request novels and magazines to read. (Doc. 150, Comp. Hrg. Vol. VIII at 1268-69).

82.     However, Merriweather also engaged in curious behavioral patterns that might potentially raise a suspicion of mental illness. Specifically, Merriweather, while at FMC Butner, as in other facilities, would undergo periods of protracted muteness, abstain from eating, and speak incoherently during taped interviews. (Doc. 145, Comp. Hrg. Vol. IV at 599, 589-93, 601-10).

83.     Nonetheless, although he considered the possibility that Merriweather might be suffering from mental illness, in light of Merriweather's demonstrated capacity for rational behavior, Dr. Berger eventually came to conclude that Merriweather's infirmities were feigned.

84.     With regard to Merriweather's periods of protracted muteness, Dr. Berger explained that there is a difference between actual mutism and selective silence. Actual mutism refers to a situation where a patient cannot speak, even if the patient desires to communicate. (Doc. 144, Comp. Hrg. Vol. III, 433; Tr. Vol. IV, 599). Selective silence, on the other hand, describes a scenario where a patient is able to communicate when he chooses, but chooses not to communicate when it suits him. (*Id.* at 430). Dr. Berger found Merriweather able to communicate when it served Merriweather's own interests. (Doc. 145, Comp. Hrg. Vol. IV, 596-97, 616). Therefore, Dr. Berger concluded that Merriweather's silence was not a symptom of a mental disorder, but rather manipulative behavior. (*Id.*).

85.     Similarly, Dr. Berger considered Merriweather's eating patterns to be less indicative of a mental disorder than of a strong will and a willingness to use nutrition as leverage to

32

attain his goals. Merriweather consumed both sealed, pre-packaged meals (*e.g.*, Ensure, T.V. dinners) as well as the regular trays provided at FMC Butner, so it did not appear that he was actually concerned about being poisoned. (Doc. 145, Comp. Hrg. Vol. IV at 591). He did, however, twice alter his eating habits in order to force the facility to place him under higher surveillance, which in turn meant that he was reassigned to a better cell. (*Id.* at 591-92, 617, 663).

86.     Dr. Berger noted that Merriweather was calm and collected during the interviews, which was not something he would expect from someone who was decompensating. (Tr. Vol. IV, 605). After the first two interviews, Merriweather refused further interviews until Judge Ott issued an order compelling Merriweather to participate in the videotaped interviews. (Doc. 145, Comp. Hrg. Vol. IV at 606). During the recorded interviews, Merriweather pretended not to know who Dr. Berger was, despite communicating with him without difficulty on a daily basis when not being videotaped. (*Id.* at 601-04, 608-10; Gov't Ex. 11). Merriweather was focused when the conversation was about routine matters. (*Id.* at 593). These behaviors led Dr. Berger to ultimately conclude that Merriweather (1) was not mentally ill, and (2) his unusual behavior represented various attempts to manipulate his environment.[18] (*Id.* at 601-09).

### 4.     Dr. Richard G. Dudley, Jr.

87.     Dr. Richard G. Dudley Jr., a forensic psychiatrist, evaluated Merriweather for mental illness and testified for the Defense at the initial competency hearing. (Doc. 147, Comp. Hrg. Vol. VI at 912-17). Dr. Dudley has extensive experience in diagnosing and treating people

---

[18] Although the Defense argues that he ignored nursing charts in performing his evaluation, Dr. Berger clarified that he reviewed the nurses' progress notes and spoke directly to the nursing staff about Merriweather. (Doc. 145, Comp. Hrg. Vol. IV at 645). Moreover, Dr. Berger had prescribed that his staff check on Merriweather every 15 minutes. (Doc. 150, Comp. Hrg. Vol. VIII at 1266-67).

who are both schizophrenic and substance abusers based upon the time he spent running a community mental health clinic in Harlem, New York. (*Id.* at 940). Dr. Dudley met with Merriweather on three separate occasions. The first interview, conducted over two days, began on January 26, 2009. (Def. Ex. 9 at 2). Dr. Dudley also met with Merriweather on August 17, 2009 (Def. Ex. 66 at 1), and again on June 24, 2011, after Merriweather returned from his second extended evaluation at FMC Butner.[19] (Def. Ex. 9 at 2). During that final meeting, however, Merriweather refused to communicate with Dr. Dudley. (Doc. 147, Comp. Hrg. Vol. VI at 946, 962, 1006-07). Altogether, Dr. Dudley estimates that he spent a total of 16 hours with Merriweather over the course of three sessions. (*Id.* at 921). Dr. Dudley also reviewed previous evaluations and other collateral sources of information regarding Merriweather's background and history, which he considered vital to his evaluation. (Doc. 147, Comp. Hrg. Vol. VI at 920-21).

88.     Dr. Dudley concluded that the most appropriate and accurate diagnosis was that Merriweather is a person who suffers from schizophrenia and who also uses drugs. (Doc. 147, Comp. Hrg. Vol. VI at 926-27). Dr. Dudley defined schizophrenia as "characterized by an episode of illness that lasts for approximately six months." (Doc. 147, Comp. Hrg. Vol. VI at 927; see AMERICAN PSYCHIATRIC ASSOCIATION, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS (4th ed. 2000) (DSM-5).[20] That episode of illness, Dr. Dudley testified, has three phases: (1) a prodromal period where the person's ability to function begins to deteriorate; (2) the active phase of the illness (which must span at least one month of that six-month period) where the

---

[19] Dr. Dudley's 2011 consultation with Merriweather lasted only a few minutes, so the vast bulk of his evaluation took place in 2009. Also, during his cross-examination, he admitted that while sitting in on two days of the hearings (prior to his own testimony), he did not look at or observe Merriweather during that time.

[20] Dr. Dudley's description of schizophrenia is consistent with the definition provided in the fourth edition of the DSM.

individual is exhibiting the full spectrum of schizophrenia symptoms, both positive and negative; and (3) a period afterwards that is similar to the prodromal period during which the person is pulling himself back together. (*Id.*). The course the illness may run varies; that is, individuals will alternate between periods of illness and stability. (*Id.*). Dr. Dudley stated that:

> [t]here are people who have some residual symptoms in between episodes of illness and then many people, if untreated, gradually deteriorate over time, and the residual symptoms that are there between episodes become more and more severe and so that it begins to look like a pattern of continuous illness with the onset of this whole disorder.

(*Id.* at 928).

89.     Dr. Dudley testified that the symptoms Merriweather's family recounted were exhibited by Merriweather,[21] and the change in Merriweather's condition between Dudley's initial interview in 2009 and what he saw in 2011, were consistent with "classic" schizophrenia. (Doc. 147, Comp. Hrg. Vol. VI at 928-29, 957).

90.     Dr. Dudley testified that when he saw Merriweather in 2009, Merriweather was verbal, but disorganized and distracted. Merriweather appeared to be responding to internal stimuli, and his responses were bizarre. According to Dr. Dudley, Merriweather evinced no understanding of the nature of the case, the charges against him, and the possible outcomes of his case. Merriweather talked about his imminent release and expressed the view that he had been held longer than he expected. Dr. Dudley found Merriweather's affect to be flat, and testified that Merriweather would interrupt him with inappropriate laughter. In a subsequent meeting in 2009,

---

[21] Much of Dr. Dudley's understanding of Merriweather's life before the robbery appears to have come from Patton and Simpson. For reasons mentioned earlier, the court finds that the testimony of Merriweather's sister and former girlfriend regarding his condition before the robbery were inconsistent in some important aspects.

Merriweather expressed to Dr. Dudley that he felt he was at risk of being harmed, perhaps poisoned. (Doc. 147, Comp. Hrg. Vol. VI at 943-44).

91.     An important factor in Dr. Dudley's diagnosis was Merriweather's substantial weight loss. (Doc. 147, Comp. Hrg. Vol. VI at 923-30, 996). He did, however, concede that Merriweather's later decision to continue eating, arising from his aversion to the needles and tubes that would have been used to inject nutrition into him, reflected a choice by Merriweather to realize a clear preference. (*Id.* at 1022).

92.     Also important to Dr. Dudley's evaluation was Merriweather's refusal to communicate with him during Dr. Dudley's visits to the Shelby County Jail in June 2011. (Doc. 147, Comp. Hrg. Vol. VI at 946). Dr. Dudley interpreted Merriweather's refusal to communicate with him showing that he was unable to communicate. (*Id.* at 951).[22]

93.     Dr. Dudley dismissed the role of illicit drugs in the context of Merriweather's diagnosis because (1) Merriweather's symptoms seemed to be present when he was not using drugs, and (2) there was a lack of information to identify a drug, or indicate that drugs were used in the quantity or for the duration necessary to cause the symptoms. (Doc. 147, Comp. Hrg. Vol. VI at 925). However, Dr. Dudley did note that, in addition to marijuana use, there is evidence that Merriweather used other illegal drugs.[23]  (*Id.* at 958, 978).

_____

[22]  Dr. Dudley interpreted this as an inability to communicate, rather than unwillingness to do so. This conclusion is questionable, however, because the day after Merriweather failed to speak with Dr. Dudley, Merriweather engaged in an extended conversation with his lawyers and Jack Early. (Doc. 146, Comp. Hrg. Vol. V at 823).

[23]  Dr. Dudley's approach to analyzing the potential for drug use is, at best, puzzling. The record has both anecdotal and empirical evidence of Merriweather's drug use, including (1) Merriweather's self-reports of the use of other drugs and (2) the lab tests conducted at UAB on the day after the bank robbery that indicate his use of opiates. (Doc. 142, Comp. Hrg. Vol. I at 103-04; Def. Ex. 15 at 18). Moreover, even if the court were to only consider the anecdotal evidence in isolation, Dr. Dudley selectively credited certain reports (*e.g.*, reports that Merriweather was obsessed with the letter "C"), but dismissed others (*e.g.*, that Merriweather was a frequent drug user) in reaching his

94.     Dr. Dudley considered but ruled out malingering, in part because mimicking the negative symptoms of schizophrenia, even if one were to assume that the patient knows what they are, would be difficult. (Doc. 147, Comp. Hrg. Vol. VI at 937-39). Dudley admitted, however, that he was unfamiliar with the Test of Memory Malingering ("TOMM") and was not an expert in malingering. (*Id.* at 956, 1003).

95.     Dr. Dudley recommended to counsel that a neurological expert be retained to determine, among other things, whether scans and MRIs of Merriweather's brain were normal. (Doc. 147, Comp. Hrg. Vol. VI at 953).

### 5.     Dr. James Merikangas

96.     On April 30, 2009, while Merriweather was still incarcerated in the Jefferson County Jail, Dr. James Merikangas, a board-certified forensic neuropsychiatrist retained by the Defense, interviewed Merriweather for one and a half to two hours. (Doc. 148, Comp. Hrg. Vol. VII at 1128). In connection with this meeting, Dr. Merikangas reviewed extensive collateral material and requested an MRI and a PET scan of Merriweather's brain to detect any physical abnormalities. (*Id.* at 1129). During the initial meeting, Dr. Merikangas formed an impression that Merriweather was psychotic, suffered from hallucinations, ideas of reference, ideas of influence, and that his grasp on reality was impaired. Merriweather reported to Dr. Merikangas that television presenters were speaking directly to him, he thought that he could control people with his thoughts, and once asked if they were in a movie. Dr. Merikangas observed positive symptoms of schizophrenia – namely, paranoia, hallucinations, and delusions. (*Id.* at 1129-31).

diagnosis.

97.     Two years later, in June 2011, Dr. Merikangas visited Merriweather for a second time. This occurred after Merriweather had returned from custodial evaluations at FMC Butner. Dr. Merikangas reported that he attempted to interview Merriweather in a small attorney-client room, this time at the Shelby County Jail, but Merriweather remained quiet during the meeting. (Doc. 148, Comp. Hrg. Vol. VII at 1146). Dr. Merikangas returned the next day to assess whether Merriweather was competent to stand trial using the ECST. (*Id.* at 1149). Dr. Merikangas also reviewed records from Merriweather's stay at FMC Butner, jail records from the Shelby County Jail, and reports and interviews conducted by other medical experts. (Doc. 148, Comp. Hrg. Vol. VII at 1147).

98.     Dr. Merikangas found that Merriweather is unable to cooperate with counsel. (Doc. 148, Comp. Hrg. Vol. VII at 1144). Dr. Merikangas concluded that Merriweather's lack of cooperation with counsel was due to an inability to communicate (rather than a deliberate refusal to do so), and was not the result of malingering. Dr. Merikangas reached the conclusion that Merriweather is not malingering based on two observations: (1) it is difficult to maintain a lie for an extended period of time and Merriweather's behavior was consistent during his 16-month stay at FMC Butner, and (2) Merriweather has no incentive to lie. (*Id.* at 1151, 1163). With regard to the first observation, Dr. Merikangas stated that "the real determinative thing is to have observations of the patient over a period of time as there are very few people who can totally fake their illnesses in ways that are consistent with their disease under 24-hour observation for weeks and months at a time." (*Id.* at 1126).[24] When asked whether he thought Merriweather has an

---

[24] The court finds this statement perplexing given Dr. Merikangas's opinion regarding Dr. Berger's evaluation in this case. Dr. Merikangas, who interviewed Merriweather for no more than two hours (Doc. 148, Comp. Hrg. Vol. VII at 1129), criticized the evaluation by Dr. Berger, who interviewed Merriweather over the

incentive to malinger, Dr. Merikangas initially testified that Merriweather has no incentive to misrepresent his current mental capacity because the result of this competency determination will merely decide whether Merriweather spends the rest of his life in prison or the rest of his life in a hospital setting. (Doc. 148, Comp. Hrg. Vol. III at 163). Of course, as Dr. Merikangas's response makes clear, he failed to take into account that the death penalty is being sought in this case.[25] The court rejects Dr. Merikangas's opinion that Merriweather has no incentive to malinger in this case. (*Id.* at 1163-64).

99.     Based on his interviews and a review of these records, Dr. Merikangas concluded that Merriweather suffers from psychosis due to schizophrenia and recommended that Merriweather be given antipsychotic and mood-stabilizing medication. (Doc. 148, Comp. Hrg. Vol. VII at 1142-43). Dr. Merikangas opined that Merriweather is not competent to stand trial because of his psychosis due to schizophrenia and his inability to cooperate with counsel. (Doc. 148, Comp. Hrg. Vol. III at 1144).

100.     In reaching his conclusion that Merriweather is afflicted with psychosis due to schizophrenia, Merikangas relied upon MRI and PET scan images.[26] While testifying about his

---

course of 16 months, as "negligent" (Doc. 148, Comp. Hrg. Vol. VII at 1145), "deficient," and "incompetent." (Doc. 148, Comp. Hrg. Vol. VII at 1152). The court concludes that, even applying Dr. Merikangas' "real determinative" test, Dr. Berger was in a much better position to evaluate Merriweather on a consistent basis.

[25] Given Dr. Merikangas's vehement opposition to the death penalty (discussed more fully below), the court concludes he would have to be extremely naive to not have comprehended that the United States seeks imposition of the death penalty in this case. The court does not believe Dr. Merikangas is so naive.

[26] All of the medical experts, including Dr. Merikangas, agree that brain imaging cannot be used to diagnose schizophrenia. (Doc. 148, Comp. Hrg. Vol. VII at 1137, 1139-40, 1188). While Dr. Merikangas testified that brain imaging can reveal abnormalities commonly found in people with mental diseases, such as schizophrenia, or any other disease that affects the brain, he cautioned that these images should not be used to reach a diagnosis. (Doc. 148, Comp. Hrg. Vol. VII at 1139-40). "There is," Dr. Merikangas admitted, "no objective test for schizophrenia." (Doc. 148, Comp. Hrg. Vol. VII at 1207).

interpretation of the MRI and PET scan images, Dr. Merikangas directed attention to thinning in the posterior corpus callosum and atrophy in the right parietal lobe. (Tr. Vol. VII, 1135-36, 1138). However, Dr. Merikangas acknowledged that the thinning of cerebral tissue like that observed in the images could be symptomatic of a large number of medical conditions, including but not limited to lupus, autoimmune diseases, post-encephalitis, some types of demyelinating disease, traumatic brain injuries, a viral infection that affects the brain (such as measles or HIV), and metabolic disturbances like thyroid diseases or disorders of calcium metabolism. (Doc. 148, Comp. Hrg. Vol. VII at 1141).

101.   Furthermore, Dr. Merikangas cautioned that he did not conduct the scans himself and that the images he presented to the court are "for illustrative purposes." He noted that he "wouldn't presume to look at [the scans] and say [he could] make a diagnosis from these tiny images." (Doc. 148, Comp. Hrg. Vol. VII at 1139-40). Nevertheless, Dr. Merikangas diagnosed "psychosis because of schizophrenia" based on the MRI and PET scan images. (Doc. 148, Comp. Hrg. Vol. VII at 1141-42). Dr. Merikangas noted that the type of atrophy observed in the images is frequently seen in patients with schizophrenia. (*Id.* at 1134-39). He further testified that the brain abnormalities observed cannot be the result of teenage or adult substance abuse because studies have shown that the brain abnormalities caused by illicit substances are of an entirely different nature. (*Id.* at 1142).

102.   After meeting with Merriweather and reviewing the brain scans, Dr. Merikangas recommended that Merriweather be prescribed anti-psychotic and mood-stabilizing drugs. (Tr. Vol. VII, 1142). Based on one and a half to two hours spent with Merriweather, Dr. Merikangas concluded that Merriweather suffers from a mental disease, most likely schizophrenia, that should be medicated, and is not competent to stand trial. (*Id.* at 1143-44). Dr. Merikangas conceded that a

schizophrenic could still be found competent to stand trial, citing the case of Ted Kaczynski.[27] (Doc. 148, Comp. Hrg. Vol. VII at 1156).

103.    Since 1998, Dr. Merikangas has testified in 97 murder proceedings, twice for the prosecution or the court and 95 times for the Defense. (Doc. 148, Comp. Hrg. Vol. VII at 1165). He acknowledges that he is a staunch opponent of the death penalty and believes it should be abolished. (Doc. 148, Comp. Hrg. Vol. VII at 1165-66).

104.    Shortly before the second competency hearing, the Defense filed an affidavit from Dr. Merikangas dated July 8, 2014. (Doc. 509-2, sealed). The court has reviewed that document. In September 2013, Dr. Merikangas met again with Defendant and later reviewed the additional records from FMC Butner which included the ESH/AD status forms and the clinical encounters with Mr. Merriweather. Dr. Merikangas maintained his opinion that Merriweather suffers from schizophrenia and is incompetent to stand trial. The court has considered the affidavit, but is aware that the Government was not given an opportunity to test the conclusions in it through cross-examination. Thus, the court accords the affidavit the evidentiary weight appropriate under the circumstances.

###     6.      Dr. C. Thomas Gualtieri

105.    In accordance with Judge Ott's order requiring Merriweather's competency evaluation at FMC Butner to include input by a neurologist and/or a neuropsychiatrist (Doc. 79 at

---

[27] Between 1978 and 1995, Theodore John "Ted" Kaczynski (born May 22, 1942), also known as the "Unabomber," engaged in a nationwide bombing campaign against modern technology, planting or mailing numerous homemade bombs, killing three people and injuring 23 others. *See generally* Adam K. Magid, *The Unabomber Revisited: Reexamining the Use of Mental Disorder Diagnoses as Evidence of the Mental Condition of Criminal Defendants*, 84 IND. L.J. SUPPLEMENT 1 (2009) (discussing the implications of a diagnosis of paranoid schizophrenia on the criminal proceedings against Ted Kaczynski).

14), Dr. C. Thomas Gualtieri, a board certified psychiatrist with 42 years of medical experience, was asked by FMC Butner's chief psychiatrist, Dr. Jean Zula, to conduct an independent neuropsychiatric evaluation of Merriweather while he was at FMC Butner. (Doc. 144, Comp. Hrg. Vol. III at 381, 385; Gov't Exs. 5 & 6).

106.    Dr. Gualtieri's evaluation consisted of an approximately two and a half to three hour interview and testing conducted on May 19, 2010. (Doc. 144, Comp. Hrg. Vol. III at 389-99). During Dr. Gualtieri's evaluation, Merriweather was calm, polite, attentive, sufficiently groomed, spoke in a level voice, and was able to appropriately sit in his chair and establish good eye contact. (Doc. 144, Comp. Hrg. Vol. III at 401-02, 463, 498, 502; Gov't Exs. 6, 7, and 8).

107.    When engaged in small talk with Dr. Gualtieri, Merriweather behaved appropriately and gave straightforward answers. (Tr. Vol. III, 401). When questioned about the robbery or other serious matters, however, Merriweather became evasive, playful, and nonsensical. (Doc. 144, Comp. Hrg. Vol. III at 402; Gov't Exs. 6, 7, and 8). Similar to his behavior during the videotaped interviews with Dr. Berger, Merriweather's responses to Dr. Gualtieri's questions were often circuitous, circumstantial, and flowed like a stream of consciousness. (Doc. 144, Comp. Hrg. Vol. III at 402, 452-54; Gov't Exs. 6, 7 and 8). Dr. Gualtieri detected, however, that Merriweather was "focused very clearly during the entire evaluation on what was in his interests." (Doc. 144, Comp. Hrg. Vol. III at 403).

108.    Dr. Gualtieri testified that Merriweather's test results suggest that Merriweather was malingering. (*Id.* at 417). Dr. Gualtieri found that Merriweather had performed well on hard tests, but poorly on easy tests, a pattern that he associated with malingering. (*Id.* at 417). Merriweather performed worse in subsequent administrations of the Verbal Fluency Test, which suggested malingering to Dr. Gualtieri. (Tr. Vol. III, 421). When interpreting tests for malingering,

42

Dr. Gualtieri emphasized that not finding malingering on a malingering test does not necessarily mean that the person is not malingering. (Doc. 144, Comp. Hrg. Vol. III at 423).

109.    Based on his interview, test results, and a review of relevant literature, Dr. Gualtieri testified that he thought that Merriweather is competent to stand trial.[28] (Doc. 144, Comp. Hrg. Vol. III at 438-39).

### 7.    Dr. Allan F. Mirsky

110.    Dr. Allan F. Mirsky, a neuropsychologist with over 50 years of experience in the field, was, like Dr. Gualtieri, asked to conduct additional psychological testing of Merriweather at FMC Butner pursuant to Judge Ott's order. (Doc. 147, Comp. Hrg. Vol. VI at 1032, 1043-46). Dr. Mirsky has devoted much of his 50-year career to the study of schizophrenia. (*Id.* at 1032-43). During his extensive career, Dr. Mirsky conducted three or four other competency determinations before evaluating Merriweather. (*Id.* at 1085). To evaluate Merriweather's mental condition, Dr. Mirsky interviewed Merriweather for about four and a half hours at FMC Butner. (*Id.* at 1089-90).

111.    During the interview, Dr. Mirsky conducted several tests of Merriweather's mental performance, including tests he developed himself to detect attention deficits. (Tr. Vol. VI, 1045). The first test, the Test of Sustained Attention, measures the ability of the patient to respond to the letter X when it appeared among other letters of the alphabet. (*Id.* at 1049). The second test, the AX-Test, requires the patient to respond to the letter X if it follows the letter A. (*Id.*). The third test, the Auditory Tone Test, requires the patient to distinguish one tone from other tones. (*Id.*). Dr.

---

[28] At the risk of redundancy, the court again notes that the ultimate question of whether Merriweather is competent to stand trial is a legal determination that the court must make.

Mirsky also subjected Merriweather to the Wisconsin Card Sorting Test, the TOMM, the Test of Verbal Fluency, and the Reciprocal Motor Programs Test. (*Id.* at 1048-50).

112.    Merriweather performed poorly on the Test of Sustained Attention, the AX-Test, the Auditory Tone Test, and the Wisconsin Card Sorting Test. (Doc. 146, Comp. Hrg. Vol. VI at 1050). Dr. Mirsky testified during the hearing that he believed the results of these tests were consistent with a diagnosis of schizophrenia. (*Id.* at 1051). Current research, Dr. Mirsky stated, suggests that schizophrenia is a disease of attention deficits and verbal memory deficits. (*Id.* at 1043-44).

113.    On the other hand, Merriweather performed within the normal range on the Test of Memory Malingering (TOMM), the Test of Verbal Fluency, and the Reciprocal Motor Programs Test. (Doc. 146, Comp. Hrg. Vol. VI at 1051). Dr. Mirsky interpreted these results to mean that Merriweather was not malingering because "somebody who is faking a disorder just does poorly on everything." (Doc. 146, Comp. Hrg. Vol. VI at 1051). Further, Dr. Mirsky noted, the TOMM failed to detect malingering. (Doc. 146, Comp. Hrg. Vol. VI at 1048). Dr. Mirsky trusted that Merriweather was not malingering because, he noted, it is very difficult for a person, even one who is familiar with the disease's features, to mimic the symptoms of schizophrenia. (Doc. 146, Comp. Hrg. Vol. VI at 1060).

114.    The Government asserts that Dr. Mirsky never firmly opined that Merriweather was incompetent, only that certain test results suggest that conclusion. (Doc. 152 at 38). In any event, his failure to probe into such things as Merriweather's understanding of (1) the charges against him, (2) the role of his lawyers, the prosecution, and the court, (3) the facts of the case, (4) the nature of the proceedings, and (5) the elements of the crime (as well as defenses available to him) has rendered his opinion testimony less than helpful.

44

115.     Shortly before the second competency hearing, the Defense filed an affidavit from Dr. Mirsky dated July 7, 2014. (Doc. 509-1, sealed). The court has reviewed Dr. Mirsky's affidavit. In September 2013, Dr. Mirsky met with Defendant, and based upon that interview, Dr. Mirsky continues to believe–for the reasons stated herein–that Defendant suffers from a major mental illness and is incompetent to stand trial. Dr. Mirsky also stated that he administered several tests designed to detect malingering or that contained scales that would expose malingering. Dr. Mirsky found that Merriweather was not malingering on any of the tests. (Doc. 509-1 at 3). Dr. Mirsky also found that Merriweather's I.Q. score dropped fifteen points, which Dr. Mirsky attributed to the trajectory of schizophrenia. (*Id.*). The court has considered this affidavit, but is aware that the Government has not had an opportunity to test the truth or credibility of Dr. Mirsky's findings through cross-examination. The court this gives this affidavit appropriate weight in light of the circumstances.

### 8.     Dr. Edward E. Landis

116.     Dr. Edward E. Landis, Ph.D., the deputy chief psychologist at FMC Butner, reviewed and analyzed all psychological testing performed on Merriweather in preparation for Dr. Berger's evaluation report, including the tests administered by Dr. Mirsky. (Doc. 150, Comp. Hrg. Vol. VIII at 1282, 1286, 1287-88). Dr. Landis has worked at FMC Butner for approximately 25 years and has testified 137 times in criminal proceedings, primarily on competency issues.

117.     Dr. Landis criticized Dr. Mirsky's approach to diagnosing Merriweather with schizophrenia. Rather than observe Merriweather for positive or negative signs of schizophrenia, Dr. Mirsky tested Merriweather's mental performance and found attention deficits. While there is a theoretical connection between schizophrenia and some lower-level functional processes, such

as attention and concentration, attention deficits are not generally accepted as a primary symptom in diagnosing schizophrenia. (Doc. 150, Comp. Hrg. Vol. VIII at 1292). Under current standards and accepted diagnosing criteria, Dr. Landis commented, schizophrenia cannot be diagnosed based on deficits in cognitive processing, such as attention. (*Id.* at 1298-99). Testing that endeavors to identify deficits in attention, while useful in recovery and rehabilitation, is presently not accepted and will not be accepted in the foreseeable future as part of the differential diagnosis system for diagnosing schizophrenia. (*Id.* at 1299).

### 9.    Jack Earley

118.    Mr. Jack Earley, a California-based public defender retained by the Defense, accompanied Mr. Jaffe and Mr. Drennan to see Merriweather on June 27, 2011. (Doc. 146, Comp. Hrg. Vol. V at 819). Merriweather was initially unresponsive; however, as the three began to leave, a guard stopped them and told them that Merriweather recognized Mr. Jaffe and wished to speak with him. (*Id.* at 822). This eventually led to a conversation that lasted hours. (*Id.* at 823). Among the issues discussed during the conversation, Mr. Earley recalled that Merriweather was dismissive of the efficacy of retaining additional medical experts, telling his lawyer that "the judge was the one that was going to make the ultimate decisions in the case, and the judge didn't need to hear from defense lawyers or a defense doctor, especially since he already had doctors that he could rely upon." (*Id.* at 833). Earley testified that Merriweather's speech during this conversation, while somewhat incoherent to others, seemingly was organized to Merriweather. (*Id.* at 838).

### B.    Testimony Presented at the 2014 Competency Hearing

119.    At the Second Competency Hearing, the court heard testimony from seven expert witnesses: one called by the Government (Dr. Christina Pietz), and three called by the Defense

(Drs. Mark Cunningham, Alex Stalcup, and Bruce Berger).[29]  The court also heard testimony from thirteen lay witnesses, including correctional staff from MCFP Springfield, the Shelby County Jail, the Atlanta Federal Penitentiary, and nine nurses from FMC Butner.

### 1.    Dr. Christina Pietz's Second Evaluation of Merriweather

120.    As previously discussed, Dr. Pietz reevaluated Merriweather at MCFP Springfield in November 2013 and was recalled by the Government at Merriweather's Second Competency Hearing. (Doc. 549, Second Comp. Hrg. Vol. I).

121.    When Defendant arrived at MCFP Springfield for his criminal responsibility evaluation, he was initially seen by Dr. Lea Preston on November 1, 2013. (Doc. 549, Second Comp. Hrg. Vol. I at 21; GX 33 at 3). Dr. Preston was initially concerned about Merriweather's affect because he was exhibiting disorganized thinking, which could have been an indication of psychosis. (*See* GX-33 at 3). Unlike the first time that Dr. Preston interviewed Merriweather in 2011, Merriweather was more evasive and less forthcoming during the November 2013 interview. (Doc. 549, Second Comp. Hrg. Vol. I at 23).

122.    A few days later, Dr. Pietz met with Defendant. (Doc. 549, Second Comp. Hrg. Vol. I at 24). Dr. Pietz shared Dr. Preston's initial concerns about Merriweather's presentation, as he exhibited the same disorganized and tangential speech in the interview with Dr. Pietz. (Doc. 549, Second Comp. Hrg. Vol. I at 23; GX-33 at 4). Those concerns continued when Dr. Pietz saw Defendant on November 8, 2013. (Doc. 549, Second Comp. Hrg. Vol. I at 24). Defendant again presented as organized and coherent at times, but disorganized at other times. (*Id.*). Dr. Pietz reported that Merriweather occasionally had word-finding difficulties, but then would also adopt

---

[29]  To be clear, Dr. Berger was called by the Defense as an adverse witness.

evasive behaviors such as asking Dr. Pietz questions in response to her questions. When Dr. Pietz refused to answer personal questions, Merriweather would respond that he would not answer her questions either. (Doc. 549, Second Comp. Hrg. Vol. I at 25). This was different than his initial presentation when at MCFP Springfield.

123.    Dr. Pietz requested one of her colleagues, psychiatrist Dr. Carlos Tomelleri, to interview Defendant with her on November 13, 2013. (Doc. 549, Second Comp. Hrg. Vol. I at 27). Defendant again presented as disorganized, tangential, and difficult to follow, leading Dr. Tomelleri to suspect psychosis. (*Id.* at 28). Dr. Tomelleri was also concerned about Defendant's statements that he did not know what his charges were or that he was facing the death penalty (*Id.* at 28-29). When Dr. Tomelleri asked Merriweather open-ended questions, Merriweather responded with an unrelated (but nevertheless organized) story. (*Id.* at 29).

124.    Soon after these concerns arose, Dr. Pietz asked a staff member at FPMC Springfield, Correctional Counselor Felicia Williams, about Merriweather. Williams told Dr. Pietz that she believed Merriweather understood his charges and why he was at Springfield. (Doc. 549, Second Comp. Hrg. Vol. I at 30). Williams said that while asking Merriweather about his emergency notification information, Merriweather asked Williams if she was a St. Louis Rams fan. (*Id.* at 32). When she told him she was actually a Kansas City Chiefs fan, he noted that at that time the Chiefs were undefeated (which was accurate). (*Id.* at 32). Williams said that she found Defendant was coherent and rational and that he clearly answered her questions. (*Id.*).

125.    Dr. Pietz attempted to reinterview Merriweather on November 19, 2013. He said he would not speak about his case without his legal counsel being present. (Doc. 549, Second Comp. Hrg. Vol. I at 36-37). Merriweather again told unrelated stories when Dr. Pietz asked him questions. (*Id.* at 32). However, Dr. Pietz noted that while Merriweather at times seemed

perplexed, he could follow the thread of a conversation. Dr. Pietz suspected that Merriweather was intentionally evading her questions to manipulate the conversation. (*Id.*). Merriweather also refused to take the Minnesota Multiphasic Personality Inventory (MMPI) on three occasions while at Springfield the second time. (Doc. 549, Second Comp. Hrg. Vol. I at 24, 41-42). He had taken the MMPI during his first stay at Springfield.

126.    Merriweather maintained that he did not know his charges in an interview Dr. Pietz conducted on November 22, 2013. (Doc. 549, Second Comp. Hrg. Vol. I at 43). Dr. Pietz called upon Dr. Robert Sarrazin, Chief of Psychiatry at Springfield, to get his impression of Merriweather. After speaking with Merriweather, Dr. Sarrazin concluded that Merriweather did not have a mental illness. (*Id.* at 45).

127.    Dr. Pietz received Judge Ott's order that all interviews must be videotaped. Dr. Pietz videotaped her interview with Merriweather on November 27, 2013. (Doc. 549, Second Comp. Hrg. Vol. I at 46; GX-19). Dr. Pietz observed that Merriweather's answers during that interview were coherent and organized. (*Id.*). He did not appear to experience any visual or auditory hallucinations. (*Id.* at 48, 52). The staff at FPMC Springfield denied seeing Merriweather experience any hallucinations. (*Id.* at 53). At times, Merriweather refused to answer or evaded answering questions, but Dr. Pietz concluded that he was doing this intentionally. Merriweather, in Dr. Pietz's view, understood the legal process and what roles the judge and his lawyers had in his case. (*Id.* at 49). Merriweather was not taking any antipsychotic medications while at MCFP Springfield. (Doc. 549, Second Comp. Hrg. Vol. I at 23 at 80).

128.    Following the November 27th recorded interview, Merriweather stopped speaking with Dr. Pietz. (Doc. 549, Second Comp. Hrg. Vol. I at 54). Instead, he used hand gestures to pantomime answers to Dr. Pietz's questions, which she interpreted as an unwillingness to speak

about the offense – as opposed to signs of schizophrenia or psychosis. (*Id.* at 54-55). On December 19, 2013, the last morning that Dr. Pietz asked Merriweather to speak with her, he again pantomimed a response, which she interpreted as a "no." (*Id.* at 58).

### 2. Dr. Pietz's Assessment of Other Evaluators' Findings

129. Dr. Pietz disagreed with the other evaluators, namely Drs. Cunningham and Stalcup, who found that Merriweather was schizophrenic. (Doc. 549, Second Comp. Hrg. Vol. I at 66). Those behaviors that other evaluators saw as indicating mental illness, Dr. Pietz interpreted as malingering or exaggerating symptoms of mental illness. For example, Dr. Stalcup, recounted Merriweather's behavior when, during an interview with his counsel, he "abruptly fell mute, looked dazed for 20 several seconds, and then woke up saying, 'Whoa, I think I went off on a fantasy there. I don't represent it,'" as an example of psychosis. (Def. Ex. 193). Dr. Pietz construed the incident instead as an attempt to malinger mental illness. (Doc. 549, Second Comp. Hrg. Vol. I at 81).[30] She concluded that Merriweather's "alleged psychosis appeared when he didn't want to be cooperative, when he didn't want to answer certain questions. But then when there was something that was important to him, like he wanted a commissary list or he wanted to talk about food or he wanted to talk to staff about something, there was no evidence of any psychotic behavior." (*Id.* at 93).

130. Dr. Pietz also disagreed with the opinion of Dr. Mark Cunningham, who felt that Dr. Pietz overemphasized Merriweather's drug use and misattributed his unusual preoffense behavior and reports of hallucinations and delusions to the effects of drug use. (Doc. 549, Second

---

[30] Dr. Pietz did agree with some of the other evaluators' findings, such as one by Dr. Stalcup, who observed in his report that "[o]n occasion, he [Merriweather] purposefully changed the subject to avoid answering the question in apparently purposeful behavior." (*Id.* at 83).

Comp. Hrg. Vol. I at 84; Def. Ex. 190 at 45). Dr. Cunningham, as discussed below, found that Merriweather's behaviors and visions were better diagnosed as "a prodromal phase of schizophrenia." (Doc. 549, Second Comp. Hrg. Vol. I at 88). In contrast, Dr. Pietz attributed Merriweather's preoffense behaviors that Dr. Cunningham felt were negative signs of schizophrenia -- such as lapses in personal hygiene, having an unkempt house, and not showing up for work -- to drug abuse. (*Id.* at 124). Dr. Pietz noted that Merriweather reported heavy drug use and having hallucinations after using drugs, both of which his family confirmed. (*Id.* at 88-91).

131.    Dr. Pietz acknowledged that some of Merriweather's behaviors, particularly during the offense, were inexplicable. One behavior during the offense seemed to indicate that Merriweather believed that he had a premonition or vision of the bank manager of the bank before the robbery, telling Dr. Pietz, "I got a message." (Doc. 549, Second Comp. Hrg. Vol. I at 161). During the robbery, Merriweather told a bank employee that she looked like the bank manager (whom Merriweather had envisioned). Dr. Pietz said that she could not tell if Merriweather had fabricated having the vision because he had given six versions of what happened on the day of the offense. (*Id.*).

132.    Dr. Pietz found that Merriweather showed no positive signs of schizophrenia (such as delusions, hallucinations or catatonic or disorganized behavior). (Doc. 549, Second Comp. Hrg. Vol. I at 68-69). Initially, Dr. Pietz was concerned about Merriweather's disorganized speech and mutism, but felt that neither was indicative of schizophrenia. (*Id.* at 69, 74). While Dr. Pietz observed that Merriweather has a flat affect, she did not believe his presentation to indicate schizophrenia. (*Id.* at 69). She saw no signs of disorganization in his cell. (*Id.* at 56). Dr. Pietz did conclude, however, that Merriweather was showing symptoms that "would suggest some sort of psychotic disorder," and because she did not believe that he suffered from psychosis, she

concluded that he was malingering. (*Id.* at 76). Overall, she concluded in her most current evaluation of Merriweather that he is competent to stand trial and that he is malingering memory deficits and psychotic symptoms. (*Id.* at 120, 252).

### 3.    Felicia Williams

133.    Felicia Williams is a correctional counselor at MCFP Springfield, Missouri, where she has worked for twelve years. Williams worked in the mental health unit when Merriweather was at MCFP Springfield. (Doc. 551, Second Comp. Hrg. Vol. II at 315). As a liaison between the institution's staff and the inmates, Williams has ongoing interaction with prisoners at MCFP Springfield. (*Id.* at 316). She formally interviewed Merriweather twice when he was at MCFP in November 2013 and saw him occasionally in his cell when she was on her rounds. (*Id.* at 328).

134.    Dr. Christina Pietz asked Felicia Williams to speak to Merriweather when he refused to speak with her. (Doc. 549, Second Comp. Hrg. Vol. I at 322). In a conversation with Merriweather, Williams viewed him as clean, coherent, and intelligent. Merriweather denied experiencing any hallucinations. (*Id.* at 320). He declined to give an emergency contact for any of his family members. (*Id.* at 346).

135.    Merriweather freely spoke about his background and family; Williams observed nothing odd in his speech or affect. (*Id.* at 323). He refused to speak directly about the charges that resulted in him being at Springfield, but did acknowledge that he got "around the wrong crowd." (*Id.* at 342). Merriweather asked Williams some personal questions that she did not answer, but he continued the conversation by changing the topic to the Kansas City Chiefs football team's then-undefeated season. (*Id.* at 324, 326). Williams found Merriweather to be high-functioning,[31]

_____

[31] Williams indicated in her testimony that she meant that Merriweather was "high functioning" in his

well-spoken, and unremarkable in hygiene or speech. (*Id.* at 320, 361). Williams did not notice any of the disorganized speech that Dr. Pietz reported. (*Id.* at 329).

### 4.    Shelby County Jail Correctional Officers

136.    Shelby County Sheriff's Department corrections officers Ronald Higgins and Joseph Szafranski testified about their impressions of Merriweather in the county jail. (Doc. 551, Second Comp. Hrg. Vol. II at 367). Officer Higgins observed Merriweather for two days every other week. (*Id.* at 368). Higgins occasionally spoke with Merriweather about sports, noticing nothing unusual about Merriweather's speech, affect, or eating patterns. (*Id.* at 371, 373). Higgins testified that Merriweather showers when scheduled and his hygiene at the jail is unremarkable. (*Id.* at 374). Overall, Merriweather seems to be an average, albeit introverted, inmate for Officer Higgins. (*Id.*).

137.    The impressions that Corrections Officer Joseph Szafranski had of Merriweather mirrored those of Higgins. (*Id.* at 383). Szafranski observed that Merriweather's cell was typical of inmate's cells. Merriweather appeared clean over the seven months that Szafranski observed him at the jail. (*Id.* at 387-88). Generally, Szafranski testified, Merriweather spends his day in his bunk with his head covered. (*Id.* at 384). Szafranski said that he has never cited Merriweather for a disciplinary infraction, has seen Merriweather get a commissary order only once, and rarely sees him interacting with other inmates. Szafranski testified that Merriweather "has never personally engaged me in conversation and I have never seen him really engage anyone else." (*Id.* at 392). In two years, Szafranski testified, he has observed "maybe two" out of 400 prisoners as reserved as Merriweather. (*Id.* at 391-92). Overall, both officers noted that Merriweather was generally

---

interactions compared with other inmates and was not referring to I.Q. (Doc. 549, Second Comp. Hrg. Vol. I at 363-64).

reserved and compliant. (*Id.* at 374-75, 392, 395, 89-90). Neither detected any issue with Merriweather's hygiene or the state of his cell. (*Id.* at 368-69).

### 5.    Dr. Mark Cunningham

138.    Dr. Mark Cunningham is a clinical and forensic psychologist in private practice and an independent research scientist. He is licensed to practice in twenty-two states, including Alabama. (Doc. 551, Second Comp. Hrg. Vol. II at 456). At the request of the Defense, Dr. Cunningham interviewed Merriweather for approximately ten hours on October 8, 2013, and on February 15, 2014. (*Id.* at 463). Dr. Cunningham diagnosed Merriweather with schizophrenia. (*Id.* at 474). He based this diagnosis on his evaluation of Merriweather, his review of court and institutional records, and interviews with a number of Merriweather's family and friends.[32] (*Id.* at 462-64). Dr. Cunningham noted that Merriweather's reported symptoms began at the expected age of onset for schizophrenia: his late teens and early twenties. (*Id.* at 490). Dr. Cunningham found that Merriweather met four of the DSM-5's five criteria for determining schizophrenia: delusions; hallucinations; disorganized speech (such as neologisms or invented words that Merriweather used); and negative symptoms (such as diminished emotional expression or avolition).[33] (*Id.* at 483). Dr. Cunningham found less evidence of the fifth criteria of grossly disorganized or catatonic behavior and found that the evidence did not support it. (*Id.* at 484).

---

[32] Dr. Cunningham conducted in-person interviews with family friends Charles and Chin Geter and Merriweather's sister Kim Patton as well as telephone interviews with family friends Martha Green and Chun Ok Jones, his father William Merriweather, Sr., former girlfriend Melanie Jackson, and Dr. Robert Hunter, a physician who had treated Merriweather at the Shelby County jail in 2009.

[33] To make a diagnostic finding of schizophrenia, an evaluator must find at least two or more of these criteria and that condition must be present for a significant time during a one-month period. (DSM-5 at 99 (Schizophrenia, Diagnostic Criteria)).

(a)     **Delusions**

139.    Dr. Cunningham acknowledged that because there have been no recent reports of actual delusions from Merriweather during the years he has been at Butner, Springfield, or the Shelby County Jail, that "makes it a little bit more difficult to diagnose a schizophrenic disorder than if he was displaying as if he was reacting to internal stimuli expressing or openly expressing delusional beliefs." (Doc. 552, Second Comp. Hrg. Vol. III at 667). Therefore, Dr. Cunningham primarily relied on descriptions of Merriweather's preoffense behavior from family and friends, such as the following: reports that Merriweather told them that he had a chip implanted in him; that he could see and hear demons in people; that he could hear others' thoughts; and that he believed that his preschool-age nephews were plotting against him. (Doc. 551, Second Comp. Hrg. Vol. II at 490-94; Def. Ex. 190). The fact that Merriweather reported experiencing some of these delusions during a five-to-six month period of alleged abstinence from drugs led Dr. Cunningham to conclude these symptoms were not drug induced. (*Id.* 496-97). Dr. Cunningham found that the evidence of negative symptoms and documentation of delusions and hallucinations at FMC Butner further supported his findings that Merriweather's reported delusions were a product of mental illness rather than the effects of drug use. (*Id.* at 497).

(b)     **Disorganized Speech**

140.    Dr. Cunningham found that Merriweather displayed disorganized speech, a proxy for disorganized thought, "characterized by things such as speaking tangentially where you move from topic to topic or circumstantially where you are not directly speaking on point to or addressing the issue before you." (Doc. 551, Second Comp. Hrg. Vol. II at 475, 483). Dr. Cunningham also cited Merriweather's use of neologisms, or invented words, that shows the type of disorganized thought consistent with schizophrenia. (*Id.* at 475). As an example of

55

Merriweather using a neologism, Dr. Cunningham related that when he asked Merriweather why he would not tell him his birthdate Merriweather responded, "that would be a depricote." (*Id.* at 476). Dr. Cunningham disagreed with Dr. Pietz's conclusion that neologisms had to occur more frequently to be symptomatic. (*Id.* at 475). Dr. Cunningham noted that both the Government and Defense's experts have "observed disorganized, random, tangential, elliptical speech, periods of time in which he was mute, periods of time in which he wouldn't make eye contact." (Doc. 552, Second Comp. Hrg. Vol. III at 748). Dr. Cunningham, like Drs. Berger, Pietz, and Dudley, found that Merriweather was selectively disorganized in his speech. Dr. Cunningham testified that Merriweather "becomes disorganized in his speech as you delve into issues of case or historical significance. He … is responsive and more organized on simple interactions." (Doc. 552, Second Comp. Hrg. Vol. III at 662; *see also* Doc. 551, Second Comp. Hrg. Vol. II at 467-68). Nevertheless, Dr. Cunningham concluded that Merriweather's overall speech pattern reflected a symptom of schizophrenia that is "exceedingly difficult to malinger on a recurrent and fluid ongoing basis." (*Id.* at 477).

### (c)   Negative Symptoms of Schizophrenia

141.   Dr. Cunningham noted the following indicators of negative symptoms of schizophrenia in his evaluation of Merriweather: "impoverished speech or affective flattening, social withdrawal, reclusiveness, reduced attention to hygiene, loss of motivation and ambition." (Doc. 551, Second Comp. Hrg. Vol. II at 483). Dr. Cunningham found that the evidence of Merriweather's poor hygiene was a highly significant indicator of negative symptoms of schizophrenia. (Doc. 552, Second Comp. Hrg. Vol. III at 662). Dr. Cunningham interpreted Merriweather's failure to shower for three months at FMC Butner and that nurses' notes reflected that he showered only once from mid-October 2010 to mid-February 2011 at FMC Butner to be a

sign of significant social withdrawal. (Doc. 552, Second Comp. Hrg. Vol. III at 663). At FMC Butner, Dr. Cunningham noted that reports showed that Merriweather only went out once for recreation in one 37-week period and left his cell for recreation sixteen times in 450 days. (Doc. 551, Second Comp. Hrg. Vol. II at 505).

142.    Dr. Cunningham explained the differences in his conclusions about Merriweather's hygiene and those of Dr. Berger, who evaluated Merriweather at Butner from December 2009 to until April 2011. (*Id.* at 527). Dr. Cunningham noted that Dr. Berger reported Merriweather's personal and cell hygiene as adequate on December 3, 2010, when by Dr. Cunningham's estimation, Merriweather had gone for seven weeks without going to the facility's showers. (*Id.* at 527; GX-26 at 129). Dr. Cunningham again noted that Berger noted during a January 19, 2011 clinical encounter that Merriweather's hygiene was good, but Dr. Cunningham noted that Merriweather had "now gone three months without a shower at the point that Dr. Burger says his hygiene [was] adequate." (*Id.* at 528; GX-26 at 163). Based on Dr. Cunningham's reading of FMC Butner's medical reports and the assessments of the nursing staff, Dr. Cunningham concluded that Dr. Berger's evaluations of Merriweather's hygiene and psychological status were inaccurate. (*Id.* at 530).

### (d)    Drug Induced Cause of Symptoms

143.    Dr. Cunningham rejected Dr. Pietz's conclusions that some of Merriweather's abnormal behavior could be attributed to polysubstance abuse or toxic psychosis. Dr. Cunningham felt that the effects of drug abuse on speech would resolve within a few weeks and be absent after a significant period away from drugs. (Doc. 552, Second Comp. Hrg. Vol. III at 738).

(e)     **Malingering**

144.    Dr. Cunningham ruled out malingering as a diagnosis or a factor in Merriweather's behavior or presentation. He did not administer a test to Merriweather to measure the presence or absence of malingering. (Doc. 552, Second Comp. Hrg. Vol. III at 747). However, Dr. Cunningham noted that there was no evidence of malingering on the Test of Memory Malingering or on the Structured Interview of Reported Symptoms that Dr. Pietz administered in 2007. (Doc. 551, Second Comp. Hrg. Vol. II at 577; Doc. 552, Second Comp. Hrg. Vol. III at 677, 688). Dr. Cunningham also observed that Merriweather consistently denied hallucinations or delusions during mental health evaluations. (Doc. 552, Second Comp. Hrg. Vol. III at 677). Merriweather's denials of symptomatic behavior in mental health evaluations made an impact on Dr. Cunningham's assessment of malingering. Dr. Cunningham testified that Merriweather is "effectively negating [his] defense" which is "profoundly self-defeating" behavior. (*Id.* at 606).

145.    Dr. Cunningham emphasized that if Merriweather is malingering negative symptoms of schizophrenia, he is doing so in "an extremely atypical way." (Doc. 552, Second Comp. Hrg. Vol. III at 677). People who are malingering, Dr. Cunningham testified, exaggerate positive symptoms of mental illness far more than Merriweather – to the extent that if an evaluator does not ask about the delusional thought, the subject will call attention to his or her bizarre behavior. (*Id.* at 467; 515). Dr. Cunningham found that Merriweather, in contrast, did not report delusions at any of the institutions where he was housed after the offense. Dr. Cunningham also found Merriweather's presentation at FMC Butner or FMC Springfield contrary to the expected conduct of someone faking a mental disease: the nurses' notes contained references to hallucinations or disorganized speech instead of Merriweather presenting them in front of the doctors; in Merriweather, negative rather than positive symptoms of schizophrenia predominate;

58

and Merriweather's behavior has a "high response cost": meaning that most rational people would find his behaviors of social isolation, not eating or bathing, and low activity "to be unbearable." (Doc. 551, Second Comp. Hrg. Vol. II at 510).

146.    Dr. Cunningham testified that a lack of any identifiable gain to Merriweather's conduct also convinced him that Merriweather was not faking mental disease. Dr. Cunningham saw no secondary gain to Merriweather's withholding information about preoffense, non-criminal conduct, particularly in light of the inconsistency of Merriweather's refusals to talk about his background. As noted above, Dr. Cunningham similarly rejected conclusions that the occasional nature of Merriweather's disorganized speech showed malingering. (Doc. 551, Second Comp. Hrg. Vol. II at 477). Dr. Cunningham feels that disorganized speech is "a symptom of schizophrenia that is exceedingly difficult to malinger on a recurrent and fluid ongoing basis" because a certain level of cognition in a normally functioning brain "is inescapable." (Doc. 551, Second Comp. Hrg. Vol. II at 477).

147.    While Dr. Cunningham did not believe that Merriweather was feigning symptoms such as disorganized speech or bathing, he [Cunningham] did acknowledge that Merriweather chooses to withhold information from evaluators. Merriweather is an unreliable witness on his own history, Dr. Cunningham noted, and it is difficult to extract reliable historical information from Merriweather such as his birthdate, the legal charges against him, or other background information. Nevertheless, Dr. Cunningham believes that Merriweather knows what he is charged with and that Merriweather is acting volitionally when refusing to discuss the offense. (Doc. 551, Second Comp. Hrg. Vol. II at 519). Dr. Cunningham theorized that when Merriweather is questioned about his past -- when he had a job, recreations, family, and emotional health -- his realization of the contrast between that and his current life of relative reclusion and isolation is too

much of an emotional load for him to bear. Dr. Cunningham analogized Merriweather's failing coping capabilities to monitoring a patient with heart disease on a treadmill – a heart patient may seem fine initially, but as the treadmill's ramp is elevated, the patient begins to show more subjective symptoms. (Doc. 551, Second Comp. Hrg. Vol. II at 469). Psychological issues operate the same way, Dr. Cunningham explained, in terms of the demands put on the system, and he observed that Merriweather deteriorates under stress. (*Id.* at 585-87).

148. Dr. Cunningham was asked why his opinion differed so significantly from Drs. Berger and Pietz who saw Merriweather over far longer periods, whose evaluations were supported by the observations of institutional and medical staff, and who saw Merriweather in a living environment where it may be assumed an evaluator can gain a comprehensive understanding of a subject's daily life and mental health. The Government's experts, he noted, did not have access to all of the documentary, institutional, and historical data that he had over different periods of Merriweather's life and incarceration. (Doc. 551, Second Comp. Hrg. Vol. II at 502).

149. Dr. Cunningham thus disagreed with Dr. Pietz's finding that Merriweather was malingering symptoms of mental illness. To explain their differing opinions, Dr. Cunningham noted that Dr. Pietz's previous diagnosis at FMC Springfield (attributing Merriweather's symptoms to drug induced psychosis) may have had a "subconscious" biasing effect on Dr. Berger's findings that Merriweather was competent. (Doc. 552, Second Comp. Hrg. Vol. III at 668-69). Dr. Cunningham also noted that putting aside Merriweather's reported drug use, Dr. Berger did not have the third-party data that he [Dr. Cunningham] had and was not able to go through notes as he did. (*Id.* at 679). Dr. Cunningham also surmised that Defendant's affect can be interpreted as stubbornness, which may "end[] up tainting the evaluation as well because there is

this sense of frustration" with Merriweather. (*Id.* at 672). Dr. Cunningham found that Merriweather's behavior was more indicative of schizophrenia.

(f)  **Ability to Assist Counsel**

150. Dr. Cunningham concluded that Merriweather's schizophrenia compromises his ability to assist presently counsel with his defense. Merriweather, with treatment in Dr. Cunningham's opinion, can be restored to competency. Dr. Cunningham discounted Merriweather's memory as having no substantial effect on the defendant's ability to presently assist counsel. (*Id.* at 637).

6. **Dr. Alex Stalcup**

151. Alex Stalcup, M.D., was called by the Defense. (Doc. 552, Second Comp. Hrg. Vol. III at 695). Dr. Stalcup is board certified in pediatrics, focusing on pulmonary and critical care medicine. However, since 1995, Dr. Stalcup has been the medical director of the New Leaf Treatment Center in Lafayette, California that specializes in alcohol and drug abuse. He evaluated Merriweather as a specialist in addiction medicine. (*Id.* at 695-96, 698, 776).

152. Dr. Stalcup diagnosed Merriweather with paranoid schizophrenia, stating that Merriweather was a "low to mid-level functioning paranoid schizophrenic" and was "floridly psychotic." (Doc. 552, Second Comp. Hrg. Vol. III at 754, 841). Dr. Stalcup accompanied Merriweather's counsel to interview Merriweather in March 2014, but concluded after an hour and a half encounter that Merriweather seemed to "just too disorganized [and] too psychotic to comply" with his attorneys' request to cooperate with the evaluation. (Doc. 552, Second Comp. Hrg. Vol. III at 711). As with other evaluators who tried to interview him, Merriweather evaded Dr. Stalcup's questions by changing the subject, or he "babbled," "said nonsensical things, [like]

61

describ[ing] the sky or food," or simply refused to discuss certain topics such as drug use. (*Id.* at 713). Dr. Stalcup observed that Merriweather seemed frightened and at one point tried to leave the interview room. (*Id.* at 712). While Merriweather responded to a few questions about his drug use, Dr. Stalcup felt that he could not give credence to them because Defendant "couldn't maintain linear thought long enough to be able to finish his answer." (*Id.* at 713).

153.     Dr. Stalcup rejected Dr. Pietz's findings that Merriweather was malingering signs of mental illness. Dr. Stalcup stated that he "could not imagine" Merriweather being able to malinger negative symptoms of schizophrenia such as "random, tangential, elliptical speech, periods of time in which he was mute, [and] periods of time in which he wouldn't make eye contact." (*Id.* at 747-78). Dr. Stalcup noted that it is "much easier to fake positive symptoms" because schizophrenic patients have no idea what negative symptoms are or that they are doing them. (*Id.* at 748). Moreover, Dr. Stalcup pointed out that recently Merriweather has denied having hallucinations and delusions. (*Id.*). When asked why the institutional doctors saw no evidence of Merriweather's mental state deteriorating as may be expected with a person with schizophrenia, Dr. Stalcup suggested that clinicians in institutional settings, such as FMC Butner and FMC Springfield, would not interpret Merriweather's behaviors as symptomatic of mental illness because Merriweather was not causing any problems. (*Id.* at 750). When a prisoner causes no problems, Dr. Stalcup suggested, institutional staff may not notice unusual behaviors. (*Id.*).

154.     Dr. Stalcup further ruled out "with a reasonable degree of medical certainty that [Merriweather] suffered from drug-induced psychosis" (*id.* at 742), contradicting Dr. Pietz's conclusion attributing the reports of Merriweather's delusions and hallucinations to toxic psychosis. Dr. Stalcup acknowledged that a person experiencing toxic psychosis will exhibit behaviors that are "very similar to paranoid schizophrenia," but the persistence of hallucinations or

delusions after a person stops using drugs indicates mental illness. (*Id.* at 811, 812). For an individual to experience toxic drug psychosis, a person first has to be addicted to the substance or using hallucinogens, (*id.* at 721-22), and Dr. Stalcup found "no evidence" that Merriweather was addicted to drugs before the offense. (*Id.* at 724). Furthermore, Dr. Stalcup said, the drugs that Merriweather reports using -- including marijuana, cocaine, methamphetamine, and opiates -- would not cause him to have toxic psychosis. Dr. Stalcup emphasized that "only stimulants and use of hallucinogens are associated with psychosis. Opiates don't produce psychosis." (*Id.* at 728, 734). He testified that even with heroin abuse, "most psychotic symptoms clear with a good sleep." (*Id.* at 722). Dr. Stalcup denied that Merriweather's psychotic symptoms could have resulted from his use of stimulants such as methamphetamine or crack cocaine. Any psychotic symptoms from such stimulants, Dr. Stalcup said, would be of a short duration: from one to six weeks. (*Id.* at 725). Dr. Stalcup stated that drug withdrawal would not be responsible for Merriweather's behavior because "opiate use doesn't produce psychosis," and "under no circumstances are they delusional or hallucinatory." (*Id.* at 733-34). Thus, withdrawal from opiates cannot produce toxic psychosis and were not the cause of Merriweather's behavior, Dr. Stalcup concluded. (*Id.*).

### 7.     Dr. Bruce Berger

155.     Dr. Bruce Berger testified at the second evidentiary hearing about his evaluation of Merriweather while he was at FMC Butner from 2009-11. (Doc. 553, Second Comp. Hrg. Vol. IV at 949). Dr. Berger was recalled as a witness presumably to address the information in the Butner records belatedly turned over to the Defense. In 2011, Dr. Berger diagnosed Merriweather with unknown substance abuse, currently in remission in a controlled environment. (*Id.* at 1034). Dr. Berger retired from FMC Butner in 2012. (*Id.* at 1067).

156.    At Butner, Dr. Berger noted that Merriweather would refuse to eat at times or would refuse the institution's prepared meals, instead requesting cans of Ensure or a TV dinner. (*Id.* at 952). Dr. Berger testified that while he did not know why Merriweather would refuse to eat institutional meals, in his opinion the refusals "didn't appear focused on any sort of psychotic or delusional belief that he shared with us, and ultimately to me it appeared to be a way that he could control his environment." (*Id.* at 954, 969-70).

157.    Dr. Berger also did not believe that Merriweather's reticence to answer assessment questions at FMC Butner to be symptomatic of psychosis. Instead, Dr. Berger felt that Merriweather's guardedness could result from being in a new environment. (*Id.* at 966). Dr. Berger also noted that some of Merriweather's odder statements made while at FMC Butner were not bizarre in context. (*Id.* at 970-71). For example, when Merriweather was asked why he refused a dinner tray, Merriweather said that he did not want to have a nervous reaction. When a nurse asked him what he meant by that statement, Merriweather replied that his water pressure in his shower went up, and he would not be able to drink any water. When further asked what he meant, Merriweather laughed and said, "I was just checking on you." (*Id.* at 969-70). Dr. Berger did not see that exchange as symptomatic of psychosis. Instead, Dr. Berger saw Merriweather's response as teasing and noted that water pressure is in fact an issue in the segregation unit where Merriweather was housed. (*Id.* at 970-71).

158.    Dr. Berger also discussed the significance of the ESH/ADs in his patient evaluations. Dr. Berger acknowledged that he did not rely on the ESH/ADs because he was not sure of the accuracy of the entries and because his practice was to speak to the staff directly about their observations of patients. (*Id.* at 999). Typically, Dr. Berger would arrive to work early, between 6:00 to 6:30, shortly before the change at 7:00 to find out from both the officers and

nurses what had gone on with the patients. (*Id.* at 1037). If the staff saw something about the way Merriweather was presenting that bothered them during the shift, the staff would have brought that to Dr. Berger's attention. (*Id.* at 1038). If the same information recorded on the ESH/ADs had been in the nurses' narrative notes, Dr. Berger stated that he might have given it more credence. (*Id.* at 1055). He testified that a narrative note "would generally have potentially much more accurate information" than an ESH/AD. (*Id.* at 1068). With the ESH/ADs, Dr. Berger was concerned about the notes' accuracy and consistency, given that the nurses might have little time to complete them during a shift. (*Id.* at 1043, 1067).

159.    Dr. Berger stated that the ESH/ADs were not clinically relevant for him as they were quickly filled in by the nurses "as one of the least important things the nurses would do." (*Id.* at 1003). While the ESH/AD might show patterns of behavior, Dr. Berger remained concerned about the accuracy of those observations. (*Id.* at 1003). Dr. Berger testified that he "put much greater weight on [a nurse's verbal report] because that is a hard thing to do in a busy unit and shows that something much more has changed. … most of the clinical people give little credence to [ESH/ADs]. (*Id.* at 1067).

160.    Dr. Berger was also unconvinced that Merriweather's varying responses to being offered food indicated schizophrenia because of the way that Merriweather refused food – at times teasing or in a manipulative manner. (*Id.* at 1046). Dr. Berger also noted that prisoners at FMC Butner will sometimes forgo showers and just sponge bathe in the sink. (*Id.* at 1048). Dr. Berger felt that Merriweather's reversal from refusing to eat and bathe to deciding to do so when the court issued a force-feeding order was not consistent with delusional thinking. (*Id.* at 1058-59).

161.    Dr. Berger agreed with Dr. Cunningham's treadmill analogy that if a schizophrenic person is in a structured environment, that helps them organize their thoughts. (*Id.* at 1058).

Turning on a video camera can make some people more suspicious or nervous which could create stress. (*Id.* at 1059).

162.   Dr. Berger did not agree with Dr. Cunningham's assessment of Merriweather's pattern of disorganized speech patterns being something that only a genius could fake. (*Id.* at 1060). Dr. Berger believed that "most people could do that, should they want to, for period of times." (*Id.* at 1061). Dr. Berger did not see any evidence that Merriweather was malingering mental illness during his evaluation. (*Id.* at 1028). As Dr. Berger noted, "I don't think it meant a tremendous amount to him to be truthful or forthcoming to people at all times." (*Id.* at 1028). Dr. Berger acknowledged that at times Merriweather said things to the nurses that indicated disorganized thinking and distrust of staff and the institution (*see id.* at 963-95), but Dr. Berger felt that as a whole, Merriweather did not exhibit significant and consistent signs of psychosis. (*Id.* at 996-97).

### 8.   Dr. Gabriela Ramirez-Leon

163.   Dr. Gabriela Ramirez-Leon, a psychologist with the United States Penitentiary, Atlanta, testified about her psychological screening of Merriweather on October 30, 2013. (Doc. 551, Second Comp. Hrg. Vol. II at 435). Dr. Ramirez-Leon oversees psychological screening and mental health for prisoners in transit. (*Id.*). Dr. Ramirez-Leon conducted a 10-15 minute assessment of Merriweather within twenty-four hours of his arrival at the Atlanta facility because of Merriweather's Bureau of Prison's psychological designation. (*Id.* at 442, 455). She found Merriweather to be appropriately oriented, calm, and normal in his presentation. (*Id.* at 450). He reported no delusions or hallucinations. (*Id.* at 455).

9.      **Nursing staff**

(a)      **Vickey Cross**

164.      Vickey Cross, a clinical nurse with the Bureau of Prisons for 20 years, testified about Merriweather's time at MCFP Springfield. (Doc. 551, Second Comp. Hrg. Vol. II at 367). She came into contact with Merriweather in her duties in passing out medications and administering medications. (Doc. 551, Second Comp. Hrg. Vol. II at 406). Cross found Merriweather's behavior and thought content to be appropriate. (*Id.* at 414).

(b)      **Robin Peterson**

165.      Nurse Robin Peterson testified about the ESH/AD reports at FMC Butner, where Peterson has worked for fifteen years. Peterson is the nurse manager for the ambulatory care unit and camp ambulatory care at FMC Butner and has worked in the mental health unit. (Doc. 552, Second Comp. Hrg. Vol. III at 858). She did not work in the area where Merriweather was housed at Butner and has no personal knowledge about him. (*Id.* at 869). Peterson testified that nurses are instructed to communicate with and observe patients and to fill in information about the patients' condition on the ESH/AD documents. (*Id.* at 863). Nurses are to track patients' hygiene on the ESH/AD, Peterson testified, to control infection, to ensure that patients are kept clean, and to observe whether symptoms of mental illness may be present. (*Id.* at 864). For mental status observations, nurses speak with the patients to make sure patients are oriented to time, place, name, person and to note on the ESH/ADs any changes in a patient's mental health that might indicate a problem. (*Id.* at 865).

166.      Peterson stated that, in her opinion, the function of the ESH/AD sheets are to comply with the administrative requirements placed on the institution by the Joint Committee on

Accreditation. Peterson felt that ESH/ADs serve less of a role in patient care: she has never seen doctors look at them and does not believe that ESH/ADs are valuable in providing care. (*Id.* at 870-71, 873). Peterson also testified that she knew and worked with Dr. Bruce Berger at FMC Butner. Peterson confirmed that Dr. Berger's normal practice was to speak with the nurses and correctional staff about the patients at the start of his rounds rather than look at the ESH/ADs. (*Id.* at 886).

### (c)       Carlene A. Beasley

167.    Carlene A. Beasley is a nurse assigned to the mental health unit at FMC Butner. (Doc. 552, Second Comp. Hrg. Vol. III at 887). She has worked at Butner for nineteen years. (*Id.* at 888). She worked on the unit where Merriweather was housed at Butner and observed him from December 11, 2009 to 2011. Beasley noted that Merriweather had refused meals and had to be encouraged to drink water to water to prevent dehydration. (*Id.* at 909). She noted that Merriweather would laugh inappropriately at times and would respond to questions or statements that had no relevance to the questions asked. (*Id.*). He avoided making eye contact with staff and at times requested to have the lights turned off in his cell. (*Id.*). Merriweather was once offered a cup for water to keep in his cell but declined, stating that he knew he was in a hospital but felt like that "would make him look like too much of a patient." (*Id.* at 911).

168.    Beasley found Merriweather to have poor hygiene and suspicious moods, reported "paranoid and bizarre" delusions, and noted that he occasionally had disorganized thought. (*Id.* at 912-13). Merriweather began eating sparingly and would communicate with staff only selectively during the latter part of his stay at FMC Butner, getting down to 126 pounds. (*Id.* at 913, 947-48). Merriweather would communicate by hand gestures rather than speech, and Beasley noted that, at times, Merriweather refused to communicate. (*Id.* at 915, 917).

68

169.    Nurse Beasley explained that ESH/ADs are flow sheets made to document the nurses' observations of patients' conditions during each shift in lieu of writing out a longhand note. (Doc. 553, Second Comp. Hrg. Vol. IV at 932). Doctors normally do not use the ESH/ADs because the doctors tend to ask the nursing and correctional staff directly about the patients' welfare. (*Id.*).

### (d)    Chidinma Nweke

170.    Chidinma Nweke has been a clinical nurse at Butner since 2006, about six and a half years (Doc. 553, Second Comp. Hrg. Vol. IV at 1072). Merriweather was very quiet and other than occasionally saying one word or responding to one question, he did not talk much, Nweke observed. (*Id.* at 1080).

171.    Regarding the ESH/ADs, nurses make notes but not diagnoses because the nurses are not qualified to make diagnoses. Nweke said that she puts down on the ESH/ADs what she sees, "be it a display, be it real. I just put down what I am being shown or what I see." (*Id.* at 1084-85). Nweke just writes down what the individual reporting says they are feeling, for example, if a patient says that he is hallucinating, she puts down on the ESH/AD that he is hallucinating. (*Id.* at 1087). When an inmate shows something significant, nurses will fill out a Butner Electronic Medical Records ("BEMR") noting what is unusual about the patient's condition. (*Id.* at 1086). Nurses are told about ESH/AD forms, instructed to complete them, and what they are used for. (*Id.* at 1073). The nurses received no special training on completing the sheets (*id.* at 1085) and do not make determinations or diagnoses. (*Id.* at 1087-88).

### (e)    Theresa McKinney

172.    Theresa McKinney has been a nurse at FMC Butner since 2007. (Doc. 553, Second Comp. Hrg. Vol. IV at 1106). She observed Merriweather while assigned to his unit from

approximately December 2009 to February 2010. (*Id.* at 1109-11). She remembered that Merriweather was "a bit reserved" in his demeanor. (*Id.* at 1113).

### (f)    Janet Oakley

173.    Janet Oakley has been a nurse at FMC Butner for 13 years. (Doc. 554, Second Comp. Hrg. Vol. V at 1127). She testified that ESH/ADs are used by the nurses to observe and assess inmates. (*Id.* at 1130). The observations recorded on the ESH/ADs are generally made during rounds where the unit nurses interact with inmates at the window of the cell door. (*Id.* at 1131). Oakley testified that ESH/AD sheets are subjective: nurses "just put down on the sheets what [the inmates] tell you." (*Id.* at 1132). When nurses want to communicate with a doctor about an inmate's condition, Oakley said, they write BEMR notes, email the doctors, or communicate with them in person. (*Id.* at 1133).

### (g)    Justine Nixon

174.    Justine Nixon is a Lieutenant Commander with United States Public Health Service and has been a psychiatric nurse for 21 years (Doc. 554, Second Comp. Hrg. Vol. V at 1145-46). She works at FMC Butner. Nixon testified that nurses do not diagnose conditions on ESH/AD sheets. (*Id.* at 1149). She received no training to learn how to complete ESH/ADs. (*Id.*). Nixon stated that she is aware of occasions when, because of time or because a nurse temporarily assigned to the unit, a nurse did not personally assess an inmate using the ESH/AD but simply copied down the assessments of the shift before. (*Id.*). She did not remember Merriweather ever being in distress while he was on the unit at FMC Butner. (*Id.* at 1153). She also knows Dr. Bruce Berger and explained that his normal practice at FMC Butner was to arrive early and speak to the nurses to discuss what happened during the night shift. (*Id.* at 1154).

#### (h)        Angela Richardson

175.    Angela Richardson, a nurse at FMC Butner for almost 14 years, discussed the role of ESH/ADs. (Doc. 554, Second Comp. Hrg. Vol. V at 1162). She remembered that Merriweather spoke to Butner staff selectively. (*Id.* at 1165). Richardson confirmed Justine Nixon's statement that nurses receive no training on filling out or using ESH/AD forms. (*Id.* at 1165). To Richardson's knowledge, no one in the institution uses the forms except to comply with the Joint Committee on Accreditation. (*Id.* at 1166). Indeed, Nurse Richardson candidly testified that "I don't know anyone who uses them other than attorneys to try to either win their cases, like this case." (*Id.* at 1166, 1171). Nurse Richardson acknowledged that what a previous shift nurse writes may have an impact with what a subsequent nurse writes, particularly "if we're not as familiar with the patient." (*Id.* at 1167).

#### (i)        Elizabeth Loziuk

176.    Elizabeth Loziuk has worked as a nurse at FMC Butner since 2003. She confirmed that she received no formal training in completing the ESH/AD forms. (*Id.* at 1177). Loziuk said she was unaware of any psychologist or psychiatrist reviewing ESH/ADs at Butner. (*Id.* at 1179). Instead, when she wishes to communicate with doctors in writing, she sends an email or makes a note in the BEMR system. Her experiences with Dr. Berger is that he would arrive early to speak to the night shift. (*Id.*). On the ESH/ADs, Loziuk stated that she bases any notations that she makes about hallucinations or delusions, "on what the inmate tells you." (*Id.* at 1178).

### III.    Standards and Procedures for Determining Competency to Stand Trial

The procedures for determining competency in a federal case are governed by statutory and constitutional requirements. The Fifth Amendment's Due Process Clause requires that a criminal defendant may not be tried unless he is mentally competent. *Pate v. Robinson*, 383 U.S.

71

375, 385 (1966). *See also Godinez v. Moran*, 509 U.S. 389, 396 (1993); *Drope v. Missouri*, 420

U.S. 162, 172-73 (1975); *United States v. Rahim*, 431 F.3d 753, 759 (11th Cir. 2005) ("The Due

Process Clause of the Fifth Amendment prohibits the government from trying a defendant who is

incompetent."); *James v. Singletary*, 957 F.2d 1562, 1569-70 (11th Cir. 1992).

      A.      **Legal Standards to Determine Competency to Stand Trial**

      The Supreme Court set forth the test standard for competency to stand trial in *Dusky v.*

*United States*, 362 U.S. 402 (1960) (per curiam). In *Dusky*, the Court held that competency is

determined by whether the defendant has "sufficient present ability to consult with his lawyer

with a reasonable degree of rational understanding" and has "a rational as well as factual

understanding of the proceedings against him." *Id.* at 402. The Court further elaborated on the

*Dusky* standard in *Drope v. Missouri*, 420 U.S. 162 (1975), in which the Court stated that it "has

long been accepted that a person whose mental condition is such that he lacks the capacity to

understand the nature and object of the proceedings against him, *to consult with counsel, and to*

*assist in preparing his defense* may not be subjected to a trial." *Id.* at 171; *see Indiana v.*

*Edwards*, 554 U.S. 164, 169-70 (2008) ("The two cases that set forth the Constitution's 'mental

competence' standard, *Dusky v. United States* and *Drope v. Missouri*, specify that the

Constitution does not permit trial of an individual who lacks 'mental competency;'" "*Drope*

repeats [the *Dusky*] standard" "that focuses directly upon a defendant's "present ability to consult

with his lawyer," a "capacity ... to consult with counsel," and an ability "to assist [counsel] in

preparing his defense") (internal citations omitted). *See also Godinez v. Moran*, 509 U.S. 389,

396 (1993) (in defining the competency standard, quoting *Drope*'s language prohibiting a

criminal defendant from being tried if he "lacks the capacity to understand the nature and object

of the proceedings against him, to consult with counsel, and to assist in preparing his defense may not be subjected to a trial"); *Wright v. Sec'y for Dep't of Corr.*, 278 F.3d 1245, 1256 (11th Cir. 2002) (in order to be considered competent for trial, a defendant must have "'sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding,'" and he must have a "'rational and factual understanding of the proceedings against him.'"); *Watts v. Singletary*, 87 F.3d 1282, 1286 (11th Cir. 1996) (competence to assist counsel at trial "is rudimentary, for upon it depends the main part of those rights deemed essential to a fair trial, including the right of effective assistance of counsel."); *United States v. Saingerard*, 621 F.3d 1341, 1342 (11th Cir. 2010) (noting the continuing viability of *Dusky*).

The federal competency statute codified the *Dusky* standard for determination of mental competency to stand trial. 18 U.S.C. § 4241(a). *See* Insanity Defense Reform Act of 1984, Sen. R. No. 98-225, at 236 (1983), *reprinted in* 1984 U.S.C.C.A.N. (98 Stat.) 3182, 3418 ("This test of competency, in essence, adopts the standards set forth by the Supreme Court in *Dusky v. United States*."); *United States v. Cornejo-Sandoval*, 564 F.3d 1225, 1233 (10th Cir. 2009) (describing Senate Judiciary Report on 18 U.S.C. § 4241(a) that federal competency statute was based on *Pate*'s procedural protections); *United States v. Wiggin*, 429 F.3d 31, 37 n. 8 (1st Cir. 2005).

Section 4241(d) outlines a two-prong legal standard for determination of a defendant's mental competency to stand trial:

> If, after the hearing, the court finds by a *preponderance of the evidence* that the defendant is presently suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable
>
> [1] to understand the nature and consequences of the proceedings against him
>
> or

[2] to assist properly in his defense the court shall commit the defendant to the custody of the Attorney General [for hospitalization].... Determination of Mental Competency to Stand Trial, 18 U.S.C. § 4241(d) (2006) (emphasis added and spacing modified).

## B.     Procedural Requirements to Determine Competency

When a criminal defendant's competency is called in question, 18 U.S.C. § 4241(d) requires the court undertake certain proceedings to make a preliminary finding as to whether a preponderance of the evidence shows that the defendant is, in fact, incompetent – *i.e.*, whether a "mental disease or defect" renders him "unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense." The court must conduct a hearing at which the defendant, represented by counsel, is afforded an opportunity to testify and to call and confront witnesses. *See* 18 U.S.C. §§ 4241(a), (c) and 4247(d). The district court "may order" a psychiatric or psychological examination of the defendant before the competency hearing. *Id.* § 4241(b). Under § 4247(b), the court may also order the defendant committed "for placement in a suitable facility" for a "reasonable period of time, not to exceed four months, as is necessary to determine whether there is a substantial probability that in the foreseeable future [the defendant] will attain the capacity to permit the trial to proceed." 18 U.S.C. § 4241(d)(1). These procedures were followed in this case.

## C.     Burden of Proof

As indicated in the court's initial competency order, there is some question about where the burden of proving competency to stand trial lies in federal criminal trials. (Doc. 160 at 19, n.14). In passing Section 4241, Congress was silent on whether the burden of proof for proving competency lies with the Defendant or the Government. *See* 18 U.S.C. §§ 4241, 4247 (requiring

74

that the court must find by a preponderance of the evidence that a defendant is incompetent to stand trial). *See United States v. Richardson*, 3:08-cr-302-J032TEM, 2009 WL 1490552, at *3 (M.D. Fla. May 27, 2009) (observing that "[w]hich party has the burden of proof concerning competency is not fully decided"); *United States v. Gigante*, 996 F. Supp. 194, 199 (E.D.N.Y. 1998) ("Legislative history [on § 4241] does little to provide additional guidance."). In *Cooper v. Oklahoma*, 517 U.S. 348 (1996), the Supreme Court briefly addressed this issue, but did so in dictum while referring to the various burdens of proof required among the states.[34] *See generally*, *United States v. Patel*, 524 F. Supp. 2d 107, 112 (D. Mass. 2007) (finding that statement in *Cooper* assigning burden of proof was not binding as the Court has not referred to it again).

The Eleventh Circuit has interpreted *Cooper* to place the burden for proving competency on the moving party, which the Defense argues is the Government. (Doc. 556, Def.'s Competency Brf. at 1). *See*, *e.g.*, *United States v. Izquierdo*, 448 F.3d 1269, 1277 (11th Cir. 2006) ("… the Supreme Court has stated, albeit in dicta, that the burden of establishing incompetence rests with the defendant"… "the relevant competency statute [18 U.S.C. § 4241] arguably contemplates that the burden will lie with the party making a motion to determine competency."); *United States v. Bradley*, 644 F.3d 1213, 1268 (11th Cir. 2011) (placing the burden of proving incompetence on the defendant does not violate due process); *United States v. Rothman*, No. 08-20895-CR, 2010 WL 3259927, at *6, n. 4 (S.D. Fla. Aug. 18, 2010) (finding

---

[34] The Court stated in *Cooper* that "a number of States place no burden on the defendant at all, but rather require the prosecutor to prove the defendant's competence to stand trial once a question about competency has been credibly raised. The situation is no different in federal court. Congress has directed that the accused in a federal prosecution must prove incompetence by a preponderance of the evidence." 517 U.S. at 361-62.

that § 4241 "does not speak in terms of whether the government or defendant has the burden of proof; it only mandates that whoever is seeking to prove incompetence has the burden").

In this case, the Government has expressly offered to assume the burden of proof. (Doc. 133). Finding neither a statutory bar to the Government's offer, nor any disadvantage to the Defendant in assigning the burden to the Government, the court granted the Government's request. The court finds support in the decision of *United States v. Talley*, in which the court noted that if placing the burden of proof on a defendant does not violate due process under Eleventh Circuit precedent, then surely placing the burden of proof on the Government offends no constitutional rights of the accused. No. 10-MJ-2835-AMS, 2010 WL 4791821, at *10 (S.D. Fla. Nov. 18, 2010). Furthermore, because the court finds that the evidence of competency is not in equipoise, allocating the burden of proof to the Government has not altered the outcome of the competency determination. *See Medina v. California*, 505 U.S. 437, 441 (1992).

## IV.    Summary of Credibility Findings

In this second competency hearing, the court is again confronted with competing (and irreconcilable) opinions by two groups of trained and competent expert witnesses. As the Supreme Court has stated, "[p]sychiatry is not … an exact science, and psychiatrists disagree widely and frequently on what constitutes mental illness, on the appropriate diagnosis to be attached to given behavior and symptoms, [and] on cure and treatment…." *Ake v. Oklahoma*, 470 U.S. 68, 81 (1985). However, a medical opinion of experts about a defendant's competency to stand trial "is not binding on the court, since the law imposes the duty and responsibility for making the ultimate decision of such a legal question on the court and not upon medical experts." *United States v. Abernathy*, No. 08-20103, 2009 WL 982794 (E.D. Mich. Apr. 13, 2009), quoting FED. PROC. § 22:549 (Hearing and Determination as to Competency).

To weigh the expert opinions, the court considered the familiarity and exposure each expert witness had with (and to) Merriweather, the thoroughness of the evaluation performed, and the care with which the respective experts reached their conclusions. Because of the particular set of facts in this case, one measurement effectively encapsulates all of these criteria: the duration of continuous interaction between the expert and Merriweather.[35] The importance of the time spent with Merriweather in evaluating an expert witness' credibility is undisputed between the parties.[36] To be clear, the court does not mean that a mathematical tally of the number of hours each expert spent with Merriweather is determinative. Simply comparing hours could work to the Defense's disadvantage, as the Defense would likely never have the same access to a prisoner that institutional mental health experts would have.

Nevertheless, the amount of time that an evaluator had to observe Merriweather is of great importance because the evidence of incompetency centers largely on negative symptoms of schizophrenia: selective mutism, neglect of hygiene and nutritional intake, and diminished interest in social interaction. Much of the relevant evidence presented at the hearings focused on what Merriweather has not done or does not do – and to establish that Merriweather's lack of activity is symptomatic of mental illness, the opportunity to observe and monitor his behavior patterns is critical. Given this focus on negative symptoms, Drs. Berger and Pietz had the greatest ability to observe and monitor such manifestations of schizophrenia in Merriweather's

---

[35] Namely, the court notes the great disparity between the amount of time Drs. Pietz and Berger invested in evaluating Merriweather, and the time spent by all other expert examiners.

[36] For example, in its brief after the first competency hearing, the Defense suggested that the court should completely discredit the evaluations conducted by Dr. Gualtieri because "[h]is exposure to Merriweather was limited." (Doc. 156 at 42). However, again, what is sauce for the goose is sauce for the gander; if the court were to discredit every expert witness who had limited exposure to Merriweather, it would have to discredit several of the Defense's expert witnesses. The court declines to go so far.

daily life, collectively observing Merriweather over one and a half years at their institutions. Moreover, Dr. Berger and Pietz's observations and evaluations are supported by the continuous observation of Merriweather by other medical and correctional staff at their respective institutions. In contrast, the Defense's expert witnesses cumulatively spent less than 48 hours with Merriweather.[37] Thus, although it is not a controlling factor, the court notes that Drs. Pietz and Berger separately spent more time evaluating and observing Merriweather's symptoms than all the other medical experts combined. *See, e.g.*, *United States v. Hoyt*, 200 F. Supp. 2d 790, 794 (N.D. Ohio 2002) (crediting expert in competency proceeding who "was able to observe and treat Defendant … for a significantly longer period of time than that which [the Defense expert] treated Defendant" … who could "supplement his own observations with those of other members of the nursing and correctional staff").

To be clear, the amount of time spent with Merriweather is not the only factor that the court has considered in crediting the testimony of Drs. Pietz and Berger. Indeed, the court was impressed with the testimony of both Drs. Pietz and Berger. During the initial competency hearing, Dr. Berger appeared to be the most balanced and careful and did not appear to be an "advocate" for either side. Leading up to the second competency hearing, Dr. Pietz was methodical in noting changes in Merriweather's presentation. In fact, her initial concerns about Merriweather's presentation immediately after his arrival at FMC Springfield in late 2013, in part, prompted the second competency hearing. Dr. Pietz's actions evidence her efforts to be

---

[37] The sum total of the time spent by Drs. Merikangas (1.5 hours), Dudley (16 hours), Mirsky (4.5 hours), Cunningham (10 hours), (*see* Doc. 551, Second Comp. Hrg. Vol. III at 463), and Stalcup (1.5 hours), (*see* Doc. 552, Second Comp. Hrg. Vol. III at 220) was about 33.5 hours. Given Merriweather's resistance to answering Dr. Stalcup's questions, the court understands why Dr. Stalcup's evaluation was short (*See* Doc. 552, Second Comp. Hrg. Vol. III at 771).

professionally balanced, and also demonstrate her efforts to ensure that Merriweather received a thorough diagnosis.

The Government attempts to show that, although Merriweather may have experienced drug-related psychotic symptoms in the past, he is not presently suffering from a mental disease or defect. (Doc. 152 at 10; Doc. 565 at 29 (sealed)). Rather, the Government insists that Merriweather's current symptoms are feigned and his apparent inability to communicate with Defense counsel is deliberate.

The Defense presented evidence at both competency hearings that Merriweather is afflicted with schizophrenia as evidenced by his alleged history of hallucinations, odd behavior, and his lack of engagement with counsel. After the first competency hearing, considering the reports and records submitted by the parties, video recordings of Merriweather's interviews at FMC Butner, the testimony delivered at the hearing, and applying the governing legal standards, the court concluded that the Government carried its burden of proving by a preponderance of the evidence that Merriweather was not currently suffering from any mental disease or defect, including schizophrenia. At the second competency proceeding, Defense counsel relies on three main points to support their argument that Merriweather is incompetent: 1) the notations contained in FMC Butner's nursing notes (the ESH/ADs); 2) the opinions offered by expert witnesses Dr. Mark Cunningham, Ph.D., and Dr. Alex Stalcup, M.D.; and 3) attacks on the credibility of the Government's experts. The court addresses each in turn below.

### A.    FMC Butner Nursing Notes

In the second competency hearing, the Defense introduced nurses' notes from FMC Butner ESH/ADs that are flowsheets with single letter notations for different conditions such as (e.g., "P" (for poor hygiene) or "F" (for flat affect)). The Defense emphasizes the number of

nurse observations of Merriweather that indicated conditions consistent with negative symptoms of schizophrenia. (*See* Doc. 556, Def.'s Brf. at 28-29 ("In reviewing the ESH/ADs created while Mr. Merriweather was housed at FMC Butner, Dr. Cunningham observed a number of symptoms of psychosis displayed by William including 519 observations of flat or inappropriate affect, 707 observations of poor insight and judgment, 74 observations of hallucinations, 419 observations of delusions, and 572 observations of suspicious mood.")). The volume of these observations, however, does not paint the full picture about their context or meaning.

As noted above, the nurses testified uniformly that the ESH/ADs chart notations reflect subjective, cursory observations that are not used by the institution for any diagnostic or medical purpose other than to comply with requirements imposed by the Joint Committee on Accreditation. (*See*, *e.g*., Doc. 552, Second Comp. Hrg. Vol. III at 870-71, 873 (testimony of Robin Peterson that the function of the ESH/AD sheets are to comply with the administrative requirements placed on the institution by the Joint Committee on Accreditation)); Doc. 554, Second Comp. Hrg. Vol. V at 1166 (testimony of Angela Richardson)). The nurses also uniformly testified that the ESH/ADs had little significance or role in patient care. Nurse Robin Peterson testified that she never saw doctors look at them and did not believe that ESH/ADs were valuable in providing care. (Doc. 552, Second Comp. Hrg. Vol. III at 870-71, 873); *see also id.* at 932 (testimony of Carlene Beasley that doctors normally do not use ESH/ADs, tending instead to ask nursing and correctional staff directly about the patients' welfare); Doc. 552, Second Comp. Hrg. Vol. V at 1132 (testimony of Janet Oakley stating her opinion that the ESH/AD sheets are subjective and nurses "just put down on the sheets what they [the inmates] tell you"); *id.* at 1166 (testimony of Angela Richardson, stating that the institutional staff do not

80

use the ESH/ADs for medical purposes; the sheets are used to comply with accreditation requirements)).

The Defense relies heavily on the nurses' notations on the ESH/ADs to refute Dr. Pietz and Dr. Berger's conclusions that Merriweather is not schizophrenic; however, no one at those institutions credits ESH/ADs as a diagnostic tool or even a reliable indicator of a patient's condition, even the nurses who actually make the notations. The nurses testified that they receive no formal training on documenting hallucinations, delusions, hygiene, affect, or patients' presentations on the ESH/ADs. (*See* Doc. 553, Second Comp. Hrg. Vol. IV at 1085 (testimony of Chidinma Nweke); Doc. 554, Second Comp. Hrg. Vol. V at 1166 (testimony of Angela Richardson); Doc. 554, Second Comp. Hrg. Vol. V at 1177 (testimony of Elizabeth Loziuk)). Nurse Angela Richardson testified that the only people that use ESH/ADs were "attorneys [who] look at to see if they can use any information to win their cases or defend their clients." (Doc. 554, Second Comp. Hrg. Vol. V at 1171).

The nurses testified that ESH/ADs have little medical significance for several reasons. First, Butner's doctors tend to read narrative notes or ask the staff about patients' conditions rather than try to interpret symbols marked on the ESH/ADs. (*See* Doc. 553, Second Comp. Hrg. Vol. IV at 1037-38 (testimony of Dr. Berger); Doc. 552, Second Comp. Hrg. Vol. III at 932 (testimony of Carlene Beasley)). Second, the notations are entirely subjective – some nurses put down what they observe; others reportedly simply note what inmates self-report about their mental states or moods; still others may be influenced by the previous nurse's notations. Third, the nurses understand that the ESH/ADs are a documentation requirement, not a diagnostic tool, so when nurses need to communicate medical information, it is typically done in an email or narrative note (such as BEMR). (*See* Doc. 552, Second Comp. Hrg. Vol. III at 886 (testimony of

Robin Peterson that Dr. Berger's normal practice was to speak with the nurses and correctional staff about the patients at the start of his rounds rather than look at the ESH/ADs); Doc. 553, Second Comp. Hrg. Vol. IV at 1054 (testimony of Dr. Berger that he gives narrative notes more credence than ESH/ADs)).

Based on the court's review of these forms and the unanimity of opinion among FMC Butner's medical staff that the ESH/ADs do not have substantial medical value, and particularly because Dr. Berger explained why he did not factor those into his analysis -- but instead talked directly to the nursing staff, correctional staff and his colleagues, reviewed narrative reports, and personally observed Merriweather -- the court does not give the records substantial weight in determining Merriweather's competency.[38]

### B.    Evaluations of Dr. Cunningham and Dr. Stalcup

Drs. Cunningham and Stalcup were the two new Defense expert witnesses at the second competency hearing. The court discusses their evaluations below.

### 1.    Dr. Cunningham's Evaluation

On balance, the court found Dr. Cunningham to be a direct, cogent, and impressive witness. However, Dr. Cunningham's evaluation, as he acknowledged during his testimony, is necessarily hampered by Merriweather's lack of cooperation and the fact that there have been no verified positive symptoms of schizophrenia since Merriweather was first sent for a mental health evaluation in 2009. Moreover, while Merriweather has not been prescribed psychiatric drugs since his arrest, he has not deteriorated as might be expected if he was in an active or acute

---

[38] Dr. Cunningham, a Defense expert, similarly acknowledged the debatable value of relying on nurses' observations of Merriweather's hygiene recorded with only a letter notation without any detail to explain what the reporting nurses meant by their designations. (Doc. 552, Second Comp. Hrg. Vol. III at 670).

phase of schizophrenia.[39] Dr. Cunningham has based his conclusion that Merriweather is incompetent to stand trial largely on preoffense conduct and on the negative symptoms of schizophrenia that Merriweather purportedly displayed since his arrest. (Doc. 552, Second Comp. Hrg. Vol. III at 667 (Dr. Cunningham's testimony that there have been no recent reports of actual delusions from Merriweather during the years he has been at Butner, Springfield, or the Shelby County Jail, which "makes it a little bit more difficult to diagnose a schizophrenic disorder than if he was displaying as if he was reacting to internal stimuli expressing or openly expressing delusional beliefs.")). Both of the foundations of this preoffense behavior and social withdrawal are complicated, however, by other equally plausible explanations for Merriweather's conduct. Dr. Cunningham recognized this point himself when he testified that the experts who have evaluated Merriweather have "all described a similar pattern of [] avolitional speech, isolation, poor hygiene, poor diet, long period of times where he just stared in the window or stared out the window or laid on his cot with a blanket over his head." (Doc. 552, Second Comp. Hrg. Vol. III at 731). It is what the various experts made of this behavior that separates the evaluators' conclusions in Dr. Cunningham's opinion. (*Id.* at 731).

Merriweather's reported hallucinations, delusions, and bizarre speech before the offense could be attributed to his drug use or to co-morbidity of substance abuse and mental illness. Dr. Cunningham found that these symptoms were not drug induced because Merriweather reported experiencing some delusions during a five-to-six month period of alleged abstinence from drugs. (*Id.* 496-97). However, the court does not find this point compelling as it rests on several

---

[39] *See, e.g.*, *United States v. Battle*, 264 F. Supp. 2d 1088, 1114 (N.D. Ga. 2003) (expert's testimony that with schizophrenia "the general course is one of deterioration, especially without treatment, and Defendant has not had any treatment for a psychotic disorder over the last nine years"), *aff'd*, 03-14908, 2005 WL 1561799 (11th Cir. July 6, 2005) *opinion withdrawn and superseded*, 419 F.3d 1292 (11th Cir. 2005).

assumptions: Merriweather's and the witnesses' reports about the periods of substance abuse abstinence are accurate; the reports of the times that Merriweather was symptom-free are also accurate; and Merriweather had no residual reaction to drugs that manifested after he stopped taking them.

Of course, even if Merriweather were found to have a mental illness, that would not be determinative of competency. As one district court has noted, "[m]ental illness does not necessarily equate to incompetence." *Grant v. Brown,* 312 F. App'x 71, 73 (9th Cir. 2009). The issue is whether Merriweather has an inability to assist counsel or understand the charges against him. Dr. Cunningham believes that Merriweather knows what he is charged with and that he is acting volitionally when refusing to discuss the offense or communicate with his lawyers. (Doc. 551, Second Comp. Hrg. Vol. II at 519). Dr. Cunningham simply concludes that Merriweather's unwillingness to cooperate shows irrationality. (*Id.* at 520). Merriweather's behavior is irrational, Dr. Cunningham testified, because Merriweather is "effectively negating [his] defense" which is the kind of "profoundly self-defeating" course that no rational person would take. (*Id.* at 606). The court does not disagree that Merriweather's behavior may be viewed as self-defeating, but some of his behaviors that are consistent with negative symptoms of schizophrenia are also goal-directed and not necessarily driven by schizophrenia. For example, Merriweather has at times refused to eat or been selective about what he eats. This is consistent with negative symptoms of schizophrenia, but limiting his caloric intake also allowed Merriweather to force the facility to house him in a better cell (Doc. 146, Comp. Hrg. Vol. V at 761); to dictate what kind of meals he received (Doc. 146, Comp. Hrg. Vol. IV at 938, 950 (testimony that Merriweather refused food trays but requested Ensure and TV dinner sealed trays)); and even to designate from whom he would accept meals (Doc. 553, Second Comp. Hrg. Vol. IV at 1019

(Defense counsel stating that for about four weeks, the flow sheet indicates that the only person that Merriweather is eating for, with few exceptions, was Nurse Nweke)).[40] Simply put, mental illness does not end the inquiry into competency. *See Walton v. Angelone*, 321 F.3d 442, 460 (4th Cir. 2003) ("Not every manifestation of mental illness demonstrates incompetence to stand trial; rather, the evidence must indicate a present inability to assist counsel or understand the charges." (citation and internal quotation marks omitted)); *Bassett v. McCarthy,* 549 F.2d 616, 619 (9th Cir. 1977) (schizophrenia diagnosis "do[es] not necessarily imply that [petitioner] did not understand the proceeding or could not cooperate with his counsel"); *Broaster v. Soto*, CV 13-3965-DOC AS, 2014 WL 3672928 (C.D. Cal. July 18, 2014) (finding no bona fide doubt of incompetency where paranoid delusions did not limit the petitioner's "ability to interact with his counsel, whom he apparently did not fear, nor [did] they indicate that [the inmate] failed to understand the proceedings against him."), citing *Boyde v. Brown,* 404 F.3d 1159, 1166 (9th Cir. 2005) (inmate's depression and paranoid delusions did not raise a doubt regarding his competence to stand trial).

The court also notes Dr. Cunningham's disagreement with Dr. Pietz's finding that Merriweather is malingering mental illness. During the experts' testimony in the hearing, the court sensed that some of the disagreement about malingering was because the experts were comparing apples to oranges. Dr. Pietz noted specific incidents where she believed that Merriweather was malingering symptoms. The court did not understand Dr. Pietz to be saying that Merriweather was faking all of the behaviors that Dr. Cunningham identified as negative

---

[40] Dr. Berger viewed Merriweather's mealtime requests as "a way that he could control his environment. As you can imagine, [Merriweather] has very limited choices in what he can do with his body and with himself under current circumstances, and that is one." (Doc. 553, Second Comp. Hrg. Vol. IV at 954). Dr. Berger stated during the first competency hearing that Merriweather's behavior could be attention-seeking: "[i]f he went back here with a post-competency hearing or an environment he didn't like and he wanted to get attention, hygiene is a way to get attention just like significant weight loss." (*Id.* at 963).

symptoms of schizophrenia (Doc. 551, Second Comp. Hrg. Vol. II at 510 (testimony about social isolation, not eating or bathing, and low activity)).

Dr. Pietz found that Merriweather's selective silence, at least during the second evaluation, was volitional and not a sign of mental illness. Dr. Pietz further found that Merriweather was likely pretending not to know what his charges were and why he was being evaluated. The court does not see either of those conclusions as controversial, given that an array of Government and Defense experts, including Dr. Cunningham, found similar behavior. While Dr. Cunningham did not believe that Merriweather was feigning symptoms such as disorganized speech or bathing, Cunningham testified that Merriweather chooses to withhold information from evaluators. (See Doc. 552, Second Comp. Hrg. III at 689 (testimony of Dr. Cunningham that "when I asked [Merriweather] about delusional information from the symptoms he reported, like family members, for example, prearrest, it immediately devolved either I'm not going to address that or it devolved into a disorganized response")). The court does not find that Merriweather's resistance to inquiries about his past or his family is as inexplicable as Dr. Cunningham does. The fact that Merriweather's resistance manifests in selective or nonsensical speech does not show that it is caused by psychosis, particularly given the compelling evidence that he frequently starts speaking in a disorganized way to deflect inquiry into areas that he does not want to discuss.

Ultimately, the evidence the Defense advanced suggesting that schizophrenia is preventing Merriweather from rationally understanding the proceedings and from assisting his counsel is insufficient to overcome the strong evidence that Merriweather understands the court proceedings and his charges, and is able to communicate and act in his own interests when he so chooses.

## 2.    Dr. Stalcup's Findings

The court has no doubt that Dr. Stalcup gave his impressions of Merriweather in good faith, based on his extensive experience in addiction medicine. Dr. Stalcup's conclusion that Merriweather has schizophrenia rests heavily on the evidence of preoffense hallucinations and delusions. Dr. Stalcup decided that the evidence was better interpreted as symptomatic of schizophrenia rather than manifesting substance-induced psychosis and interpreted Merriweather's withdrawn behavior as additional support for that diagnosis. But the court finds that Dr. Stalcup's conclusions were occasionally inconsistent. The court was particularly concerned about his categorical denial that drugs other than hallucinogenics and methamphetamine can cause toxic psychosis, which is contradicted by the DSM. *See* AMERICAN PSYCHIATRIC ASSOCIATION, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS at 11 (5th ed. 2013) (DSM-5). As the court noted during the competency hearing, the DSM-5's chart for substance/medication-induced psychotic disorders includes the substances that Merriweather and his family reported that he was using before the offense: heroin, cocaine, amphetamines, and marijuana, including other substances such as alcohol and inhalants. *Id.* at 111.[41] Dr. Stalcup did not give the court a convincing explanation for his position that the American Psychiatric Association did not mean to include other classes of substances among stimulants that can cause toxic psychosis in the DSM-5.[42] (*Id.* at 803-04). The court asked Dr.

---

[41] According to the DSM, a clinician may consider the diagnostic criteria for substance/medication-induced psychotic disorder when finding the presence of one or both symptoms of delusions or hallucinations, when the disturbance does not occur exclusively during the course of delirium, and when the disturbance causes clinically significant distress or impairment in social, occupational, or other important areas of functioning, and this disturbance is not better explained by a psychotic disorder that is not substance/ medication-induced. DSM-5 at 111.

[42] The court notes that even marijuana, which Dr. Stalcup said cannot on its own cause psychosis, has been known to be contaminated, unbeknownst to the user, with hallucinogenic substances such as phencyclidine ("PCP,"

Stalcup to reconcile his categorical position that the drugs that Merriweather reportedly took could not have caused toxic psychosis, or would have done so only briefly, with the DSM-5's inclusion of marijuana and cocaine among the substances that can cause psychotic disorders. When asked about this discrepancy, Dr. Stalcup said that he did not understand the DSM chart to reflect an official medical position that such drugs can cause psychotic symptoms. After some additional probing by the court, Dr. Stalcup eventually acknowledged that "many drugs can produce symptoms that in the transient look psychotic … [and can] mimic psychotic symptoms." (*Id.* at 811).

Dr. Stalcup also discounted the evidence from Merriweather and his family tying his drug use with occasions when he experienced hallucinations and delusions because he saw no evidence of drug dependence. (*Id.* at 724). The record evidence simply belies Dr. Stalcup's conclusion that Merriweather was not consistently using drugs when Merriweather reports that he used marijuana daily, and frequently used cocaine (up to three times daily), crystal methamphetamine, alcohol, ecstasy, and heroin intravenously. (Doc. 142, Comp. Hrg. Vol. I at 43; Doc. 24 at 6). Given these reports, along with the findings of Merriweather's other experts

---

an illegal substance which can induce hallucinations, delusional ideas, loss of coordination, unpredictable or violent behavior and psychoses). To be sure, the court is not suggesting that the marijuana used by Merriweather was laced with PCP, but simply notes that there are unknown variables about Merriweather's drug use that caution against categorical statements about the effect of those substances. As one court noted, "unlike alcohol, unlawful street drugs are frequently not the substance they purport to be or are contaminated with other substances not apparent to the naked eye. In particular, marijuana is frequently contaminated with PCP or other psychoactive drugs." *United States v. Bindley*, 157 F.3d 1235, 1242 (10th Cir. 1998); *see also Taylor v. Cain*, CIV.A. 12-03057, 2013 WL 5718543 (W.D. La. Oct. 21, 2013) (rejecting defendant's claim that he was not responsible for his actions because, earlier in on the day of the offense, he had been smoking a marijuana cigarette that was laced with PCP); *United States v. F.D.L.*, 836 F.2d 1113 (8th Cir. 1988) (discussing defense of temporary insanity due to involuntary drug intoxication when PCP was added to marijuana cigarettes), citing *People v. Velez*, 175 Cal.App.3d 785, 221 Cal. Rptr. 631 (1985) (rejecting involuntary intoxication defense based on defendant's smoking a marijuana cigarette unaware it contained PCP; court noted that "a reasonable person has no right to assume that a marijuana cigarette furnished to him at a social gathering will not contain PCP; nor may such a person assume such a marijuana cigarette will produce any predictable intoxicating effect.").

that he used a substantial amounts of drugs, and absent any contrary evidence, Dr. Stalcup's resistance to the evidence about Merriweather's serious drug use is inexplicable. While Dr. Stalcup denied that the reported drug use could be a contributing cause of Merriweather's preoffense hallucinations and delusions, the as-yet uncontroverted evidence before the court is that Merriweather reported using substantial quantities of drugs on a daily basis. As Drs. Pietz and Dudley concluded, such drug use would have affected his behavior and perceptions.

### C.     The Defense's Challenge to the Credibility of the Government's Experts

The Defense has attacked the professional credibility of the Government's expert witnesses by accusing them of having performed their duties with "extreme negligence" (Doc. 156 at 42), professional "carelessness," and bias towards the Government. (Doc. 556, Def.'s Comp. Brf. at 12-17).[43] Such accusations should not be made lightly; once they are made, they must be evaluated seriously. The main reason the Defense provides for asserting that Drs. Pietz, Berger, and Gualtieri[44] have acted with "extreme negligence" is that each one of them ultimately found that Merriweather does not have schizophrenia. (Doc. 156 at 39-41).[45]

---

[43] The Defense challenged the credibility of Drs. Pietz, Berger, and Gualtieri in the first and second competency hearings. (Doc. 156 at 38-42).

[44] The Defense also challenged Dr. Gualtieri's testimony at the first competency hearing during cross-examination by drawing the court's attention to *Wyatt v. Rogers*, 985 F. Supp. 1356, 1387 n.109 (M.D. Ala. 1997), a case in which a court discredited Dr. Gualtieri's expert testimony. In a footnote, the *Wyatt* court discredited Dr. Gualtieri's testimony "because of an attempt to mislead [the court], through charts purporting to give a national average, that was in fact not such an average" and a "failure to correct known error that went to the substance of some very important conclusions." *Id*. This court has conducted a thorough review of the transcripts in *Wyatt*, and finds that the reasons given for discrediting Dr. Gualtieri's testimony in *Wyatt* are far wide of the mark; accordingly, the court gives this attempt at impeachment of Dr. Gualtieri no weight.

In *Wyatt*, by all accounts, the court discredited Dr. Gualtieri's testimony for two reasons: (1) when testifying about the rehospitalization rates of patients in Alabama mental institutions (*Wyatt* Tr. 1097:20) compared to rehospitalization rates nationally (*Wyatt* Tr. 1085:13), Dr. Gualtieri used a chart as demonstrative evidence that included numbers labeled as national averages (*Wyatt* Tr. 895:24-25); and (2) Dr. Gualtieri gave an inaccurate description of a confrontation between two employees at a mental institution. Regarding the first reason, the *Wyatt* court objected to the use of the term "national average," which it seemed to expect to be computed as the simple

The loose bolt in that logic is the assumption that the existence of some symptoms commonly present in a particular disease or condition should automatically lead to a diagnosis of that condition. First, many mental conditions share symptomatology. *See, e.g., Parsons v. Heckler*, 739 F.2d 1334, 1337 n.5 (8th Cir. 1984) (disability claimant received "differential diagnosis" of a range of six disorders from psychogenic pain disorder to schizoid personality

mean of rehospitalization rates from all 50 states. (*Wyatt* Tr. 1088:4). As Dr. Gualtieri testified, however, the figures he used to represent national "averages" actually described rates aggregated from available data from other hospitals as compiled by a research paper (William S. Edell et al., *Effects of Long-Term Psychiatric Hospitalization for Young, Treatment-Refractory Patients*, 41 HOSP. & COMMUNITY PSYCHIATRY 780 (July 1990)). (*Wyatt* Tr. 1085:12-16). Although the *Wyatt* court found this misleading, it is quite clear to this court that Dr. Gualtieri had candidly discussed his methodology on direct examination (*Wyatt* Tr. 1097:6-9), and no one contested the truth of Dr. Gualtieri's facts. The confusion surrounding the term "average" is unfortunate, but it appears to have been used, not as an attempt to mislead the court, but as a shorthand for Dr. Gualtieri to convey his principal point: that rehospitalization rates in Alabama mental institutions are lower than in most other states.

The second reason the *Wyatt* court disregarded Dr. Gualtieri's testimony was that Dr. Gualtieri recited an inaccurate account of a confrontation between two employees at a mental institution. *Wyatt*, 985 F. Supp. at 1387 n.109 (citing *Wyatt* Tr. 1313-27). Specifically, Dr. Gualtieri wrote in his report that no knife fights occurred in the presence of children because there were no knife fights at the institution. After preparing his report, Dr. Gualtieri discovered (the week before he testified) that he was wrong, and candidly admitted as much at the hearing. (*Wyatt* Tr. 1322:5-6). The reason for his mistake is simple, and readily apparent from even a cursory review of the hearing transcript. Dr. Gualtieri called staff at the mental institution, including the center's director, the center's clinical director, and the department director of institutions, to ask about the alleged knife fight. (*Wyatt* Tr. 1314:16-18, 20-21, 23-25). He was assured "that no such thing happened" and relied upon that statement in preparing his report. (*Wyatt* Tr. 1321:21-22). Dr. Gualtieri may have been wrong, but there is nothing in that case's record (and nothing in the record here) to support a finding that he made any attempt to deceive the court in *Wyatt*.

[45] In essence, the structure of this syllogism follows a peculiar logical pattern:

1)      Merriweather's symptoms include X, Y & Z;

2)      Symptoms X & Y could indicate schizophrenia, though other explanations exist; and

3)      Therefore, it follows that all of these doctors must have acted with extreme negligence when they ultimately concluded that symptoms X & Y are better explained by something other than schizophrenia.

This argument fails because of its faulty logic. For example, the Defense could just as well argue that it would be "extremely negligent" to conclude that Merriweather does not have a condition like ovarian cancer because 1) he had significant weight loss and loss of appetite; 2) significant weight loss and loss of appetite can indicate ovarian cancer, though other explanations exist; and 3) therefore, all of these doctors must have acted with extreme negligence when they ultimately concluded that Merriweather's weight loss and loss of appetite are better explained by something other than ovarian cancer. This analogy leads to an absurd result and that is the point – the conclusion that Drs. Berger and Pietz were negligent is based on the incorrect premise that severe mental illness is the only explanation for Merriweather's behavior.

disorder "because many disorders have symptoms which are very similar, and at early stages of treatment a therapist may have insufficient information to determine which specific disorder is present").[46] Second, symptoms of mental illness can be faked. Doctors, by virtue of their training and experience, may use their extensive medical knowledge to identify a diagnosis that best fits the observed symptoms. Therefore, while it is true that Drs. Pietz, Berger, and Gualtieri have each testified that some of the behaviors arguably exhibited[47] by Merriweather *could* be interpreted to be consistent with a diagnosis of schizophrenia, they all found that those behaviors are better explained by other causes.[48]

In its competency motion, the Defense argues that, in light of the belatedly-released documents from FMC Butner (the ESH/ADs and clinical encounter notes),

---

[46] Throughout the cases addressing mental health assessments in other contexts, experts agree that substance abuse symptoms can mimic psychiatric disorders. *See, e.g.*, *Lake v. Astrue*, 8:07-CV-1115-T-17MSS, 2008 WL 4279667 (M.D. Fla. Sept. 16, 2008) (psychologist testified that "what confounds the various diagnoses is [the disability claimant's] history of substance abuse, which can mimic or cause Major Depression, Schizophrenia, paranoia, and mania, particularly due to LSD and crack cocaine. … the [reported] hallucinations and ideas of reference may be residuals from substance abuse."); *Cribbs v. State*, W200601381CCAR3PD, 2009 WL 1905454 (Tenn. Crim. App. July 1, 2009) (expert testimony that "some types of drugs like cocaine ... mimic some of the paranoid symptoms of schizophrenia, although, the negative symptoms are not so mimicked usually by cocaine abuse."); *Albert R. v. Arizona Dep't of Econ. Sec.*, 2 CA-JV 2007-0055, 2008 WL 4643891 (Ariz. Ct. App. Jan. 10, 2008) (expert testified in termination of parental rights case that a person under the influence of drugs "may exhibit psychotic symptoms and that the withdrawal phase of drug abuse can 'mimic schizophrenia' to the extent that the two are 'almost indistinguishable.'"); *Billiot v. State*, 655 So. 2d 1, 6 (Miss. 1995) (in examination of competency to be executed, court recounted psychologist's testimony that "cocaine, speed, downers, LSD, PCP, marijuana, etc., could result in a condition that mimics schizophrenia if taken in high enough dosage or over a long period of time.").

[47] The experts called by the Government affirmed when asked by Defense counsel that Merriweather exhibits symptoms that could be consistent with schizophrenia. (*See* Doc. 142, Comp. Hrg. Vol. I at 111-12; Doc. 145, Comp. Hrg. Vol. IV at 666; Doc. 144, Comp. Hrg. Vol. III at 549). The experts, however, ultimately concluded that Merriweather did not have schizophrenia. (*See* Doc. 142, Comp. Hrg. Vol. I at 46-47; Doc. 145, Comp. Hrg. Vol. IV at 663-64; Doc. 144, Comp. Hrg. Vol. III at 436).

[48] These doctors' recognition that some of Merriweather's behavior in isolation could be considered symptomatic of schizophrenia bolsters the credibility of their final assessments because they have shown that they considered, but separately and affirmatively rejected, the conclusion that these manifestations point to a diagnosis of schizophrenia.

the only conclusion that can be drawn is that Dr. Berger intended to commit a fraud upon the parties and the Court and that the failure to comply with the Court's Orders regarding disclosure was intentional. The reason for this is simple: Dr. Berger had two choices based upon what was in Merriweather's file and what Dr. Berger claims was in his purview: 1) that Mr. Merriweather has a severe mental illness or 2) Mr. Merriweather was malingering a mental illness. For whatever reasons that are personal to Dr. Berger, he was never going to choose the first irrespective of the evidence in front of him.

(Doc. 330 at 16).

The court declines to place the responsibility for the delayed FMC Butner records on Dr. Berger personally. Nor does it find, as the Defense insists without any basis in fact, that Dr. Berger was complicit in withholding the Butner records so that "the [D]efense could not challenge [his] testimony because [the Defense] did not have the material." (Doc. 330 at 18). At the second competency hearing, the Defense was given a full and fair opportunity to confront Dr. Berger about any "lies" about Merriweather's condition while at Butner, but failed do so. (Doc. 330 at 18, n. 35).[49]

---

[49] The Defense highlights a troubling clinical encounter note by FMC Butner nurse Patrice Yoder that she saw Merriweather playing with feces on February 8, 2010. (Doc. 330 at 14; 330-5 at 32, the encounter note reads: "S- Laughs at nurse and states stench is from "bad food". 0- Found playing c feces. A- Inappropriate behavior. P- Plan cell move c custody and psychiatrist when staff available for 3 man hold"). Yoder did not testify at the competency hearing. The Defense charges Dr. Berger with intentionally withholding records like Nurse Yoder's report to conceal testimonial "lies" that Merriweather generally had acceptable hygiene over the 496 days that he was housed at FMC Butner. *See* Doc. 330 at 14, n. 35 ("To the extent that it could be found that Berger would have told the same exact lies even in the face of this contradictory documentation, such a conclusion cannot definitively be disputed as he may well have simply said that playing with one's feces is normal behavior.").

The Defense asked Dr. Berger to read Yoder's note during the competency hearing, but did not question him further about that entry. (Doc. 553, Second Comp. Hrg. Vol. IV at 975). Dr. Berger made it clear that he did not read the ESH/ADs or the Clinical Encounter/Administrative Notes, but instead spoke to the staff directly about the inmates' condition. (Doc. 553, Second Comp. Hrg. Vol. IV at 1037). Moreover, as far as the court has been made aware, Nurse Yoder's note was the only report of Merriweather "playing with" feces. The court was given no further context for that report. If Merriweather was seen doing that once or twice over the time that he was at Butner, the court does not find that Dr. Berger had any obvious reason to lie about the clinical significance of that behavior. The court is perplexed, however, that the Defense has leveled allegations about Dr. Berger without any evidentiary basis and when, given every opportunity to question him about his role in withholding the Butner documents, the Defense failed to do so.

Turning to Dr. Pietz, the Defense specially faults her with professional "carelessness" and bias towards the Government. (Doc. 556, Def.'s Comp. Brf. at 12-17). The Defense's charge of carelessness stems from an unrelated case in which Dr. Pietz allegedly misdiagnosed a federal offender. (Doc. 556, Def.'s Comp. Brf. at 12-13, 16).

Dr. Pietz is an experienced and qualified expert, having conducted hundreds of forensic evaluations, approximately half of which specifically addressed the competency of a criminal defendant. *See United States v. Simmons*, 993 F. Supp. 168, 170 (W.D.N.Y. 1998). In 2011-12, Dr. Pietz evaluated a federal defendant (who for privacy reasons is referred to anonymously here as "John Doe"). Dr. Pietz found that Doe exhibited no schizophrenic symptoms during an examination at MCFP Springfield. (Doc. 556, Def.'s Comp. Brf. at 12-13). However, Doe was later found incompetent to stand trial because of a schizoaffective disorder and was civilly committed in 2013. (*Id.*). The Defense posits that the Doe case's disposition shows that "Dr. Pietz has a documented history of misdiagnosing a schizophrenic as being mentally intact." (*Id.* at 12). The court finds far less significance in the Doe case than the Defense advocates for two reasons. First, Dr. Pietz's primary goal was to treat Doe at Springfield, not diagnose him, as the Government points out. (Doc. 568, Govt.'s Comp. Reply Br. at 9). Second, Dr. Pietz did not "miss" Doe's mental health diagnosis; she simply concluded that she did not see any evidence of symptoms during Doe's time at Springfield that warranted treatment. (Doc. 568, Govt.'s Comp. Reply Br. at 9). Dr. Pietz stated in her report that she considered Doe's mental health history and accepted his presenting diagnosis of Schizoaffective Disorder, Bipolar Type from FMC Butner. (Doc. 556, Def.'s Comp. Brf. at 13; Def. Ex. 273). However, as Dr. Pietz wrote in her report, during Doe's time at MCFP Springfield, he "never exhibited symptoms of a mental illness. Consequently we had no justification to prescribe medication to him. It is my opinion Mr. Doe

previously met the criteria for Schizoaffective Disorder, Bipolar Type. Currently, these symptoms have abated." (Doc. 556, Def.'s Comp. Brf. at 13; Def. Ex. 273). As both parties have acknowledged in this case, symptoms of schizophrenia may wax and wane.[50] (*See* Doc. 551 at 490; Doc. 556, Def.'s Comp. Brf. at 28; Doc. 568, Govt.'s Comp. Reply Br. at 10). Doe apparently presented no symptomatic behavior at Springfield. Nothing presented to this court shows that Dr. Pietz was negligent or even incorrect about her conclusion that Doe did not need medication and further treatment at that time. Dr. Pietz explicitly recognized Doe's schizophrenia diagnosis; she simply saw no evidence of incapacitating mental illness while Doe was at Springfield. Therefore, she concluded that Doe was (at that time) competent to proceed to trial. The reemergence of Doe's symptoms seven months after he left Springfield and the subsequent incompetency finding does not make Dr. Pietz less reliable as a psychologist. If there was evidence that Doe was manifesting schizophrenia at the time of Dr. Pietz's evaluation that she ignored, that evidence might be more relevant to the issue of professional competence, but no such allegation is before this court.[51] Moreover, the court hesitates to evaluate an expert witness's credibility based on a single diagnosis in an unrelated case about which the court has limited information. If the test of professional competence depended on whether another court has ever made a finding contrary to an expert witness' diagnosis, few experts would be permitted to testify again.

---

[50] Defense expert Dr. Mark Cunningham confirmed this point during his testimony, describing schizophrenia as a "heterogeneous disorder" that "takes different forms" in which the symptoms fluctuate in appearance, intensity, timing and duration. (Doc. 551, Second Comp. Hrg. Vol. II at 471-73).

[51] At the 2014 competency hearing, Dr. Pietz freely acknowledged that there were occasions when she made mistakes about a patient and had diagnosed a patient as schizophrenic when he was he was actually malingering. (Doc. 549, Second Comp. Hrg. Vol. I at 237-38).

The court also finds no evidence that bias towards the Government clouded Dr. Pietz's evaluation of Merriweather. The Defense bases this allegation on an email that Dr. Pietz sent to the Government on December 3, 2013, indicating "that she had determined Mr. Merriweather to be competent" before notifying the court and before receiving a copy of a transcript that she had requested to review for Merriweather's competency determination. (Doc. 549, Second Comp. Hrg. Tr. I at 229-230; Def. Ex. 174). The Defense faults Dr. Pietz with failing "to keep the Court and the [D]efense informed about material matters." (Doc. 556, Def.'s Comp. Brf. at 16). The court finds no evidence that the email reflects a bias that affected Dr. Pietz's diagnosis and evaluation. Indeed, the court notes this argument runs wholly contrary to Dr. Pietz's initial actions in this case when Merriweather presented for a criminal responsibility evaluation.  She delayed the review, called the court, and reported she had concerns about Merriweather's competence – hardly the conduct one would expect from a biased doctor attempting to favor the Government.   It was just these candid concerns articulated by Dr. Pietz about Merriweather's condition that, at least in part, led to the court's decision to hold a second competency proceeding. (Doc. 142, Comp. Hrg. Vol. I at 96). This hardly shows a pro-Government bias.

### D.      Merriweather Does Not Currently Suffer from Schizophrenia

The Defense's experts at both competency hearings concluded that Merriweather currently suffers from schizophrenia. (*See* Doc. 551, Second Comp. Hrg. Vol. II at 567, 594 (Dr. Cunningham's finding that Merriweather falls on the schizophrenia spectrum) and Doc. 552, Second Comp. Hrg. 2d, Vol. III at 764, 773-74 (Dr. Stalcup's diagnosis of psychosis and paranoid schizophrenia)). The experts concluded that Merriweather's schizophrenia is evidenced by the following symptoms: (1) hallucinations and delusions, (2) selective mutism and alogia, (3)

poor hygiene, (4) flat affect, and (5) weight loss.[52] The Defense asserts that these symptoms are valid because Merriweather was not found to be malingering on tests designed to identify such behavior. (Doc. 156 at 43). The Defense also argues that brain scans provided objective evidence that Merriweather has schizophrenia. The court discusses these factors below.

### 1.    Hallucinations

The court has counted five specific instances where Merriweather was alleged to have responded to internal stimuli (hallucinations).[53] As explained more fully below, four of these alleged incidents are questionable; and the other one coincided with his illicit drug use.

The first incident was described by Merriweather's former girlfriend, Latisha Simpson, who testified that Merriweather experienced "visions and hallucinati[ons]." (Doc. 144, Comp. Hrg. Tr. Vol. III at 554). Further questioning revealed that Simpson's statement about "visions and hallucinati[ons]" actually referred to one bad dream. (*Id.*). Another incident that could arguably be described as a hallucination was when Merriweather mentioned an alleged accomplice named "Charlie" during his recollection of the robbery in interviews with Dr. Pietz. (*See* Doc. 142, Comp. Hrg. Tr. Vol. I at 32-33; Doc. 24 at 15). Dr. Pietz dismissed this latter

---

[52] While Defendant's brief states that "each [expert] testified that behaviors they witnessed could be a positive or negative symptom of schizophrenia," it never explicitly enumerates which behaviors are believed to evidence schizophrenia. (Doc. 156 at 37). Consequently, the court has scoured the record for all relevant behaviors discussed at the hearing.

[53] Dr. Dudley and Dr. Merikangas have mentioned non-specific accounts of Merriweather responding to internal stimuli, but these accounts are insufficiently detailed for the court to evaluate them. Dr. Dudley testified during the hearing that Merriweather appeared to be responding to internal stimuli when he visited him in 2009. (Doc. 147, Comp. Hrg. Vol. VI at 943). However, no mention of internal stimuli was included in Dr. Dudley's affidavit (Doc. 147, Comp. Hrg. Vol. VI at 965) and further prodding revealed that "internal stimuli" to Dr. Dudley simply referred to "something that was causing [Merriweather] to smile." (*Id*. at 965, 1084). Dr. Merikangas similarly testified that he saw Merriweather "responding to some internal stimulus," but cautioned that he "didn't know what it was." (*Id*. at 1149). Without more information, the court cannot reach any conclusions about these facts without engaging in armchair speculation, which this court declines to do.

account as an attempt by Merriweather to deflect responsibility for the robbery and noted that Merriweather stopped talking about "Charlie" after she pointed out discrepancies between Merriweather's account and the investigative record. (Tr. Vol. I, 35).[54]

The third incident also occurred during Merriweather's evaluation at MCFP Springfield. On a single occasion, Merriweather told psychologist Dr. Preston that he thought he might be suicidal and reported seeing gremlins. (Doc. 142, Comp. Hrg. Tr. Vol. I at 39). Dr. Preston wrote in her report that she found Merriweather's claim of seeing gremlins to be suspicious. (Doc. 142, Comp. Hrg. Tr. Vol. I at 40). Dr. Pietz was skeptical of Merriweather's report for at least five reasons: (1) visual hallucinations are more consistent with illicit substance abuse than psychosis; (2) in the rare cases where an individual actually experiences a visual hallucination, the hallucination is usually frightening and not casually mentioned; (3) generally, people who complain about suicide are typically not actually suicidal since drawing attention to their suicidal inclinations increases the risk that their suicide attempts will be intercepted; (4) after being placed under suicide watch, Merriweather became primarily concerned about the loss of privacy and requested to be taken off suicide watch, and (5) although true hallucinations never completely go away, Merriweather never again mentioned gremlins. The court finds Dr. Pietz's reasoning persuasive and concludes that Merriweather's claim of seeing gremlins was most likely pretense, or as Dr. Gualtieri noted, Merriweather may have been teasing his evaluators. (Doc. 144, Comp. Hrg. Tr. Vol. III at 402).

---

[54] One may be led to suspect that Merriweather conceived of "Charlie" following his initial interview at the Jefferson County Jail. (*See* Def. Ex. 16 at 88). The name is also shared by a sister-in-law of a family friend. (*See* Def. Ex. 109 at 1). In any case, eyewitness accounts make it clear that there was no accomplice. (Def. Ex. 13). Moreover, after listening to the tape of the police interrogation where "Charlie" was referenced (Def. Ex. 17), the court concludes that this creation by Merriweather was an attempt at deception, not the result of hallucination.

The fourth incident that could potentially be interpreted as a hallucination was a single occasion when Merriweather was found scraping his arms with a spork and complaining that there were bugs in the room. (Doc. 142, Comp. Hrg. Tr. Vol. I at 42). Merriweather mentioned the bugs casually and never complained about bugs in his cell again. (*Id.*). For the same reasons she discounted Merriweather's account of gremlins, Dr. Pietz found this claim similarly suspect.

Finally, the fifth incident was related by Merriweather's sister, Kim Patton, who testified that sometime in either late 2001 or 2002, Merriweather told her that he was hallucinating that there were demons in everybody, including members of his family. (Doc. 143, Comp. Hrg. Tr. Vol. II at 299-300). Patton suspected drug use, which Merriweather confirmed when Patton raised the question. (Doc. 143, Comp. Hrg. Tr. Vol. II at 300). From a review of the record, the court finds that the best theory to explain the association between Merriweather's hallucinations and his substance abuse is that his substance abuse caused his hallucinations.

It is virtually uncontested that Merriweather has used illicit substances. During interviews with Dr. Pietz, Merriweather described a history of substance abuse that began with alcohol at age 14, grew to include marijuana at age 17, and expanded to included cocaine, crystal methamphetamine, and ecstasy by age 22. (Doc. 142, Comp. Hrg. Tr. Vol. I at 43). He also acknowledged using "various pills" and injecting heroin intravenously. (*Id.*). Following the robbery, Merriweather tested positive for opiates while being treated at UAB Hospital. (Def. Ex. 15 at 18).

There are correlations between Merriweather's history of substance abuse and reports of his odd behavior. As already noted, Merriweather's complaint to Patton that he was seeing hallucinations was followed by an admission that he had been taking drugs. (Doc. 143, Comp.

Hrg. Tr. Vol. II at 300). Similarly, when Merriweather told his father that he was hearing voices, it was during the period when Merriweather reported taking illicit drugs. (Doc. 24 at 7).

According to Dr. Pietz, hallucinations are actually quite rare, and in any event, more consistent with illicit drug use than psychosis. (Doc. 142, Comp. Hrg. Tr. Vol. I at 40). Substances such as marijuana, cocaine, crystal methamphetamine, alcohol, and ecstasy can cause psychotic symptoms to develop and persist for some time after ingestion. (Doc. 142, Comp. Hrg. Tr. Vol. I at 40, 43, 121-22, 159, 163; Doc. 145, Comp. Hrg. Tr. Vol. IV at 604). Given that prolonged drug use can cause hallucinations and psychotic-like symptoms long after the consumption of such drugs has ceased, it is reasonable to conclude that someone who has not only had a history of extensive drug use, but a history of hallucinations that coincided with that drug use,[55] most likely suffers from hallucinations (to the extent that he suffers from actual hallucinations rather than dreams) because of substance abuse, not a mental disease. The court finds this is the case here, and therefore, the court adopts the findings of Drs. Berger and Pietz that Merriweather's psychotic-like symptoms were most likely drug-induced and not the product of a mental disease.

## 2.    Mutism

The great weight of the evidence indicates that Merriweather is acting volitionally when he elects not to communicate verbally. As Dr. Berger explained, there is a difference between actual and selective mutism. People who are actually mute cannot speak whereas people who are

---

[55] The court notes that while interacting with Dr. Mirsky, Merriweather never self-reported any hallucinations or delusions. (Doc. 148, Comp. Hrg. Vol. VI at 1090-91). Indeed, virtually all the reports of these purported symptoms were historical in nature (and, as the court has already noted, this "history," which was garnered from Merriweather's family members, is less than credible in some instances).

selectively silent can speak, but choose not to when it suits them. (Doc. 144, Comp. Hrg. Vol. III at 430; Doc. 145, Comp. Hrg. Vol. IV at 599). Dr. Berger found that Merriweather was being selectively silent. (Doc. 144, Comp. Hrg. Vol. IV at 596-97; Def. Ex. 51 at 1 (Merriweather was "mute with most of the staff but, ... [was] interested and willing to discuss" what Dr. Berger wrote in his report.)). Dr. Pietz also found that Merriweather's decision to stop speaking following a recorded interview on November 27, 2013, reflected his unwillingness to speak about the offense – as opposed to signs of schizophrenia or psychosis. (Doc. 549, Second Comp. Hrg. Vol. I at 54-55). Medical and correctional professionals who observed Merriweather, such as Diana Shirley, Kelly Hammonds, Eugene Singleton, and Timothy Laatsch, Ronald Higgins, and Felicia Williams all communicated freely with Merriweather. (Doc. 148, Comp. Hrg. Vol. VII at 1233-34, 1244; Doc. 150, Comp. Hrg. Vol. VIII at 1268; Doc. 148, Comp. Hrg. Vol. VII at 1229); Doc. 551, Second Comp. Hrg. Vol. II at 371, 373; Doc. 549, Second Comp. Hrg. Vol. I at 323). Dr. Mirsky testified that "[t]here was no period of time when [Merriweather] was mute with [him]." (Doc. 147, Comp. Hrg. Tr. Vol. VI at 1091).

Even with respect to those incidents to which the Defense points as evidence of Merriweather's mutism,[56] the record evidence reveals Merriweather's ability to communicate when he wishes. Dr. Dudley testified that when Merriweather refused to speak with him, he dismissed him with "hand signals and the verbal refusal to speak." (Doc. 147, Comp. Hrg. Tr.

---

[56] Having reviewed the "silent" tapes from the Shelby County Jail (Def. Ex. 121, 131-35), the court cannot tell whether Merriweather was communicating with his attorneys, deliberately not communicating with his attorneys, or a combination of both. The court does note, however, that the testimony provided by Defense witnesses alleging that Merriweather is unable to communicate is belied by other testimony -- by both Government and Defense witnesses -- indicating that Merriweather engaged in long conversations with his attorneys. (See e.g., Doc. 146, Vol. V at 822-23 (testimony by Jack Earley that Merriweather engaged in conversation with Richard Jaffe for hours)). To be sure, the evidence in the record indicates that Merriweather can be less than communicative when he decides to do so.

Vol. VI at 946). After Merriweather's attorneys and Jack Earley were initially turned away during a visit on June 27, 2011, Merriweather told a guard to call his lawyers back because he recognized Jaffe and wanted to talk. (Doc. 146, Comp. Hrg. Tr. Vol. V at 821). When Mr. Earley and Mr. Jaffe returned, Merriweather engaged in a conversation with Mr. Jaffe that, according to Earley, lasted for hours. (Doc. 146, Comp. Hrg. Tr. Vol. V at 822-23). Merriweather himself decides when to speak, and when not to. The evidence is persuasive that Merriweather's silence is not the product of psychosis.[57]

### 3.    Poor Hygiene

The Defense argues that the relationship between personal hygiene and schizophrenia shows that Merriweather is suffering from negative symptoms of schizophrenia. (Doc. 146, Comp. Hrg. Vol. V at 762). Dr. Cunningham found that the evidence of Merriweather's poor hygiene was a highly significant indicator of negative symptoms of schizophrenia. (Doc. 552, Second Comp. Hrg. Vol. III at 662). Dr. Cunningham interpreted Merriweather's failure to shower for three months at Butner and that nurses' notes reflected that he showered only once from mid-October 2010 to mid-February 2011 at Butner to be a sign of significant social withdrawal. (Doc. 552, Second Comp. Hrg. Vol. III at 663). Dr. Berger denied that hygiene was a major issue for Merriweather while he was at FMC Butner and further noted that poor hygiene may be used by a prisoner as a tool to get attention. (*Id.*). Dr. Berger also noted that prisoners at Butner will sometimes forgo showers and just sponge bathe using the sink. (*Id.* at 1048).

---

[57] This conclusion is buttressed by the testimony of Dr. Mirsky, who indicated that Merriweather was cooperative during his evaluation. (Doc. 147, Comp. Hrg. Vol. VI at 1089).

Dr. Dudley suggested that Merriweather's hygiene was indicative of his inability to take care of himself, which was indicative of Merriweather's mental condition. (Doc. 147, Comp. Hrg. Tr. Vol. VI at 929). While poor hygiene is not a symptom of schizophrenia, Dr. Dudley offered it as a proxy for Merriweather's inability to care for himself (*i.e.*, another sign of disorganized behavior). (*Id.*). When pressed on that point, Dr. Dudley admitted that he was unaware of Judge Ott's order, issued after Dr. Dudley's last visit with Merriweather, which directed staff at the Shelby County Jail to force bathe Merriweather if necessary. (*Id.* at 999). As it turns out, forced bathing was unnecessary because Merriweather, when faced with Judge Ott's order, began bathing himself daily without issue. (Doc. 148, Comp. Hrg. Tr. Vol. VII at 1220; 1249). Dr. Berger similarly felt that Merriweather's reversal from refusing to eat and bathe to deciding to do so when the court issued a force-feeding order was not consistent with delusional thinking. (*Id.* at 1058-59). Therefore, the court finds, in any event that Merriweather had the ability (and mental capacity) to care for his personal hygiene, but simply declined to do so until a court order motivated him to act.

### 4.      Flat or Inappropriate Affect

It is uncontested that flat affect can be one negative symptom of schizophrenia. (Doc. 146, Comp. Hrg. Vol. V at 770; Doc. 147, Comp. Hrg. Vol. VI at 933). Merriweather has presented as fairly subdued and occasionally uncommunicative since the last competency hearing, so it is unsurprising that several observers viewed him as having a flat affect. Dr. Cunningham, in his review of Butner's records, counted 519 nurse observations on ESH/ADs that Merriweather had a flat or inappropriate affect over 71 weeks at FMC Butner. (Doc. 551, Second Comp. Hrg. Vol. II at 505). Drs. Dudley and Pietz also testified to Merriweather

exhibiting flat affect.[58] (*See* Doc. 147, Comp. Hrg. Vol. VI at 944, 952, 999, 1002 (Dr. Dudley's testimony that Merriweather's "affect was largely flat"); Doc. 549, Second Comp. Hrg. Vol. I at 70, 97-98 (Dr. Pietz noting that Merriweather "is always flat.")). Dr. Dudley's report states that Merriweather's "affect was often inappropriate, in th[at] he often smiled and laughed while talking about content that didn't merit such response." (Def. Ex. 9 at 5). The court has weighed and considered this evidence in determining Merriweather's competency. Consistent with the analysis below in the Malingering section, *see infra*, the court believes that Merriweather has been feigning a flat or inappropriate affect.

### 5.    Weight Loss

The Defense has presented two theories to connect Merriweather's weight loss to schizophrenia: (1) it results from a delusion of persecution, which could be a negative symptom of schizophrenia (Doc. 142, Comp. Hrg. Vol. I at 120), and (2) "a person incapable of making basic decisions about [his] own physical health is in no position to make the sorts of decisions required of a defendant facing the death penalty." (Doc. 156 at 44). Regarding the first argument, when Merriweather refused to eat, the record simply does not suggest that a delusion of persecution was a primary reason why Merriweather fasted. Dr. Berger testified that weight loss is often a way for prisoners to get attention. (Doc. 145, Comp. Hrg. Vol. IV at 617). His observation notes related to his evaluation of Merriweather indicate that Merriweather used his refusal to eat "as a bargaining chip[,] asking for a phone call or other staff request." (Def. Ex. 53 at 1). "There is some apparent manipulation in this," Dr. Berger noted, "where [Merriweather]

---

[58] Earley did at one point during the hearing describe Merriweather as "flat" in reference to his energy level. (*See* Doc. 146, Comp. Hrg. Vol. V at 837).

will at times key a request with refusal of food if the request is not granted." (Def. Ex. 52 at 1). One example where Merriweather manipulated his weight to accomplish a desired result occurred during his stay in FMC Butner when he used weight loss to force the facility to house him in a better cell. (Doc. 146, Comp. Hrg. Vol. V at 761). However, Merriweather's use of his weight loss as a bargaining chip to manipulate others stopped after Director Shirley confronted him with a feeding tube. (Doc. 148, Comp. Hrg. Vol. VII at 1233).

The Defense argues that "it is not rational for a person to have to be strapped down and threatened with a tube being snaked down his nose to finally get someone to eat," as "[a] rational person would never let it progress that far." (Doc. 156 at 44). But that argument is undercut by Merriweather's own volitional conduct. Judge Ott's court order made Merriweather's concerns about poisoned food immediately vanish, and Merriweather successfully negotiated with Director Shirley to avoid being force-fed. (Doc. 148, Comp. Hrg. Vol. VII at 1233-35). Merriweather's ability to successfully negotiate with medical and correctional staff members shows that he is in fact capable of making decisions and engaging with his environment to reach his goals.

### 6.    Malingering

Medical symptoms can be malingered, and there is evidence that Merriweather was faking or pretending on some occasions during mental health evaluations, particularly when he displayed disorganized speech or claimed not to remember information about his life and the offense. As discussed above, during the first competency hearing, both Drs. Pietz and Mirsky concluded that Merriweather did not malinger during the testing process, or in other words, he appeared to give his best effort when tested. (Doc. 142, Comp. Hrg. Vol. I at 67 (no suggestion

of malingering of effort on Merriweather's test results on the Structured Interview of Reported Symptoms); *id.* at 87 (no suggestion of malingering on Test of Memory Malingering administered by Dr. Mirsky)).

However, during evaluations, Merriweather presented a different picture. Dr. Pietz recalled during the first competency hearing that some of Merriweather's responses led her to suspect malingering. (Doc. 142, Comp. Hrg. Vol. I at 49). When confronted about the suspicious test results, Merriweather admitted that he answered questions about whether or not he experienced hallucinations based on how he experienced the world when under the influence of illicit substances. (*Id.*).

In the second competency hearing, Dr. Pietz identified several incidents that led her to conclude that Merriweather was faking mental illness or disability while he was being evaluated for mental disease, such as Merriweather telling Drs. Dudley, Tomelleri, and Stalcup that he did not know what his charges were. (*See* Doc. 549, Second Comp. Hrg. Vol. I at 28-29; Doc. 147, Comp. Hrg. Vol. VI at 943-44 (Dr. Dudley's testimony stating that Merriweather showed no understanding of the nature of the case, the charges against him, or the possible outcomes)). Dr. Pietz was similarly skeptical that Merriweather suddenly fell silent during Dr. Stalcup's evaluation and then suddenly saying, 'Whoa, I think I went off on a fantasy there. I don't represent it,'" was a true incidence of psychosis. She saw the exchange as an attempt to malinger mental illness. (Doc. 549, Second Comp. Hrg. Vol. I at 81). Dr. Pietz concluded from these incidents that Merriweather's "alleged psychosis appeared when he didn't want to be cooperative, when he didn't want to answer certain questions. But then when there was something that was important to him, like he wanted a commissary list or he wanted to talk about food or he wanted to talk to staff about something, there was no evidence of any psychotic

behavior." (*Id.* at 93). An example of Merriweather's switching behaviors is his friendly and focused conversation with Felicia Williams, but refusing to speak at all during Dr. Pietz's interviews. (*See* Doc. 549, Second Comp. Hrg. Vol. I at 323 (testimony of Felicia Williams); *see also* Doc. 144, Comp. Hrg. Vol. III at 402; Gov't Exs. 6, 7, and 8 (testimony of Dr. Gualtieri that when Merriweather was questioned about the robbery or other serious matters he became evasive, playful, and nonsensical); Doc. 144, Comp. Hrg. Vol. III at 402; Gov't Exs. 6, 7, and 8 (testimony of Dr. Gualtieri that when Merriweather was questioned about the robbery or other serious matters he became evasive, playful, and nonsensical); Doc. 552, Second Comp. Hrg. III at 689 (Dr. Cunningham's agreement that Merriweather chooses to withhold information from evaluators that Merriweather likely knows)).

Dr. Berger also observed Merriweather's "manipulative tactics."[59] (*See* Doc. 145, Comp. Hrg. Vol. IV at 601-609, 658) (recounting Merriweather's evasiveness while being interviewed and attempts to bargain around or manipulate his environment). Dr. Berger found Merriweather able to communicate when it served Merriweather's own interests. (Doc. 145, Comp. Hrg. Vol. IV at 596-97, 616 (Dr. Berger testified that "it appeared that [] when [Merriweather] chose to or did communicate, he could communicate in a very reasonable manner. When he chose not to communicate, he would either wave a person away or as in the interviews. … he just disregarded the questions, or really there was no exchange of information")). Therefore, Dr. Berger concluded that Merriweather's silence was not a symptom of a mental disorder, but rather manipulative behavior. (*Id.*). While Dr. Berger stopped short of making a malingering

---

[59] Dr. Gualtieri also testified about similar conduct exhibited by Merriweather during their interviews. (Doc. 144, Comp. Hrg. Vol. III at 402) (testifying to Merriweather becoming "evasive and playful" during their interviews and refusing to answer questions or answering them in a nonsensical way).

diagnosis,[60] he stated that Merriweather intentionally refused to cooperate by going through these actions that could result in serious penalties to him.

Both Government and Defense experts agreed that Merriweather at times pretends not to know things that he does or adopts an evasive strategy to avoid discussing certain topics. (*See, e.g.*, Doc. 551, Second Comp. Hrg. Vol. II at 519 (Dr. Cunningham's testimony that Merriweather knows what he is charged with and is acting volitionally when refusing to discuss the offense)).

The record contains persuasive evidence that Merriweather has malingered symptoms of mental illness during mental health evaluations. The experts who evaluated Merriweather, both for the Defense and the Government, generally agree that he occasionally reports that he does not know or remember things that he probably does. Dr. Cunningham attributes Merriweather's selective mutism and unwillingness to discuss the offense, or on occasion, his background, to a "treadmill effect": that the stress of remembering is too much for him to cope mentally with and thus he shuts down. (*Id.* at 520). "The defect," Dr. Cunningham, concluded, is "not with [Merriweather's] memory. It is with his rationality." (*Id.* at 520).

The court has carefully considered the reports of the lay and expert witnesses about Merriweather pretending or faking behaviors that are also negative symptoms of schizophrenia. The Defense's experts discount Merriweather's behavior as irrational because it has no identifiable secondary gain. However, the court is convinced that Merriweather perceives some benefit to his failing to cooperate with evaluators (and, for that matter in his restricting his food

---

[60] Dr. Berger considered finding malingering but decided against that diagnosis, stating, "I actually thought long and hard about making that diagnosis, but to me, his presentation – I thought he could do a much more credible job in malingering mental illness than he was doing[.]" (Doc. 145, Comp. Hrg. Vol. IV at 615).

intake and hygiene) even if that perception is wrongheaded. The court need not speculate as to what those motivations may be. The court is satisfied, based on the weight of the evidence, that Merriweather's conduct is not a product of a severe mental illness that has stripped him of the ability to make rational (even if misguided) choices.

### 7.      Brain Scans

The Defense has argued that Merriweather's brain scans provide objective evidence of schizophrenia. (Doc. 156 at 37). In the 2011 competency hearing, Dr. Merikangas testified that he examined Merriweather's brain scans and saw "atrophy or maldevelopment" in the left parietal and frontal lobes in brain scans of Merriweather's brain. Dr. Merikangas found that the brain scans showed "abnormalities which have been described in cases of schizophrenia." (Doc. 148, Comp. Hrg. Vol. VII at 1135; Def. Ex. 84). The court has considered Dr. Merikangas's testimony on this point, but accords it little weight because, as Dr. Merikangas has frankly conceded, "[the scan] itself is not diagnostic of anything in particular but it correlates with what is seen frequently in people with schizophrenia." (Doc. 148, Comp. Hrg. Vol. VII at 1137). However, he also testified that the brain scans could also be consistent with other conditions, including conditions such as lupus, auto-immune diseases, post-encephalitis, some types of demyelinating disease, traumatic brain injuries, a viral infection that affects the brain (such as measles or HIV), and metabolic disturbances (like thyroid diseases or disorders of calcium metabolism). (Doc. 148, Comp. Hrg. Vol. VII at 1141). Thus, even if the court accepted Dr. Merikangas's methodology as valid, any conclusion that the brain images show that Merriweather has schizophrenia is far too speculative to be useful to the court's inquiry.[61] Given

---

[61] The experts at the initial competency hearing agreed that the enterprise of diagnosing medical conditions

this inconclusive finding, and in light of the totality of evidence presented, the brain scans are not sufficient evidence to support a finding that Merriweather suffers from schizophrenia.

### 8.      Merriweather's Alleged Use of Neologisms

The parties have been litigating the issue of Defendant's competency for the lion share of the last seven years, and in doing so have heard from a variety of medical experts called by each side. Despite this extended litigation history, the question of whether Merriweather's use of neologisms indicates some type of thought disorder (which could be indicative of schizophrenia) has, to the best of the court's recollection, never come up – that is, until the most recent competency hearing earlier this year. At that hearing, Defense counsel cross-examined Dr. Pietz about neologisms during the Government's case in chief, and Dr. Cunningham testified about Merriweather's use of neologisms during Merriweather's presentation of evidence.

A neologism is, just as its Latin roots suggest, a "new word," sometimes coined, other times made up. There is some consideration in the medical field that the use of neologisms by adults may equate to a symptom of disorganized thought which, in turn, can indicate a schizophrenic thought disorder. Dr. Cunningham said that this sometimes can occur in conjunction with disorganized speech, or what formerly was referred to as "word salad."

First, there is no dispute that, to the extent Merriweather used neologisms, he did so infrequently.

_____

using brain imaging techniques, such as MRI or PET, is questionable at best. Dr. Merikangas himself cautioned that he "wouldn't presume to look at [the MRI scans] and say [he could] make a diagnosis from these tiny images." (Doc. 148, Comp. Hrg. Vol. VII at 1139-40). Dr. Landis testified that it is inappropriate to use imaging to diagnose behavior. (Doc. 150, Comp. Hrg. Vol. VIII at 1299). Dr. Gualtieri found the MRI scans to be ambiguous and questioned the legitimacy of attempting to make specific findings based on them. He stated that a clinician's reaction to seeing a scan with thinned brain tissue is that "[y]ou would shrug your shoulders. You need clinical correlation. … You can find these abnormalities in the brain of perfectly normal people." (Doc. 144, Comp. Hrg. Vol. III at 395-96).

Q        Neologism was never mentioned in the first Pate hearing by anyone?

A        Yes, sir.

Q        Why?

A        His use of that is infrequent, at least in my experience ….

(Doc. 551 at 271, Second Comp. Hrg. Vol X at 583).

Second, although Dr. Pietz and Dr. Cunningham disagreed about how frequently one would need to use neologisms to indicate a symptom of psychosis, what is clear is that whether a use of a neologism suggests schizophrenia is a matter of interpretation. There may be other explanations for such use. For example, in prison populations, there are words that are unique to the prison culture. That is, prisoners sometimes invent their own language and vocabulary. There are also instances where an individual misuses or mispronounces a word, and that mistake can approximate a neologism. Perhaps the important point is this: language is inextricably intertwined with culture, and it is difficult to draw a firm conclusion about whether a unique word or phrase is (1) a product of someone attempting to speak beyond his education level, (2) a product of that person making words up (whether with an agenda, or otherwise for fun, fame, or profit), (3) a concerted attempt to brand a particular vocabulary (*e.g.*, within a prison culture), or (4) an indication of disorganized thought and speech.

In this case, Merriweather's alleged use of neologisms was infrequent. Moreover, as the court has already concluded, Merriweather has volitionally made attempts to control conversations, and one of the techniques he used in doing so is talking in nonsensical terms. Although Dr. Cunningham opined that Merriweather's neologisms indicate disorganized speech and thought, he acknowledged the possibility that Merriweather was engaging in these speech

110

patterns in his attempts to malinger:

> Q       Disorganized thought; there was some testimony in the first hearing from Dr. Berger, as I recall, that he would have a perfectly candid and logical conversation with Mr. Merriweather as they were setting up the video camera. They would turn the camera on and then he would go into what you might characterize as disorganized speech?
>
> A       Yes, sir.
>
> Q       How does that fit into the analysis of all this? And by the way, he would say after the camera was turned off, if I recall correctly, he would go back to more candid, organized speech, including immediately after that if he saw him on a round.
>
> A       Certainly one possibility is that he is malingering and so he turns that on.

(Doc. 551 at 273-74, Second Comp. Hrg. Vol. X at 585-86).

After careful review, the court concludes that there is simply insufficient evidence that Merriweather's alleged infrequent use of neologisms suggests disorganized thought caused by a psychosis.

### E.       Application of the Competency Standard

While a finding of incompetency is predicated on the existence of a mental disease or defect, the standard for evaluating a defendant's competency to stand trial is not a medical inquiry, but rather a legal determination.[62] *United States v. Makris*, 535 F.2d 899, 905, 907 (5th Cir. 1976) ("The question of competency, of course, is a mixed question of law and fact" but "[i]n the final analysis, the determination of competency is a legal conclusion; even if the

---

[62] *See* 18 U.S.C. § 4241(d) ("If, after the hearing, the court finds by a preponderance of the evidence that the defendant is presently suffering from a mental disease or defect rendering him mentally incompetent . . .").

experts' medical conclusions of impaired ability are credited, the judge must still independently decide if the particular defendant was legally capable of reasonable consultation with his attorney and able to rationally and factually comprehend the proceedings against him.").[63] Ultimately, however, whether Merriweather has schizophrenia is ancillary to a determination of his competency. A defendant may be found competent even if a court finds that he or she had schizophrenia. *See Ferguson v. Sec'y, Florida Dep't of Corr.*, 716 F.3d 1315, 1340 (11th Cir. 2013) (finding that the nature and severity of petitioner's mental illness do not render his "perception of reality so distorted" that he cannot adequately appreciate the connection between his crimes and impending execution"); *Wright v. Sec'y for Dep't of Corr.*, 278 F.3d 1245, 1259 (11th Cir. 2002) ("[t]he fact that [the petitioner] suffers from chronic schizophrenia the effects of which have come and gone over the years is not enough to create a real, substantial, and legitimate doubt" about his competency to stand trial); *Lawrence v. Sec'y, Fla. Dep't of Corr.*, 700 F.3d 464, 482 (11th Cir. 2012) (affirming the district court's finding that a diagnosis of schizophrenia is not enough to show that a defendant was incompetent to enter a guilty plea or stand trial).

As discussed above, the test for competence is whether the defendant is presently suffering from a mental disease or defect rendering him mentally unable to (1) understand the nature and consequences of the proceedings against him or (2) to provide present sufficient assistance to counsel in his defense with a reasonable degree of rational understanding. *Dusky v. United States*, 362 U.S. 402 (1960) (per curium); *see also Cooper v. Oklahoma*, 517 U.S. 348,

---

[63] The determination of competency as a whole is a mixed question of law and fact. The Eleventh Circuit has held that for direct review purposes, a competency determination is treated as a finding of fact. *See United States v. Hogan*, 986 F.2d 1364, 1371 (11th Cir. 1993) ("If a state court's conclusion that a defendant is competent to stand trial is a factfinding for habeas review purposes, and the Supreme Court has said it is, then it follows that the identical conclusion by a district court is a factfinding for purposes of direct review").

112

354 (1996) ("The test for incompetence is also well settled."); *Godinez*, 509 U.S. at 402 (rejecting multiple standards in favor of the "*Dusky* formulation" as the standard for determining competency).

While the law is well-settled as to what the proper standard to determine competency, the definition of "rational understanding" remains ambiguous. [64] The Supreme Court has noted that the concept of "rational understanding is difficult to define." *Panetti v. Quarterman*, 551 U.S. 930, 959 (2007); *see Ferguson*, 716 F.3d at 1318 ("The bottom line of the *Panetti* decision is that there is not yet a well-defined bottom line in this area of the law."). The Eleventh Circuit concluded in *Ferguson* that "what *Panetti* held and clearly establishes" is "that whatever "rational" means in the context of competency to be executed, a court may not "treat … delusional beliefs as irrelevant once the prisoner is aware the State has identified the link between his crime and the punishment to be inflicted." *Id.* at 1337. [65]

Thus, to find that a defendant's understanding is *rational* as opposed to *factual*, it is not enough to show that the defendant knows facts such as the day of the week or the name of the current President. The language of *Dusky* indicates that competency requires something more – "[I]t is not enough," as the *Dusky* Court admonished, "to find that the defendant is oriented to time and place and has some recollection of events." 362 U.S. at 402 (internal quotations

---

[64] *See* Terry A. Maroney, *Emotional Competence, "Rational Understanding," and the Criminal Defendant*, 43 Am. Crim. L. Rev. 1375, 1381-85 (2006) (exploring possible meanings of the term "rational understanding").

[65] Some Eleventh Circuit cases have addressed the issue without providing a definition for the term. *See e.g., Bundy v. Dugger*, 850 F.2d 1402, 1409-10 (11th Cir. 1988) (finding a defendant to have a rational understanding of the proceedings against him where the defendant expressed displeasure at one of the trial judge's instructions, evaluated some of the evidence against him, and criticized the state's closing argument for referring to facts not in evidence); *James v. Singletary*, 995 F.2d 187, 188 (11th Cir. 1993) (finding rational understanding where defendant participated in formulating defense strategy with attorneys).

113

omitted). The Court noted that a competent defendant can make a "reasoned choice" among the alternatives available to him when confronted with such crucial questions as whether he should testify, waive a jury trial, cross-examine witnesses, put on a defense, etc. *Id.* at 397-98.

The Court later expounded on the prohibition against subjecting a mentally incompetent person to trial. *See Drope*, 420 U.S. at 172. In *Drope*, the Court cited a law review note, *Incompetency to Stand Trial*, that argued that the *Dusky* standard can be best understood by viewing the primary purpose of the incompetency rules as safeguarding the accuracy of adjudication and protecting the fairness of the adversarial system. *See* Note, *Incompetency to Stand Trial*, 81 Harv. L. Rev. 455, 457-459 (1967). To that end, the law review note suggested that rationality under the *Dusky* standard requires that a defendant have some ability to confer intelligently, to testify coherently, to follow and evaluate the evidence presented, and have some awareness of the significance of the proceeding and some ability to understand the charges against him, the defenses available to him, and the basic elements of a criminal trial. 81 Harv. L. Rev. at 458.[66] The court believes that this understanding best approximates what the Supreme Court had in mind regarding the standard for mental competency and will therefore use these criteria in evaluating Merriweather's rational understanding of the proceedings against him.

As already noted, the court finds that the Government has shown by a preponderance of the evidence that Merriweather does not currently suffer from "a mental disease or defect to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense." 18 U.S.C. § 4241(a). Alternatively, even if

---

[66] 81 Harv. L. Rev. at 458; *see also* Judicial Conference of the District of Columbia Circuit, Report of the Committee on Problems Connected with Mental Examination of the Accused in Criminal Cases Before Trial 132 (1965); Peter R. Silten & Richard Tullis, *Mental Competency in Criminal Proceedings*, 28 Hastings L. J. 1053, 1058 (1976).

Merriweather were found to suffer from an unidentified mental disease or defect, the presence of some mental illness does not necessarily make a defendant incompetent to stand trial. *See Medina v. Singletary*, 59 F.3d 1095, 1107 (11th Cir. 1995) ("Not every manifestation of mental illness demonstrates incompetence to stand trial . . . neither low intelligence and mental deficiency, nor bizarre, volatile, and irrational behavior can be equated with mental incompetency to stand trial"); *United States v. Hogan*, 986 F.2d 1364, 1373 (11th Cir. 1993) (cognitive degeneration due to Alzheimer's Disease did not render defendant incapable of assisting attorney); *see also United States v. Vamos*, 797 F.2d 1146, 1150 (2nd Cir. 1986) ("It is well-established that some degree of mental illness cannot be equated with incompetence to stand trial."); *Hall v. United States*, 410 F.2d 653, 658 (4th Cir. 1969) ("[T]he presence of some degree of mental illness is not to be equated with incompetence to be sentenced.").

The ultimate question under *Dusky* is whether a defendant has sufficient present ability to consult with his lawyers with a reasonable degree of rational understanding, and is able to have a rational and factual understanding of the proceedings against him. The Government's evidence that Merriweather has a factual understanding of the proceedings has not been refuted – the Defense challenge centers on whether Merriweather's decisionmaking reflects a rational understanding. Here, the preponderance of the evidence shows that Merriweather has both (1) a sufficient present ability to consult with his lawyers with a reasonable degree of rational understanding, and (2) a rational as well as a factual understanding of the proceedings against him. Thus, Merriweather's functioning has not been impaired to a level below that required by *Dusky*.

### 1.   Merriweather has Sufficient Present Ability to Consult with his Lawyers with a Reasonable Degree of Rational Understanding

The first prong of the *Dusky* standard, whether a defendant has "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding," concerns the ability of a defendant to effectively participate in his defense by communicating effectively with his counsel. *See Drope,* 420 U.S. at 171-72; *Cooper*, 517 U.S. at 356-57. It is worth emphasizing that the *Dusky* standard refers to the *ability* of a defendant to communicate with his attorneys, not his *willingness* to communicate with his attorney. Being able -- but unwilling -- to communicate with one's attorney does not make a defendant incompetent to stand trial. *See, e.g.,* 40 Am. Jur. Proof of Facts 2d 171 (1984), citing *Ferry v. State*, 453 N.E.2d 207, 212 (Ind. 1983).

Merriweather's attorneys argue that Merriweather ought to be found incompetent under the first prong because "Merriweather is not engaged in meaningful communication with his counsel." (Doc. 156 at 44). In making this argument, the Defense correctly identifies the issue to hinge on whether Merriweather deliberately refused to communicate or was unable to communicate due to a mental disease or defect. (*Id.* at 44-45). However, in making these arguments, the Defense fails to account for this critical distinction, arguing simply that Merriweather's communication with his counsel so far has been "insufficient to protect and exercise his Constitutional rights." (*Id.* at 45).[67]

---

[67] Along the way, Merriweather's attorneys have argued that the question of whether Merriweather's lack of communication was deliberate or involuntary may be resolved entirely by ascertaining that Merriweather has a mental illness. (Doc. 156 at 44-45). The Defense does not focus on this argument much though, noting that "such analysis may be somewhat superfluous" when compared with the later argument that Merriweather's communication with his attorneys has been objectively lacking. However, the problem with this premise is not that it is superfluous, but that it is incorrect; merely having a mental illness does not necessarily render a defendant incompetent. *See Medina*, 59 F.3d at 1107; *Hall* 410 F.2d at 658.

This argument misses the target. The Defense has not shown that Merriweather *cannot* speak with his attorneys, but only that he *will not* speak with his attorneys (except, of course, when he desires to do so). When Merriweather refused to speak with Dr. Merikangas in June 2011, he was not unresponsive to his environment; Dr. Merikangas testified that Merriweather waived food away. (Doc. 147, Comp. Hrg. Vol. VII at 1176). When Dr. Dudley testified to Merriweather's lack of communication, he indicated that the only communication he was able to elicit from Merriweather during his June 2011 visit came in the form of "the hand signals and the verbal refusal to speak with him." (Doc. 147, Comp. Hrg. Vol. VI at 946). While these experts were apparently seeking to express the view that Merriweather was unable to communicate, that assertion is actually undermined by their own testimony. Waiving away a food tray when it was offered shows that Merriweather is aware of his surroundings and able to respond to achieve a desired result (*i.e.*, sending the food away). Similarly, using hand signals and *verbally* expressing the desire not to see someone evinces Merriweather's ability to communicate his desire not to see that person.

Moreover, the conversation that took place the next day among Merriweather, Jack Earley, and Merriweather's attorneys belies the assertion that Merriweather is unable to communicate with his attorneys with a reasonable degree of rational understanding. As Earley, Jaffe, and Drennan were leaving the Shelby County Jail, Merriweather told a guard to call them back because he recognized Jaffe and wanted to talk with him. (Doc. 147, Comp. Hrg. Vol. V at 822). The conversation lasted for hours. (*Id.* at 822-23). Earley testified that Merriweather's speech during this conversation seemed organized. (*Id.* at 838). Although Defense counsel argue that Merriweather is not able to consult his counsel, he has consulted his lawyers when he desired to speak with them. Merriweather's refusal to speak with members of the Defense team

can therefore be best understood to show unwillingness, not a lack of ability to do so. As the Eleventh Circuit has noted, even if a criminal defendant is "at times uncommunicative with his counsel, periods of uncooperativeness alone are insufficient to support a finding of incompetence." *United States v. Jones*, 200 F. App'x 915, 921 (11th Cir. 2006).[68]

The Defense may protest that, while the evidence demonstrates that Merriweather is able to consult with his counsel, it does not establish that Merriweather is unable to consult with his lawyers with a reasonable degree of rational understanding. Because this requires an inquiry into whether Merriweather has rational understanding of the proceedings against him, the court turns now to the second prong of *Dusky*.

### 2.    Merriweather has a Rational as Well as a Factual Understanding of the Proceedings Against Him

*Dusky* requires that a defendant have both a *rational* as well as a *factual* understanding of the proceedings against him. 362 U.S. at 402. Subsequent cases have clarified that the standard does not require that a defendant actually have a present rational and factual understanding of the proceedings against him, but only that he is capable of having a rational and factual understanding of the proceedings against him. *Cooper v. Oklahoma*, 517 U.S. 348, 368 (1996) ("The deep roots and fundamental character of the defendant's right not to stand trial when it is more likely than not that he lacks the capacity to understand the nature of the proceedings against him or to communicate effectively with counsel mandate constitutional protection."); *Godinez v. Moran*, 509 U.S. 389, 401 (1993) ("Requiring that a criminal defendant be competent has a modest aim: It seeks to ensure that he has the capacity to understand the proceedings and to

---

[68] Although *Jones* is an unpublished decision, the quoted language is a legal statement that is true and appropriate for this issue.

assist counsel."); *Drope v. Missouri*, 420 U.S. 162, 171 (1975) ("A person whose mental condition is such that he lacks the capacity to understand the nature and object of the proceedings against him, to consult with counsel, and to assist in preparing his defense may not be subjected to a trial."). The Government has shown by a preponderance of the evidence that Merriweather is capable of having both a rational and a factual understanding of the proceedings against him.

> ### a.   Merriweather has a Factual Understanding of the Proceedings Against Him

The evidence leaves little doubt that Merriweather has a factual understanding of the proceedings against him. In his interviews with Dr. Pietz, Merriweather provided clear, detailed, and coherent recollections of the robbery. (Doc. 24 at 16). Merriweather correctly identified the roles of the judge, the prosecutor, and the Defense counsel. (*Id.*). He knew that a jury of 12-14 jurors would be selected from his community. (*Id.*). He was aware of the insanity defense, understood the meaning of a guilty plea, and told Dr. Pietz that "a defendant should discuss the options [sic] of a plea bargain with his attorney." (*Id.*). During his conversation with his lawyers in the presence of Mr. Earley, Merriweather told his lawyers that "the judge was the one that was going to make the ultimate decisions in the case, and the judge didn't need to hear from [D]efense lawyers or a [D]efense doctor, especially since he already had doctors that he could rely upon." (Doc. 146, Comp. Hrg. Vol. V at 833). While Merriweather's understanding of the facts may reflect a cynical outlook, it is nonetheless connected to reality.

> ### b.   Merriweather Has a Rational Understanding of the Proceedings Against Him

As established earlier, to determine whether Merriweather has a rational understanding of the proceedings against him, the court considers whether Merriweather has some ability to (1) confer intelligently and testify coherently, (2) follow and evaluate the evidence presented, (3)

understand the significance of the proceeding, and (4) understand the charges against him, the defenses available to him, and the basic elements of a criminal trial.

### (1)     Merriweather Has the Ability to Confer Intelligently and Testify Coherently

The evidence has demonstrated that Merriweather has had the ability to communicate intelligently and coherently with psychological examiners and correctional officers over the years, and has that ability at present. The transcript from Merriweather's initial interview at the Jefferson County Jail shows that Merriweather had no difficulty communicating intelligently and coherently with investigators on the day after the robbery. (Def. Ex. 16). During his evaluations at MCFP Springfield, Dr. Pietz found Merriweather's speech was rational and coherent, and that he would pause to think about what he wanted to say. (Doc. 142, Comp. Hrg. Vol. I at 27, 54). Officer Singleton, a corrections officer at FMC Butner, noted that he was able to have normal communications with Merriweather without difficulty. (Doc. 150, Comp. Hrg. Vol. VIII at 1268). Dr. Berger testified that Merriweather should be able to consult with his attorneys since he could certainly communicate reasonably with himself, nurses, and correctional officers. (Doc. 145, Comp. Hrg. Vol. IV at 621). Dr. Gualtieri testified that Merriweather maintained appropriate behavior and communicated with an attentive and pleasant demeanor when engaged in small talk, though noted that Merriweather could become evasive when he wanted to. (Doc. 144, Comp. Hrg. Vol. III at 401-02). Officer Laatsch, a corrections officer at the Shelby County Sheriff's Office, indicated that he had no problems understanding Merriweather. (Doc. 148, Comp. Hrg. Vol. VII at 1229). Merriweather's ability to communicate intelligently and coherently was also clearly evident when he engaged in successful negotiations with Director Shirley to avoid being force-fed. (*Id.* at 1233-34). While Merriweather refused to meet with Drs.

120

Merikangas or Dudley, he conferred with Mr. Earley and his attorneys the next day with sufficient intelligence and coherence that Mr. Earley testified that he recognized that Merriweather's speech at least seemed organized to himself.[69] (Doc. 146, Comp. Hrg. Vol. V at 838). The evidence clearly establishes that Merriweather is able to confer intelligently and coherently.

### (2)   Merriweather Has the Ability to Follow and Evaluate the Evidence Presented

The record also shows that Merriweather does have the ability to follow and evaluate the evidence in his trial because his behavior, especially when he attempts to be evasive, reveals a rational, manipulative mind. During his interview with Jefferson County Investigators, Merriweather frequently paused to consider his answers and repeatedly tried to stall the interview. (Def. Ex. 16 at 12, 18, 25). During his interviews with Dr. Pietz, Merriweather would take time to think through his responses (Doc. 142, Comp. Hrg. Vol. I at 46, 57) and recognized when to change them when they were not eliciting the response that he wanted, such as when he changed his recollection of the robbery. (*Id.* at 35). Merriweather also demonstrated that he is able to predict the path of a conversation and react accordingly, which Dr. Gualtieri noticed when Merriweather would become more evasive when the conversation turned to topics relevant to the instant proceedings against him. (Doc. 144, Comp. Hrg. Vol. III at 404-06).

Further evidence of Merriweather's ability to follow and evaluate facts around him can be found in the activities Merriweather performed in his spare time. While at FMC Butner, Merriweather would read novels. (Doc. 150, Comp. Hrg. Vol. VIII at 1269). Drawing from his electrical engineering background, Merriweather fixed a radio so that he could listen to

---

[69] The *Dusky* standard, as commentators have noted, does not require that a defendant have a high level of ability or performance. *See* 81 HARV. L. REV. at 458.

broadcasts. (Doc. 146, Comp. Hrg. Vol. V at 614). These are not activities associated with people divorced from reality.

Even more revealing was Merriweather's conversation with his attorneys in the presence of Mr. Earley. According to Mr. Earley, Merriweather told his lawyers that he believed that "the judge was the one that was going to make the ultimate decisions in the case, and the judge didn't need to hear from [D]efense lawyers or a [D]efense doctor, especially since he already had doctors that he could rely upon." (Doc. 146, Comp. Hrg. Vol. V at 833). Merriweather's comment, though untrue (intentionally or not), demonstrates that Merriweather is able to connect facts (he knows about the expert witnesses testifying in the case and can distinguish between doctors and lawyers retained by the Defense from the medical examiners assigned to conduct the competency evaluation) and draw an inference from the evidence. Taken together, these events reveal that Merriweather is capable of following and evaluating evidence.

### (3) Merriweather is Aware of the Significance of this Proceeding

Merriweather has acknowledged to Dr. Pietz that he is aware that the death penalty may be imposed in his case. (Doc. 24 at 16). His awareness of the nature and the implications of these proceedings is similarly evident in the way that he responded to Judge Ott's order authorizing the Shelby County Jail to forcibly feed and bathe him. His immediate transformation -- taking showers and eating regularly without incident after being confronted with Judge Ott's orders -- evidences his ability to appreciate his situation.

### (4) Merriweather Has the Ability to Understand the Charges Against Him, the Defenses Available to Him, and the Basic Elements of a Criminal Trial

During Dr. Pietz's interview of Merriweather, it became apparent that Merriweather has an unusually comprehensive understanding of the criminal legal process. Merriweather

understood the charges against him and provided a written description of the robbery from memory. (Doc. 24 at 16). He understood possible pleas and described the insanity defense. (*Id.*). He correctly identified court personnel and proceedings. (*Id.*). Dr. Pietz noted that Merriweather had not only done "exceptionally well" on the ECST-R, he had performed better than one of her students. (Doc. 142, Comp. Hrg. Vol. I at 59-60). Given his outstanding performance, Merriweather clearly demonstrated his ability to understand the charges against him, the defenses available to him, and the basic elements of the criminal trial.

## V.   Conclusion

After thoroughly reviewing all available evidence, the court remains of the opinion that Merriweather is competent to stand trial under the standards set forth in 18 U.S.C. § 4241. The record makes it clear that Merriweather has a comprehensive understanding of the criminal trial proceedings: he understands the charges against him; he has the ability to discuss his various options with his lawyers; he can consider options available to him; and he suffers no memory impairment that would make him unable to assist in his defense. The Government has thus met its burden to show that Merriweather does not currently suffer from a mental disease or defect that renders him incompetent under *Dusky*. For these reasons, the court finds by a preponderance of the evidence that Defendant Merriweather is competent to stand trial. Accordingly, a trial date will be set by future order. Therefore, Defendant's motion requesting that the court find Defendant incompetent to stand trial (Doc. 330) is due to be denied.

A separate order consistent with this memorandum opinion will be entered.

**DONE** and **ORDERED** this November 5, 2014.

_____
**R. DAVID PROCTOR**
UNITED STATES DISTRICT JUDGE